[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 06-14633

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
FEBRUARY 5, 2009
THOMAS K. KAHN
CLERK

D. C. Docket No. 06-21577-CV-ASG

AMERICAN CIVIL LIBERTIES
UNION OF FLORIDA, INCORPORATED,
MIAMI-DADE COUNTY STUDENT
GOVERNMENT ASSOCIATION,

                                        Plaintiffs-Appellees,

versus

MIAMI-DADE COUNTY SCHOOL BOARD,
RUDOLPH F. CREW,

                                        Defendants-Appellants.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(February 5, 2009)

Before CARNES and WILSON, Circuit Judges, and WALTER,[*] District Judge.

CARNES, Circuit Judge:

Kafka advised a friend that "we ought to read only books that bite and sting us. If the book we are reading doesn't shake us awake like a blow on the skull, why bother reading it in the first place?"[1] The kind of biting, stinging, and shaking Kafka advocated, however, is not the kind we feel when we read a purportedly nonfiction book filled with factual errors, distortions, and misrepresentations. Juan Amador was outraged when he read the inaccurate portrayal of life in Cuba that was contained in a book on the shelves of the library where his young daughter [R:19:397] went to school. He asked that the book be removed from the shelves, explaining that "[a]s a former political prisoner from Cuba, I find the material to be untruthful. It portrays a life in Cuba that does not exist." ACLU of Fla, Inc. v. Miami-Dade County Sch. Bd., 439 F. Supp. 2d 1242, 1247 (S.D. Fla. 2006). After a lengthy review process, the School Board removed the book.

Illustrating something akin to Newton's Third Law of Motion, the action the School Board took at Amador's request caused an equal and opposite reaction from another parent and two organizations. They promptly sued the Board. Agreeing

---

[*] Honorable Donald E. Walter, United States District Judge for the Western District of Louisiana, sitting by designation.

[1] Letter from Franz Kafka to his friend Oskar Pollak (Jan. 27, 1904), in Alberto Manguel, A History of Reading 91 (Penguin Books 1997).

with their claims that the School Board's action violated the First Amendment and the Due Process Clause, a federal district court enjoined the Board from removing the book. Id. at 1294. This is the Board's appeal.

## I.

The Miami-Dade County Public School District has forty-nine copies of the book, A Visit to Cuba, and its Spanish-language counterpart, ¡Vamos a Cuba!, spread out among thirty-three of its elementary and middle schools. Id. at 1249. (For convenience we will refer to all forty-nine copies by the Spanish language title Vamos a Cuba.) The Vamos a Cuba book is part of a series of books which "targets readers between the ages of 4 to 8 years old, and [is] written to provide basic information about what life is like for a child" in various countries.[2] Id. at 1248. The "A Visit to" series also includes books about Puerto Rico, Costa Rica, Colombia, Brazil, Cambodia, England, Egypt, the United Kingdom,[3] Canada, Vietnam, Wales, Australia, China, Japan, Scotland, Mexico, Italy, Israel, Ireland,

---

[2]  The elementary school libraries that contain Vamos a Cuba provide books for children from kindergarten through fifth grade. [R:27:10:¶ 11] The publisher of Vamos a Cuba describes the target audience as "K–2." [R:19:293]  One expert witness also testified that the book is aimed at children in kindergarten through second grade. [R:27:92:¶ 6; T:19:18] Another expert testified that the book was written for children from the age of five to seven.  [R:27:128:¶10] Yet another stated that the relevant age group was children from four to eight. [R:62:113]  Mark Balzli, a plaintiff in the case who testified that he wanted to read the book with his son, stated that his son was six years old. [R:19:247:¶ 2]

[3] The United Kingdom, of course, consists of England, Northern Ireland, Scotland, and Wales.  In addition to a book on each of those four countries the series includes one on the United Kingdom as a whole.

India, Greece, Germany, and France. The school district has at least one copy of those other "A Visit to" books in some of its elementary and middle school libraries. Id. at 1248–49. [R:28] The "A Visit to" series is located in the libraries' nonfiction (history, geography, cultures) section. [R:19:59]

The books in the "A Visit to" series all follow the same "formulaic format." Id. at 1254. They offer the young reader "superficial introductions to geography, people, customs, language, and daily life." Id. at 1249 n.8 (quoting a peer review of the series). "The large-print texts are accompanied by color photos of varying quality and relevance." Id. For example, the thirty-two pages of Vamos a Cuba contain general statements about Cuba's geography ("Cuba is a country in the Caribbean Sea, south of Florida."), people ("Most Cubans live in cities."), customs ("Cubans dress to keep cool in the hot weather."), language ("Most people in Cuba speak Spanish."), and daily life ("People in Cuba eat, work, and go to school like you do."). Id. at 1247 n.4, 1249 n.8. [R:28 Ex:A Visit to Cuba]

The library at Marjory Stoneman Douglas Elementary School is one of the thirty-three district libraries with Vamos a Cuba in its collection. Id. at 1248. On April 4, 2006, Juan Amador, the father of a young girl at Douglas Elementary, filed a "Citizen's Request for Reconsideration of Media" to have Vamos a Cuba removed from the library at his daughter's school. Id. at 1247. [R:19:Ex.32] On

4

the request form Amador identified himself as a former political prisoner and complained that the material in the book was not truthful and "portrays a life in Cuba that does not exist." Id. Amador also wrote that, "I believe [Vamos a Cuba] aims to create an illusion and distort reality." [R:19:Ex.32] He recommended that the book be replaced by one "that truly reflects the plight of the Cuban people of the past and present." [Id.]

The school district has a four-tiered administrative procedure for reviewing citizen requests to remove books from the district's libraries. [R:8:Ex.G:86–90] The initial complaint about a book goes to the school's principal, even though he does not have the authority on his own to remove a book. [Id. at 86] Apparently, the only authority the principal has is to explain why the school has the book in its library collection. If the complainant is not satisfied with the explanation, he can file a formal request that the book be removed. [Id. at 86–87]

The formal request is heard by a School Materials Review Committee, an ad hoc group composed of teachers, administrators, counselors, library specialists, students, and parents from the school where the complaint was made. [Id. at 87] This School Committee reviews the book. It considers the Board's fifteen criteria for selecting library materials: educational significance, appropriateness, accuracy, literary merit, scope, authority, special features, translation integrity, arrangement,

5

treatment, technical quality, aesthetic quality, potential demand, durability, and lack of obscene material. The School Committee may also solicit any "professional written reviews" of the book and any comments by library experts and "appropriate audiences." [Id. at 83, 87–88] After the review the School Committee recommends to the principal whether to retain, remove, or limit the use of the book as part of the library's collection. [Id. at 83, 87–88]

If the complaining citizen is dissatisfied with the School Committee's recommendation, he may appeal it to the superintendent, who has the option of issuing a decision based on that committee's recommendation or submitting the appeal to the District Materials Review Committee. The District Committee is an ad hoc group made up of district administrators, principals from other schools, library specialists from other schools, a student, a union official, a member of the parent-teacher association, and a "lay person." [Id. at 88–89] If the superintendent submits the appeal to the District Committee, it will review the same materials as the School Committee and will make its own independent recommendation to the superintendent of schools. [Id. at 89] The superintendent then considers the District Committee's recommendation and decides whether to remove the book. [Id. at 89–90] The superintendent's decision can be appealed to

the School Board, which has the final say insofar as the school system is concerned. [Id. at 90]

In this case Amador followed the administrative review process from start to finish. Because he was not satisfied with the principal's explanation about Vamos a Cuba, he submitted a formal request to the School Committee to remove the book from the Douglas Elementary library. [R:19:Ex.10:55–57] The School Committee considered the book in light of the district's fifteen written criteria for evaluating books for its school library collections. [Id. at 54–55; see id. at 64–71] Some of the eight committee members believed that Vamos a Cuba was "factually accurate," "apolitical," and "appropriate for the age group," while one member felt that the "author could have better written and researched the topic," and another was convinced that the book did not meet the district's criteria for accuracy. [Id. at 64–71] All eight members checked the "meets criteria" box for the categories of "educational significance" and "appropriateness." [Id.; see also ACLU Br. 10] The School Committee's vote was seven to one in favor of retaining Vamos a Cuba in the Douglas Elementary library. [Id. at 56]

Amador appealed the School Committee's decision to retain the book in the Douglas Elementary library to the superintendent, who submitted the appeal to the District Committee. [R:19:Ex.8:49] The seventeen-member District Committee

7

decided to evaluate Vamos a Cuba based on what it determined to be the three most important of the fifteen criteria: educational significance, appropriateness, and accuracy. [R:19:Ex.7:44] As to those three factors, one committee member said that the title of the book was inaccurate because "Cuba is not a country [one is] free to visit," and that the cave drawings pictured on page 29 of the book "were not painted 1,000 years ago as the text states." [Id. at 46–47] Another District Committee member said that other books in the "A Visit to" series, and specifically the one on Vietnam, another communist country, "contain[] more specific information and ha[ve] more accuracy whereas, A Visit to Cuba detracts [sic] factual information and contains inaccuracies when comparing formulaic sentences." [Id. at 46] Still another member commented that the "A Visit to" series consists of "formula books" that "contain the same type of information presented in the same formulaic matter." [Id.] The District Committee, by a vote of 15 to 1, recommended that the superintendent retain Vamos a Cuba in the Douglas Elementary library. [R:19:Ex.5:8] (One member resigned before the vote, stating that "he had concerns regarding the ability of the committee to render an objective decision.") [R:19:Ex.36:3]

The superintendent adopted the District Committee's recommendation and informed Amador of his decision to leave Vamos a Cuba on the library shelves.

[R:19:Ex.4:6; R:19:Ex.3:4–5]  Amador appealed the superintendent's decision to the School Board the same day and asked that the Board take up his appeal at its next meeting.  [R:19:Ex.2:3]  It did so. [R:8:Ex.I] In its April 18, 2006 meeting, the Board heard comments from guest speakers in the community and considered the issue of removing <u>Vamos a Cuba</u> from the libraries. [R:19:297–390] In its June 14, 2006 meeting, Board members spoke about their views on the subject, and a majority of the Board voted for removal of <u>Vamos a Cuba</u>. [R:19:449]

At that June 14 meeting, after Amador spoke, Board chairman Augustin Barrera began the discussion for the Board.  He stated that the "issues before us, to me are quite clear, it's issues of inaccuracies, it's issues of omissions, because sometimes the words that are not said are more powerful than those words which are said, and sometimes there's generalities, which [is] how this book is portrayed."  [R:19:Ex.34:9]  Chairman Barrera continued:

> We talk about censorship, the parent, Mr. Amador, talked about censorship.  Censorship is when you want to stop somebody from giving another opinion, something that goes against what you believe in.
>
> In this particular case, when I read the book, it doesn't really give an opinion, what it does is it gives a lack of information, and it's in that lack of information that I think we as the Cuban community are offended. . . .
>
> I cannot support the recommendations that are made here today by the superintendent.  What I can support is the replacement of this book

9

with a book that really talks about the richness and the culture that the Cuban people have lived and, if it was up to me, I would replace the whole series, because those books do not do justice to those 24 countries, and I think we owe it to the students in Miami-Dade County public schools to give them the best education possible.

[Id. at 13, 15]

Board member Ana Rivas Logan spoke next. [Id. at 15] She said that "from the very first day" she reviewed Vamos a Cuba she had "found the book extremely offensive, inaccurate, full of omissions." [Id. at 17] Board member Logan continued: "I reviewed the other books [in the series]. The other books don't paint the same portrait; in other words, they also have omissions." [Id.] Noting that the school district replaces outdated library books "every few years" as a matter of course, Logan said:

At the appropriate time, Mr. Chair, I'd like to make the motion to replace the series with a new and updated series, which is nothing different than what we're going to be doing across this county, and across this state, and probably across this nation in every single school.

[Id. at 18]

After Logan spoke, Board member Frank Bolanos noted that the School Board rules "put[] in place and set[] forth very clear educational standards that must be met by books that are placed in our public school library." [Id. at 19]

Vamos a Cuba, he said, "does not meet those standards, that is crystal clear." [Id.]

He continued:

> We're talking here about a simple right, I believe it's also a right protected by The U.S. Constitution, and that is the right and the responsibility that we teach our children the truth; that is a sacred right and responsibility.
>
> And if we recognize as, even members of the committee that looked at this book, as the superintendent has recognized when he made an offer to place a label of distinction and separation of the book, if we recognize that this book due to its acts of commission, and omission does not teach our children the truth about Cuba, then it should be removed from our public school libraries, we have that sacred responsibility.

[Id. at 19–20]

Board vice-chair Perla Tabares Hantman explained that she did not view the issue to remove the Vamos a Cuba book as "one of censorship or about banning a book." [Id. at 21, 24] "I view this," she continued, "as one of accuracy and truth."

She explained:

> I don't think anyone here would support the presence of a math book in our libraries that taught that two plus two equals five.
>
> I don't think anyone here would support the presence of a geography book in our libraries that says that Miami is boarded [sic] by the Pacific Ocean.
>
> Similarly, I cannot support the presence of a book in our school that creates a misleading and inaccurate portrait of Cuba. . . .
>                    . . . .

11

. . . I read the book, and in many pages, I would say at least 14 omissions or statements that are not true, so that's why I said that this is not about censorship or banning. This is about a book that is not accurate, and there's nothing that—I cannot support this book in our libraries.

[Id. at 24–25]

Board member Marta Perez thanked "all of the people on both sides of this issue that have come together to express their opinions," but regretted "that this issue so divides our community." [Id. at 25–26] She seconded Bolanos' motion to remove the book. [Id.]

Board member Evelyn Langlieb Greer explained that the "beauty" of the administrative procedure for requesting that a book be removed from the library was that "it takes the emotion and the politics out" of the decision-making process "and substitutes professional judgment." [Id. at 29, 33–34] She explained:

Once a book is in a system, and has enjoyed the consent of the administrative, of being in the system, it can only be legitimately removed in this country based on serious, material, irrevocable and clear inaccuracies and biases.

The 22 professional educators who reviewed this book have affirmatively determined that that is not the case, therefore, we are here today in essentially a political process. . . .

We are rejecting the professional recommendation of our staff based on political imperatives that have been pressed upon members of this board, which I completely understand, and with which I sympathize, but one of the things we did when we took an oath of office today is to

12

uphold The Constitution of The United States as it has been set down
and interpreted by The United States Supreme Court.

[Id. at 34–35]

Board member Martin Karp explained that "the author's intent in Vamos a

Cuba was not to say anything about the politics of the country, and the harsh

realities that exist there, but sometimes, as our Chair said, when you do not say

anything or avoid addressing real problems, you say a lot." [Id. at 36–37] He said

that the way to handle the problem "is to give our children a more accurate, age

appropriate picture." [Id. at 37]

Finally Board member Robert Ingram spoke. [Id. at 38] He suggested that

if some of his colleagues on the School Board did not vote to remove Vamos a

Cuba from the libraries, "they can't walk out of here. If they don't vote for it, they

can't go home, they might find a bomb under their automobiles, and I feel that's a

shame to be put upon a school system that we are trying to train our children to

have equality and justice." [Id. at 40] Board member Ingram continued:

To say that if I say, no, that I'm pro-communist; to say if I say, yes,
I'm anti [i]s to create a context that doesn't fit me. I move for what I
believe to be right and what I believe to be accurate. . . .

. . . .

Will there be some condemnations? I honestly believe there will be.
Will my children and my grandchildren be at risk? They just might

13

be, because of the e-mails, and many of the things that have come in my direction have not been pleasant.

And I cannot believe that this community, that this Miami-Dade County community, who wants to grow, and be as diverse and, clearly, all it's claimed to be diverse in representing everybody to create a context that promotes threats, that promotes violence. . . .

. . . .

I can't vote my conscience without feeling threatened. That should never happen in this community anymore. That should never happen anymore, and especially at this place that we call Miami-Dade County Public Schools, especially at this dias [sic], where we're supposedly setting a tone for our children.

[Id. at 42–44]

After all Board members who wished to speak (eight of the nine) had done so, Board member Logan made a motion. Her motion was to reject the superintendent's decision to retain the Vamos a Cuba book in the Douglas Elementary library and to replace the entire "A Visit to" series in the district's libraries "with updated books that are more actual to real life in these countries." [Id. at 57–58] Logan stated that the "findings" for her motion were "that the book is inaccurate, it has omissions." [Id. at 59] Board member Bolonas seconded the motion. [Id.] The motion was approved by a vote of 6 to 3. [Id.] The Board's decision, as contained in its written order, provided:

Upon a review of the complete Record of the proceedings below, including the transcript of the proceedings on Board Agenda Item G-3

14

(incorporated herein by reference and attached hereto, and made a part of this Final Order), the Superintendent's recommendation sustaining the District Materials Review Committee's decision is hereby rejected. The foregoing is based upon the findings reflected by the record of these proceedings, and more specifically the finding that the book is inaccurate and contains several omissions. It is further ordered that, this book and the series it is a part of, be replaced, throughout the school district, with a more accurate set of books that is more representative of actual life in these countries.

[R:19:Ex.15] That order was issued on June 14, 2006.

About a week later the American Civil Liberties Union of Florida, Inc. and the Miami-Dade County Student Government Association filed a complaint, pursuant to 42 U.S.C. § 1983, in the Southern District of Florida against the School Board and the superintendent seeking declaratory and injunctive relief. [R:1:1–2] The ACLU and the student government association alleged that the defendants had violated their members' First Amendment rights to freedom of speech and access to information as well as their Fourteenth Amendment rights to due process. [Id. at 14–16] The plaintiffs also requested that the district court enjoin the School Board from enforcing its removal order. [R:7]

The plaintiffs argued to the district court that both the ACLU and the student government association had standing. The ACLU's standing was premised on the fact that many of its members, who object to removal of the books, have school children in the district. [R:23:4–5] Howard Simon, the ACLU's executive

15

director, swore in his declaration that its Greater Miami Chapter had "approximately 3,500 members within the Miami-Dade County School District including many parents of children who attend Miami-Dade county elementary and middle schools, and who want their children to have access to the books the School Board ordered removed from the libraries." [R:19:Ex.26:4–5] Mark Balzli, a member of that chapter of the ACLU, swore in his declaration that: (1) his son was a student at North Beach Elementary School; (2) he wanted his son to have access to Vamos a Cuba and the other books in the "A Visit to" series; (3) he saw Vamos a Cuba in the North Beach Elementary library; and (4) he had planned to check the book out of the library with his son "in the future," but they "will be unable to do so when school resumes on August 14, 2006" because of the School Board's order removing the series. [R:19:Ex.27]

As for the standing of the student government association, Ronald Bilbao, its former president and a member of its executive board [R:8:Ex.M:1], swore in his supplemental declaration that he had "spoken to several student members of the SGA who have told me they would like to have access to the books ¡Vamos a Cuba! and A Visit to Cuba and other books in the series." [R:19:Ex.25:1–2] Specifically, the plaintiffs proffered the declaration of Mark Balzli, who swore that he "want[ed] [his] son to have access to the books ¡Vamos a Cuba! and A Visit to

16

Cuba and the other books in the series of which they are a part." [R:19:Ex.27:1; R1:23:10 n.8]

The defendants, in response, sought dismissal of the complaint for lack of standing. [R:24:1] They contended that the ACLU, through its member Mark Balzli, did not have organizational standing to bring the lawsuit because any First Amendment right of access to school library books belongs to the student, not the parent. [R:29:2–3] Since Mark Balzli's son was not a member of the ACLU, the defendants argued, there was no member of that organization whose First Amendment rights had allegedly been violated by the School Board's order to remove the books. [Id. at 3]

As to the student government association, the defendants contended that because the organization did not exist separate and apart from the School Board—it was created by the Board and is administered and run by Board employees—it could not, in effect, sue itself by suing the Board. [Id. at 3–4] Even if it could do that, the defendants argued, the student government association is made up of, and represents, only high school students. [Id. at 5–6] Because the books in the "A Visit to" series, including Vamos a Cuba, had never been shelved anywhere except in elementary and middle school libraries, none of the student government association's members had access to the books before they were

17

removed. Therefore, they could not have been injured by removal of the books. [Id. at 6–7]

Shortly after the defendants filed their motion to dismiss, the plaintiffs amended their complaint to add Mark Balzli, individually and on behalf of his son Aidan, as a plaintiff to the lawsuit. [R:39:1, 3] It was on the basis of that amended complaint that the district court decided the standing issue. ACLU, 439 F. Supp. 2d at 1260.

The district court found it unnecessary to decide whether the student government association had standing because it concluded that Balzli and the ACLU did. Id. at 1260, 1264. Crediting Balzli's affidavit, the court found that he "had planned to check out the book and read it with his son before the School Board entered its Final Order." Id. at 1261. Not only did Balzli want his son to have access to the book, the court found, but before the Board's action the book had also been available to both parents and students through the school district's "inter-library loan system of exchanging books between schools." Id. Based on these facts, the district court concluded that Balzli had standing to litigate his First Amendment and due process claims against the defendants. Id. at 1262.

As to the ACLU's standing, the district court rejected the defendants' argument that Aidan Balzli was the true party in interest, and because Aidan was

18

not a member of the ACLU the organization itself did not have standing. Id. at 1264. The court reasoned that this "novel" argument would lead to "an illogical result" because "[a]s Defendants acknowledge, under Florida law, Aidan Balzli may only bring suit through a next friend, in this case, his father. Therefore, his father has standing to pursue relief on his behalf." Id. And because Mark Balzli is a member of the ACLU, the district court reasoned, the organization has standing to litigate the suit on his behalf. Id. at 1263–64.

After concluding that Balzli and the ACLU had standing, the court found that: (1) the plaintiffs were likely to succeed on their First and Fourteenth Amendment claims, id. at 1283, 1292; (2) they would be irreparably harmed if the School Board's removal order were allowed to stand pending a trial on their complaint, id. at 1292–93; (3) this irreparable harm to the plaintiffs outweighed the harm to the defendants in keeping the "A Visit to" series books on the library shelves, id. at 1293; and (4) it was in the public interest to protect the plaintiffs' constitutional rights to have access to the books, id. at 1294. Considering these four factors, which it determined all favored the plaintiffs, the court issued a preliminary injunction enjoining the School Board from enforcing its removal order, and it also ordered that any of the books in the "A Visit to" series that had already been removed be returned to the libraries. Id.

19

The defendants filed a notice of appeal from the district court's preliminary injunction order. The books in the "A Visit to" series remain in the school district's libraries. [R:48]

## II.

The School Board challenges here, as it did before the district court, the plaintiffs' standing to bring their lawsuit. [Board Br. 30–33] The Board contends that the plaintiffs have failed to establish the requisite imminent injury in fact. [Id.] Because standing is a necessary component of our jurisdiction to hear "cases" and "controversies" under Article III of the Constitution, we must address it first. See Ouachita Watch League v. Jacobs, 463 F.3d 1163, 1169 (11th Cir. 2006). We review the matter anew, without deference to the district court's legal conclusions. CAMP Legal Def. Fund, Inc. v. City of Atlanta, 451 F.3d 1257, 1268 (11th Cir. 2006).

## A.

"The constitutionally minimum requirements for standing are three-fold." Fla. State Conference of the NAACP v. Browning, 522 F.3d 1153, 1159 (11th Cir. 2008) [hereinafter Fla. NAACP].

> First, the plaintiff must have suffered, or must face an imminent and not merely hypothetical prospect of suffering, an invasion of a legally protected interest resulting in a "concrete and particularized" injury. Second, the injury must have been caused by the defendant's

20

complained-of actions. Third, the plaintiff's injury or threat of injury must likely be redressible by a favorable court decision.

Id. (citing Lujan v. Defenders of Wildlife, 504 U.S. 555, 560–61, 112 S. Ct. 2130, 2136 (1992)). The battle over standing in this case centers on the first requirement, and specifically on whether the injury the plaintiffs suffered was imminent. [Board Br. 30–33]

In Lujan the plaintiff environmental organizations challenged the joint regulation of the Fish and Wildlife Service and the National Marine Fisheries Service, which required that federal agencies consult with the Secretary of the Interior about threats to endangered species or their habitats caused by agency action only if that action was "taken in the United States or on the high seas." Lujan, 504 U.S. at 558–59, 112 S. Ct. at 2135. The environmental organizations sought a declaratory judgment that the joint regulation was contrary to the language of the Endangered Species Act. They also sought an injunction forcing the Services to expand their joint regulation to require consultation with the Secretary of the Interior about threats to endangered species and their habitats even when the agency action is to occur outside the United States. See id. The Secretary of the Interior moved to dismiss the environmental organizations' lawsuit for lack of standing. Id. at 559, 112 S. Ct. at 2135. The district court did so, but the court of appeals reversed. Id.

21

In discussing the injury in fact requirement, the Supreme Court stated that the environmental organization plaintiffs needed to submit evidence or affidavits establishing that at least one of their members wanted to use or enjoy an endangered animal species in a way that would be directly affected by the Services' regulation.  Id. at 562–63, 112 S. Ct. at 2137–38.  The environmental organizations had submitted the affidavits of two of their members, Joyce Kelly and Amy Skilbred, to establish that the Services' regulation would cause them to suffer the requisite injury.  Id. at 563, 112 S. Ct. at 2138.

Ms. Kelly swore in her affidavit, which was filed in 1988, that she had "traveled to Egypt in 1986 and 'observed the traditional habitat of the endangered [N]ile crocodile there and intends to do so again, and hopes to observe the crocodile directly.'"  Id. (quoting Ms. Kelly's affidavit) (alterations omitted).  She also swore she intended to return and at that time would "'suffer harm in fact as the result of the American role in overseeing the rehabilitation of the Aswan High Dam on the Nile and in developing Egypt's Master Water Plan.'"  Id. (quoting Ms. Kelly's affidavit) (alterations and omission omitted).

In Ms. Skilbred's affidavit, which was filed in 1988, she swore that "she traveled to Sri Lanka in 1981 and 'observed the habitat' of 'endangered species such as the Asian elephant and the leopard' at what is now the site of the Mahaweli

22

project funded by the Agency for International Development." Id. (quoting Ms. Skilbred's affidavit) (alteration omitted). That project, she predicted, "'will seriously reduce endangered, threatened, and endemic species habitat including areas that I visited, which may severely shorten the future of these species.'" Id. (quoting Ms. Skilbred's affidavit) (alteration and omission omitted). Her desire to use and enjoy these endangered species will be harmed, Ms. Skilbred said, "because she 'intends to return to Sri Lanka in the future and hopes to be more fortunate in spotting at least the endangered elephant and leopard.'" Id. (quoting Ms. Skilbred's affidavit) (alternations omitted). When asked at her deposition "when she had any plans to return to Sri Lanka," Ms. Skilbred answered that "'I intend to go back to Sri Lanka,'" but "'I don't know when. There is a civil war going on right now. I don't know. Not next year, I will say. In the future.'" Id. at 563–64, 112 S. Ct. at 2138 (quoting Ms. Skilbred's deposition) (alteration omitted).

Those two affidavits, the Supreme Court found, "plainly contain no facts . . . showing how damage to the species will produce 'imminent' injury to Mses. Kelly and Skilbred." Id. at 564, 112 S. Ct. at 2138. The Court explained:

> [T]he affiants' profession of an "inten[t]" to return to the places they had visited before—where they will presumably, this time, be deprived of the opportunity to observe animals of the endangered species—is simply not enough. Such "some day" intentions—without

23

any description of concrete plans, or indeed even any specification of when the some day will be—do not support a finding of the "actual or imminent" injury that our cases require.

Id. (second alteration in original). And:

Although "imminence" is concededly a somewhat elastic concept, it cannot be stretched beyond its purpose, which is to ensure that the alleged injury is not too speculative for Article III purposes—that the injury is certainly impending. It has been stretched beyond the breaking point when, as here, the plaintiff alleges only an injury at some indefinite future time, and the acts necessary to make the injury happen are at least partly within the plaintiff's own control. In such circumstances we have insisted that the injury proceed with a high degree of immediacy, so as to reduce the possibility of deciding a case in which no injury would have occurred at all.

Id. at 564 n.2, 112 S. Ct. at 2138 n.2 (citation omitted).

In the decade and a half since Lujan we have applied and expounded on the Supreme Court's "some day intentions" language three times. The first time was in National Parks Conservation Ass'n v. Norton, 324 F.3d 1229 (11th Cir. 2003), where two environmental organizations had sued the National Park Service for violating the equal protection rights of their members by failing to evict the occupants of the Stiltsville properties (buildings on stilts in the middle of Biscayne Bay, Florida) following the expiration of the lease agreement between the occupants and the Service. That failure, the organizations claimed, was "tantamount to the grant of an exclusive lease to the occupants." Id. at 1234.

24

The district court dismissed for lack of standing the organizations' equal protection claim. Id. at 1241. We reversed, citing the affidavits of the groups' members who swore that they "had visited Biscayne National Park (and specifically the area that includes Stiltsville) with frequencies ranging from once per month to fifty times per year," and "indicated an intent to maintain the frequency of these visits in the future." Id. at 1242. The members also averred that: (1) their "lack of access to Stiltsville or its surrounding environs impairs [their] recreational and aesthetic enjoyment of the park," and (2) the impairment "they suffer as a result of the [Service]'s failure to discontinue the exclusive private use of the structures is continually present when they are at or near Stiltsville." Id. at 1242–43.

Those facts, we concluded, were sufficient to avoid the "some day intentions" problem of Lujan. Id. at 1243. We explained that the case before us was not one "in which the affiants have asserted only 'some day intentions' to return to the site of their harm 'without any description of concrete plans, or indeed even any specification of when the some day will be.'" Id. (quoting Lujan, 504 U.S. at 564, 112 S. Ct. at 2138). Instead, "[t]he affiants state with particularity that they have definite plans to continue visiting Stiltsville with precisely the same

25

frequency that they have to date, and that in the absence of remedial action they will continue to experience the aesthetic and recreational harms described." Id.

On the other hand, in Elend v. Bashman, 471 F.3d 1199 (11th Cir. 2006), we found the plaintiffs' future intentions insufficiently clear to establish standing. Id. at 1208. On November 2, 2002 the three plaintiffs in that case had been protesting outside the Sun Dome in Tampa, Florida during a speech by President Bush when they were ordered by the Secret Service to move to an authorized "protest zone," which was further away. Id. at 1202–03. They sued for declaratory and injunctive relief to enjoin the Secret Service from taking similar action in the future, which they claimed would violate their First Amendment rights. Id. at 1203. The protestors contended that they had standing because they "'fully intend to peacefully express their viewpoints in the future in a manner similar to their activities on November 2, 2002 in concert with presidential appearances at the USF Sun Dome and at other locations around the country.'" Id. at 1204.

The district court dismissed the claims on the ground that the plaintiffs' assertion that they would protest in a similar manner in the future was too speculative. Id. We affirmed, noting that "the injury alleged in this case remains wholly inchoate." Id. at 1209. We explained:

> Plaintiffs' intention in this case to protest "in concert with
> presidential appearances at the USF Sun Dome and at other locations

around the country" fails to provide any limitation on the universe of possibilities of when or where or how such a protest might occur. . . .

. . . [I]t is entirely conjectural that President Bush would return to speak at a political rally at the Sun Dome. In fact, we have no indication that he has done so again since November 2002 despite numerous presidential visits to Florida. Nor is it even remotely permissible to presume future injury from Plaintiffs' intention to protest "at other locations around the country." To find that this somehow constitutes "real and immediate" injury sufficient to confer standing would eviscerate the meaning of both words.

Indeed, the Plaintiffs' avowed intention to protest in a similar manner in the future is akin to the plaintiff in Lujan who declared, "I intend to go back to Sri Lanka [to observe endangered species]," but confessed that she had no current plans: "I don't know [when]." Lujan, 504 U.S. at 564, 112 S. Ct. 2130. "Such 'some day' intentions—without any description of concrete plans, or indeed even any specification of when the some day will be—do not support a finding of the 'actual or imminent' injury that our cases require." Id. In the four years since Plaintiffs' alleged First Amendment violation, they have not asserted that they protested President Bush at the Sun Dome or any other venue, for that matter. The entirely speculative nature of the "future protests" would render wholly advisory any prospective relief.

Id. (third paragraph alterations in original).

Finally, in the recent Fla. NAACP case, the state of Florida required that all voter registration applications include the applicant's name, address, date of birth, and driver's license number or the last four digits of her social security number. Fla. NAACP, 522 F.3d at 1156. If the applicant inadvertently gave information on the application that did not match the information in the state's driver's license or

social security database, the state would not register her until the error was fixed. Id. at 1156–57. The problem was that the applicant often was not notified of the error in time to fix it before the voter rolls were closed in advance of an upcoming election. Id.

The plaintiff voting rights organizations sued the state in September 2007 alleging that the matching requirement, and its interference with the registration of some applicants, violated a number of their members' constitutional and statutory rights to vote. Id. at 1158. The state moved to dismiss asserting that the organizations lacked standing in part because they had not alleged an imminent injury. Id. The district court disagreed, id., and so did we, id. at 1164. We noted that "[a]n imminent injury is one that is 'likely to occur immediately.'" Id. at 1161 (citation omitted). The injury the plaintiffs had alleged was "the denial of voter registration and hence the right to have one's vote counted," which would occur "before the scheduled elections in November 2008." Id. The organizations also alleged that "they intend to increase voter registration efforts and anticipate increased registration applications ahead of the upcoming presidential election." Id. Without a change in Florida's voter registration law, they argued, the new registrants would be unconstitutionally denied the right to vote in the November

28

2008 election. Id. That was enough, we concluded, to satisfy the immediacy requirement. Id.

The key in all three of our decisions applying Lujan is that "[i]mmediacy requires only that the anticipated injury occur with[in] some fixed period of time in the future." Id. Immediacy, in this context, means reasonably fixed and specific in time and not too far off. In National Parks, the injury alleged by the environmental groups—destruction of the Stiltsville area in Biscayne Bay—was imminent because, according to their members, they visited Stiltsville from once a month to once a week and planned to continue these trips. National Parks, 324 F.3d at 1242–43. In Fla. NAACP the voting rights organizations alleged that their members would be injured—denied the right to register to vote and have their votes counted—in the November 2008 presidential election. Fla. NAACP, 522 F.3d at 1161. In both cases, the imminence requirement was met because the respective plaintiffs alleged that they would be injured within a "fixed period of time in the future."

In Elend, on the other hand, "the plaintiffs failed to allege when, where, and how [their] protests were going to occur in the future." Fla. NAACP, 522 F.3d at 1161. Instead, all that the Elend plaintiffs alleged was that they intended to protest again at some indefinite time and place in the future. Elend, 471 F.3d at 1206. As

29

we said, "the Plaintiffs' avowed intention to protest in a similar manner in the future is akin to the plaintiff in <u>Lujan</u> who declared, 'I intend to go back to Sri Lanka [to observe endangered species],' but confessed that she had no current plans: 'I don't know [when].'" <u>Id.</u> at 1209 (quoting <u>Lujan</u>, 504 U.S. at 564, 112 S. Ct. at 2138) (alterations in original). We explained that "[s]uch 'some day' intention—without any description of concrete plans, or indeed even any specification of when the some day will be—do not support a finding of the 'actual or imminent' injury our cases require." <u>Id.</u> (quoting <u>Lujan</u>, 504 U.S. at 564, 112 S. Ct. at 2138).

**B.**

The plaintiffs in this case have alleged that they will be injured by the removal of <u>Vamos a Cuba</u> and the other "A Visit to" books from the school district's libraries. [R:39:13–15] Individual plaintiff Balzli, a member of the ACLU, swore in his declaration that he:

> want[ed] [his] son to have access to the books ¡Vamos a Cuba! and <u>A Visit to Cuba</u> and the other books in the series of which they are a part. In fact, before the School Board's Order in this case ¡Vamos a Cuba! was part of the library collection at North Beach Elementary School and I had seen it with my son and we had planned to check it out and read it together in the future. Unless the Court grants Plaintiffs' request for preliminary injunctive relief we will not be able to do so when the school resumes on August 14, 2006.

30

[R:19:Ex.27:1–2] The School Board contends that Balzli's declaration is insufficient to establish an injury in fact regarding Vamos a Cuba because the asserted injury is not imminent. Balzli's professed future plans are, the Board argues, no more than the kind of someday intention that Lujan holds is insufficient. [Board Br. 32] We disagree.

We stated in Fla. NAACP that "[i]mmediacy requires only that the anticipated injury occur with[in] some fixed period of time in the future, not that it happen in the colloquial sense of soon or precisely within a certain number of days, weeks, or months." Fla. NAACP, 522 F.3d at 1161. Balzli's declaration, which is dated July 5, 2006, states that he anticipated checking out Vamos a Cuba "when school resumes on August 14, 2006"—a specific intention pegged to a sufficiently fixed period of time. [R:19:Ex.27] In its immediacy the injury claimed is like that asserted by the voting rights plaintiffs in Fla. NAACP. The injury there, unless redressed, would have occurred when voters were prevented from registering and voting in an election that was to be held on a specific date fourteen months after the complaint in that case was filed. Id. The injury here, unless redressed, would have occurred when Balzli and his son were prevented from checking out Vamos a Cuba after school resumed in six weeks. Lujan and our decisions interpreting it require no more immediacy than that.

31

The School Board contends that, even if the injury alleged is sufficiently imminent, Balzli still lacks standing to challenge the School Board's order because the right to check out Vamos a Cuba from the district's libraries belongs not to him but to his son. [Board Br. 30–31] We agree with the district court's analysis rejecting this contention. ACLU, 439 F. Supp. 2d at 1261–62. Florida law, which applies to capacity determinations in this case, see Fed. R. Civ. P. 17(b)(1), requires that "a child sue by his next friend" because the child does not have capacity to sue on his own, Kingsley v. Kingsley, 623 So. 2d 780, 784 (Fla. 5th DCA 1993). The only way for Aidan Balzli to seek redress for his injuries is for his father to sue on his behalf, which is what his father did.

In addition to misfiring on the law, this real party in interest argument of the Board also misses on the facts. The School Board's rules provide parents with the "right to visit the library" and to "review books that are kept there, accompany [their children] through the check-out process, and transfer books between libraries." ACLU, 439 F. Supp. 2d at 1262. Balzli, in other words, had the right as a parent to access Vamos a Cuba with and for his son. The Board's decision to remove the book from the school district's libraries injured Balzli by taking away that right.

32

The School Board also contends that it presented "unrebutted" evidence that Vamos a Cuba was not in the library collection at the school Aidan attended, and therefore Balzli could not have checked out the book for his son. [Board Br. 31–32] But the evidence was not "unrebutted." Balzli himself disputed the School Board's account when he swore in his declaration and testified at the July 21, 2006 preliminary injunction hearing that he saw Vamos a Cuba in the library at the North Beach Elementary School, which his son attended. [R:19:Ex.27:1; R3:62:12] The district court recognized that "[t]here was an issue of fact at the preliminary injunction hearing as to whether Mr. Balzli and his son had seen Vamos a Cuba at the North Beach Elementary School library." Id. at 1247 n.2. And the court resolved it in Balzli's favor. Id. We review the factfindings underlying a standing determination only for clear error. See Wooden v. Board of Regents, 247 F.3d 1262, 1271 n.9 (11th Cir. 2001). We cannot say that the district court's resolution of the conflicting factual assertions was clear error.

For these reasons, we conclude that Balzli has sufficiently asserted that he and his son will suffer an imminent injury from the removal of Vamos a Cuba from the school district libraries. None of the other requirements of standing are disputed. It follows that the district court was correct in concluding that Balzli has standing to pursue his First Amendment and due process claims against the School

33

Board for removing Vamos a Cuba from the district's libraries. Because Balzli has standing to raise those claims, we need not decide whether either of the organizational plaintiffs also has standing to do so. See Watt v. Energy Action Educ. Found., 454 U.S. 151, 160, 102 S. Ct. 205, 212 (1981) ("Because we find California has standing, we do not consider the standing of the other plaintiffs."); Glassroth v. Moore, 335 F.3d 1282, 1293 (11th Cir. 2003) ("Having concluded that those two plaintiffs have standing, we are not required to decide whether the other plaintiff, the one who has not altered his behavior as a result of the monument, has standing."). We will, however, refer to the "plaintiffs" in the plural to remind ourselves that we have not ruled out the standing of the other groups and individuals who want to challenge the removal of the Vamos a Cuba book.

## C.

The standing of any of the plaintiffs to challenge the Board's removal of the other books in the "A Visit to" series is more problematic. The plaintiffs point to three declarations. One is Balzli's, which we have already discussed in connection with the Vamos a Cuba book. About the other books in the series, Balzli's declaration merely stated that he "want[ed] [his] son to have access to . . . the other books in the series." He did not state, as he did about the Vamos a Cuba book, that

34

he and his son planned to check out any of the other books when school resumed. [R:19:Ex.27]

The other two declarations are similar. In his declaration Ronald Bilbao states that: "I have spoken to several student members of the SGA who have told me they would like to have access to the books ¡Vamos a Cuba! and A Visit to Cuba and other books in the series." [R:19:Ex.25:1–2] Likewise, Howard Simon, the executive director of the ACLU stated in his declaration that the "Greater Miami Chapter of the ACLU has approximately 3,500 members within the Miami-Dade County School District including many parents of children who attend Miami-Dade County elementary and middle schools, and who want their children to have access to the books the School Board ordered removed from the libraries." [R:19:Ex.26:4–5]

Those three declarations merely establish a free-floating desire to access the other books in the "A Visit to" series, a desire untethered to any intended action during any reasonably specific period of time. In that respect these declarations are more like the ones in the Lujan and Elend cases, where imminence was found to be lacking, than they are like the ones in National Parks and Fla. NAACP, where it was found to be present. In Lujan the plaintiffs who submitted affidavits wanted wildlife in Egypt and Sri Lanka preserved so that they could view it. Lujan, 504

35

U.S. at 563–64, 112 S. Ct. at 2138.  They had no concrete and definite plans to visit those countries, only a desire to keep the wildlife there alive so that they could go see it someday.  Id.  The Supreme Court held that absent "any description of concrete plans, or indeed even any specification of when the some day will be," the statements in the affidavits "d[id] not support a finding of the 'actual or imminent' injury' required for standing."  Id. at 564, 112 S. Ct. at 2138.

Just as the Lujan plaintiffs' general desire to have wildlife preserved for their viewing someday was insufficient to establish an imminent injury in fact, the general desire of the plaintiffs in this case to have the other books in the "A Visit to" series kept in the school library for their use someday is insufficient as well.  In both cases it is not enough to have an injury in fact.  The injury must be imminent, and in both cases it was not.  See id., 112 S. Ct. at 2138.

The Elend decision illustrates the same point.  There the plaintiffs, claiming a violation of their First Amendment right to protest, averred only that "'they fully intend[ed] to peacefully express their viewpoint in the future.'"  Elend, 471 F.3d at 1206.  As we have since explained, the plaintiffs in Elend "failed to allege when, where, and how such protests were going to occur in the future."  Fla. NAACP, 522 F.3d at 1161.  The protestors' "intention . . . to protest [in the future] . . . fails

36

to provide any limitation on the universe of possibilities of when or where or how such protest might occur." Elend, 471 F.3d at 1209.

Likewise in this case, the plaintiffs have not stated with sufficient specificity their plans for accessing the books in the "A Visit to" series. They have not given any indication of some fixed period of time in the reasonably foreseeable future during which they want to use the books.

The plaintiffs seek to distinguish Lujan on the ground that it would have been much more difficult for the plaintiffs in that case to travel halfway around the world to see wildlife than it would be for a plaintiff in this case to visit a school library and check out a book. Apparently they would distinguish Elend on similar grounds, arguing perhaps that it is more difficult to schedule a specific protest of a presidential speech than to go get a book. Their theory is that the easier it is to take the action that will be prevented by the defendant's conduct, the easier it should be to satisfy the imminent injury requirement for standing. We don't think so.

The imminence requirement does not depend on the burden of taking some action that will be prevented by the alleged injury—going to Egypt or Sri Lanka in Lujan or going to the school library in this case. Instead, it depends on the imminence of the action, regardless of how much effort that action involves. A trip to Egypt that is planned for the next week would be more imminent than a trip to a

37

school library when it reopens in a few months.  There is no good reason that the specificity of a statement that is acceptable should vary inversely with the difficulty of engaging in the activity that is threatened by the alleged injury.  Intricate drafting is not required to describe a threatened injury.  Plain English and clear language work best.  There is either an imminent injury or there is not.  If there is not, there is no standing.  If there is an imminent injury, then there may be standing.  All the plaintiff has to do is describe the threatened injury and specify why it is imminent.  The penalty for failing to do so is dismissal for lack of standing.

It does not matter, as the plaintiffs argue it should, that it is easier to imagine a parent stopping by the school library when dropping off his child than it is to imagine people flying halfway around the world to see wildlife.  The allegation of standing requires specification, not imagination.  As we explained a few years ago:

> Even though the [plaintiff's] complaint sets forth facts from which we could imagine an injury sufficient to satisfy Article III's standing requirements, we should not speculate concerning the existence of standing, nor should we imagine or piece together an injury sufficient to give plaintiff standing when it has demonstrated none.  The plaintiff has the burden to "clearly and specifically set forth facts sufficient to satisfy [] Art. III standing requirements."  If the plaintiff fails to meet its burden, this court lacks the power to create jurisdiction by embellishing a deficient allegation of injury.

Miccosukee Tribe of Indians v. Fla. State Athletic Comm'n, 226 F.3d 1226,

1229–30 (11th Cir. 2000) (internal citations omitted, second alteration in original).

Without embellishment, which we are powerless to provide, the plaintiffs'

declarations do not carry their burden of showing that they face a threat of

imminent injury from the removal of any of the "A Visit to" books from the school

district's libraries except for Vamos a Cuba. To the extent that the district court's

preliminary injunction enjoins the School Board from enforcing that part of the

Board's removal order, we will vacate the injunction and remand for the district

court to dismiss for lack of standing the portions of the plaintiffs' complaint that

concern any of the "A Visit to" series books other than Vamos a Cuba.

### III.

Because there is no standing problem with regard to the attack on the School

Board's order to remove copies of the Vamos a Cuba book itself from the

libraries, we turn to other questions about that part of the preliminary injunction.

"A district court may grant [preliminary] injunctive relief only if the moving party

shows that: (1) it has a substantial likelihood of success on the merits; (2)

irreparable injury will be suffered unless the injunction issues; (3) the threatened

injury to the movant outweighs whatever damage the proposed injunction may

cause the opposing party; and (4) if issued, the injunction would not be adverse to

39

the public interest." Siegel v. LePore, 234 F.3d 1163, 1176 (11th Cir. 2000) (en banc); accord Alabama v. U.S. Army Corps of Eng'rs, 424 F.3d 1117, 1128 (11th Cir. 2005); Schiavo ex rel. Schindler v. Schiavo, 403 F.3d 1223, 1225–1226 (11th Cir. 2005) (per curiam); Klay v. United Healthgroup, Inc., 376 F.3d 1092, 1097 (11th Cir. 2004).

"A preliminary injunction is an extraordinary and drastic remedy not to be granted unless the movant clearly establishes the burden of persuasion as to the four requisites." All Care Nursing Serv., Inc. v. Bethesda Mem'l Hosp., Inc., 887 F.2d 1535, 1537 (11th Cir. 1989) (quotation marks omitted). Failure to show any of the four factors is fatal, and the most common failure is not showing a substantial likelihood of success on the merits. See, e.g., Schiavo, 403 F.3d at 1226 n.2, 1237; Church v. City of Huntsville, 30 F.3d 1332, 1342 (11th Cir. 1994); Cunningham v. Adams, 808 F.2d 815, 821 (11th Cir. 1987). That is what the School Board says has occurred here. It argues that we should reverse the preliminary injunction, because the plaintiffs failed to establish a substantial likelihood of success on their claims.

We generally review preliminary injunctions only for an abuse of discretion, but we review de novo the legal conclusions on which they are based. Fla. NAACP, 522 F.3d at 1166; SEC v. Unique Fin. Concepts, Inc., 196 F.3d 1195,

40

1198 (11th Cir. 1999); Tefel v. Reno, 180 F.3d 1286, 1295 (11th Cir. 1999). An abuse of discretion occurs if the district court bases its decision on an erroneous factual premise. See Chi. Trib. Co. v. Bridgestone/Firestone, Inc., 263 F.3d 1304, 1309 (11th Cir. 2001); Drill South, Inc. v. Int'l Fid. Ins. Co., 234 F.3d 1232, 1239 (11th Cir. 2000); Jones v. Int'l Riding Helmets, Ltd., 49 F.3d 692, 694 (11th Cir. 1995); see also United States v. Varner, 13 F.3d 1503, 1508 (11th Cir. 1994) ("Abuse of discretion occurs when the court . . . bases its decisions upon considerations having little factual support." (quotation marks omitted)); Arlook v. S. Lichtenberg & Co., 952 F.2d 367, 374 (11th Cir. 1992) (same). Ordinarily, factfindings that matter to the issuance of a preliminary injunction are reviewed only for clear error, Unique Fin. Concepts, 196 F.3d at 1198, but that changes in First Amendment free speech cases like this one. For reasons we will explain later, we review de novo the core constitutional fact relating to the Board's motive. That means if we disagree with the district court's finding about the Board's motive, its decision to enter a preliminary injunction was an abuse of discretion. It was an abuse of discretion because if we find that the Board was motivated by the factual errors in the book, the plaintiffs have no chance of success on the merits, much less a substantial one. Insofar as the First Amendment issue is concerned the disagreement in this case is not about the standard of review applicable to

41

preliminary injunctions but about the Board's motive in removing the book from the school library shelves.

## IV.

The district court based the preliminary injunction it entered on both the plaintiffs' First Amendment claim and their due process claim. Because they are separate claims we will examine the likelihood of success on the merits as to each in turn.

## A.

The parties disagree about the contours of the legal standard we should apply to decide whether it is likely that the plaintiffs will succeed on their claim that the School Board's decision to remove the Vamos a Cuba book from all the school district's libraries violated their First Amendment rights. The plaintiffs contend [ACLU Br. 35–40], and the district court found, ACLU, 439 F. Supp. 2d at 1272–73, that we should apply the test enunciated by a plurality of the Supreme Court in Board of Education v. Pico, 457 U.S. 853, 102 S. Ct. 2799 (1982). In Pico, a New York school board voted to remove nine books from the libraries of the school district's middle and high schools because the books, according to the school board, were "anti-American, anti-Christian, anti-Semitic, and just plain filthy," and as a result posed a "moral danger" to the students. Id. at 857, 102 S.

42

Ct. at 2803 (alteration omitted). Some students at those schools sued the school board claiming that the removal of the books for "social, political, and moral" reasons violated their First Amendment rights to have access to the books. Id. at 856, 858–59, 102 S. Ct. at 2802, 2804.

After the district court granted summary judgment for the school board, the Second Circuit reversed and remanded for a trial on the students' First Amendment claim. Id. at 859–60, 102 S. Ct. at 2804–05. The Supreme Court affirmed in a badly fractured decision. The lead opinion by Justice Brennan was joined in full only by Justices Marshall and Stevens. Id. at 855, 102 S. Ct. at 2802. Justice Blackmun joined parts of that opinion, id. at 882, 102 S. Ct. at 2816 (Blackmun, J., concurring in part and concurring in the judgment), including its statement of this constitutional standard: "[L]ocal school boards may not remove books from school library shelves simply because they dislike the ideas contained in those books and seek by their removal to 'prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion.'" Id. at 872, 102 S. Ct. at 2810 (plurality opinion) (quoting W. Va. Bd. of Educ. v. Barnette, 319 U.S. 624, 640, 63 S. Ct. 1178, 1187 (19143)); see also id. at 879–80, 102 S. Ct. at 2814 (Blackmun, J., concurring in part and concurring in the judgment) ("[S]chool officials may not remove books for the purpose of restricting access to the political ideas or social

perspectives discussed in them, when that action is motivated simply by the officials' disapproval of the ideas involved.").

All four of the justices in the Pico plurality gave examples of reasons for which a school board could constitutionally remove books. Justice Brennan's opinion acknowledged the students' concession that it would be "perfectly permissible" to remove a book based on its lack of "educational suitability." Id. at 871, 102 S. Ct. at 2810 (plurality opinion). Justice Blackmun, in his separate opinion, acknowledged that: "First Amendment principles would allow a school board to refuse to make a book available to students because it contains offensive language, or because it is psychologically or intellectually inappropriate for the age group, or even, perhaps, because the ideas it advances are 'manifestly inimical to the public welfare.'" Id. at 880, 893, 102 S. Ct. at 2815 (Blackmun, J., concurring in part and concurring in the judgment) (citations omitted).

The other five members of the Court did not join in the views of Justice Brennan or Justice Blackmun. There were four dissenters, who were of the opinion that the First Amendment placed no limits on a school board's power to remove books from school libraries. Id. at 885, 893, 102 S. Ct. at 2817, 2821 (Burger, C.J., dissenting, joined by Powell, Rehnquist, and O'Connor, JJ.); see also id. at 921, 102 S. Ct. 2835 (O'Connor, J., dissenting) ("If the school board can set

44

the curriculum, select teachers, and determine initially what books to purchase for the school library, it surely can decide which books to discontinue or remove from the school library so long as it does not also interfere with the right of students to read the material and to discuss it.").  A fifth justice "expresse[d] no opinion on the First Amendment issues, being of the opinion that the Court should not, until after remand, 'issue a dissertation on the extent to which the First Amendment limits the discretion of the school board to remove books from the school library.'"  See Muir v. Ala. Educ. Television Comm'n, 688 F.2d 1033, 1045 n.30 (Former 5th Cir. 1982) (en banc) (plurality opinion of Hill, J.) (quoting Pico, 457 U.S. at 883, 102 S. Ct. at 2816 (White, J., concurring in the judgment)).

The result is that "Pico is of no precedential value as to the application of the First Amendment to these issues."  Id.; see also id. at 1051 n.18 (Rubin, J., concurring, joined by Politz, Randall, and Williams, JJ.) ("Seven Justices filed opinions in Pico.  The Court divided four-four on the constitutional issue of the extent to which the first amendment limits the discretion of a school board to remove books from a school library.  Justice White concurred in the judgment of the Court but did not reach this issue."); Chiras v. Miller, 432 F.3d 606, 619 n. 32 (5th Cir. 2005) ("[T]his court concluded in Muir that Pico has no precedential value as to the application of First Amendment principles to the school's decision

45

to remove the books from the library.").[2]  With five different opinions and no part of any of them gathering five votes from among the nine justices—only one of whom is still on the Court—Pico is a non-decision so far as precedent is concerned.  It establishes no standard.

The School Board contends that it did not violate the First Amendment regardless of whether we apply Pico or the test from Hazelwood School District v. Kuhlmeier, 484 U.S. 260, 108 S. Ct. 562 (1988).  [Board Br. 41–45] Hazelwood involved a school board decision about the content of the student newspaper as part of the school's curriculum.  See id. at 262, 108 S. Ct. at 565.  The Board argues that the Vamos a Cuba book, like all books in the district's libraries, should be considered as part of the curriculum for elementary school students, and when viewed in that light its removal was a curricular decision entitled to deference under the Hazelwood decision.  [Board Br. at 44–45]

In Hazelwood the principal at a Missouri high school directed that the student newspaper, which was written and edited as part of a journalism class, withhold from publication the pages of an issue containing one story about

---

[2]  Ironically, there was no majority opinion of the en banc court in the Muir case itself, where our best exposition of the Pico opinions can be found.  However, considering Judge Hill's ten-judge plurality opinion together with Judge Rubin's four-judge concurring opinion, a total of fourteen of the twenty-two judges who participated in the Muir decision explicitly recognized that the Pico decision has no precedential value.

46

pregnant students and another about the impact of divorce on students. Id. at 263–64, 108 S. Ct. at 565–66. The principal was concerned that the story about the pregnant students might indirectly reveal their identities, and he believed that the article's references to sexual activity and birth control were inappropriate for some of the younger students. Id. at 263, 108 S. Ct. at 566. He decided to stop publication of the divorce article because in the draft of the article that he reviewed, a student identified by name was quoted complaining about her father's behavior, and her parents had not been given an opportunity to respond. Id.

Some of the staff members of the student newspaper sued the school board in Hazelwood claiming that preventing publication of the two articles had violated their First Amendment rights. Id. at 262, 108 S. Ct. at 565. The district court concluded that no First Amendment violation had occurred. Id. at 264, 108 S. Ct. at 566. The court of appeals reversed, reasoning that the school newspaper was a public forum and as a result the school could censor its content only when "'necessary to avoid material and substantial interference with school work or discipline or the rights of others.'" Id. at 265, 108 S. Ct. at 567 (citation and alteration omitted). The Supreme Court, in turn, reversed the court of appeals. Id. at 266, 108 S. Ct. at 567.

In doing so the Court distinguished its decision in <u>Tinker v. Des Moines Independent Community School District</u>, 393 U.S. 503, 89 S. Ct. 733 (1969), concluding that suppression of individual student expression on school premises differs from control of expressive activities that "may fairly be characterized as part of the school curriculum." <u>Hazelwood</u>, 484 U.S. at 270–71, 108 S. Ct. at 569–70. The Court rejected the argument that the school newspaper was a public forum, because the school had not, by policy or practice, opened it up for indiscriminate public use. <u>Id.</u> at 267, 108 S. Ct. at 568. School officials had consistently treated the newspaper as a component of the journalism course, which was part of the curriculum taught at the school. <u>Id.</u> at 262–63, 108 S. Ct. 565.

Because the newspaper in <u>Hazelwood</u> was part of the curriculum, it bore "the imprimatur of the school" and entitled school officials to exercise greater control over it. <u>Id.</u> at 271, 102 S. Ct. at 570. The Court held that the school could censor the newspaper in order to disassociate itself from speech that would interfere with the school's work or impinge on the rights of others, or in order to correct "speech that is, for example, ungrammatical, poorly written, inadequately researched, biased or prejudiced, vulgar or profane, or unsuitable for immature audiences." <u>Id.</u>, 108 S. Ct. at 570. In overseeing the newspaper, the school could "take into account the emotional maturity of the intended audience in determining

48

whether to disseminate student speech on potentially sensitive topics." Id. at 272, 108 S. Ct. at 570. The Hazelwood decision establishes that "educators do not offend the First Amendment by exercising editorial control over the style and content of student speech in school-sponsored expressive activities so long as their actions are reasonably related to legitimate pedagogical concerns." Id. at 273, 108 S. Ct. at 571.

The School Board in our case equates its decision about which books to remove from school library shelves with the decision the principal made in Hazelwood about which articles to remove from the school newspaper. Both decisions, it asserts, relate to control over curriculum. [Board Br. 43–45] Alternatively the Board argues that, even if its decision to remove the Vamos a Cuba books were not curricular, its libraries are nonpublic fora and the book collection (and book removal) decisions of the Board should be treated as government speech. [Id. at 45–50] Government speech, we have said, is "expression delivered directly though the government or indirectly through private intermediaries." Bannon v. Sch. Dist., 387 F.3d 1208, 1213 (11th Cir. 2004). As the D.C. Circuit has explained, "in the case of a public library . . . there is still government speech. . . . [T]he government speaks through its selection of which books to put on the shelves and which books to exclude." PETA, Inc. v. Gittens,

49

414 F.3d 23, 28 (D.C. Cir. 2005). The government's ability to limit speech in a nonpublic forum, however, is not unlimited. "The government can restrict access to [the] nonpublic forum 'as long as the restrictions are reasonable and are not an effort to suppress expression merely because public officials oppose the speaker's view.'" Ark. Educ. Television Comm'n v. Forbes, 523 U.S. 666, 677–78, 118 S. Ct. 1633, 1641 (1998) (alteration omitted).

The argument against applying the Hazelwood standard here is that this is not a school newspaper situation, and the speech at issue does not form part of a course of study in a school's curriculum. This is a school library book case. The two situations may be sufficiently analogous to extend the Hazelwood standard here, or they may not be. The question of what standard applies to school library book removal decisions is unresolved. And for reasons that will become apparent later we have no need to resolve it here.

Even if the plaintiffs won the argument about the applicable standard and got the one of their dreams, the furthest we could possibly go in their favor is the standard that failed to attract a majority in the Pico case: school officials may not remove books from library shelves "simply because they dislike the ideas contained in those books and seek by their removal to prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion." Pico, 457

50

U.S. at 872, 102 S. Ct. at 2810 (plurality opinion of Brennan, J., joined by Marshall and Stevens, JJ., and in that part by Blackmun, J.). That is the standard the plaintiffs want. [ACLU Br. 35]

Even assuming that standard applies, however, the plaintiffs still lose if the School Board removed Vamos a Cuba not for those prohibited reasons but instead, as the Board insists, for legitimate pedagogical reasons such as concerns about the accuracy of the book. Whatever else it prohibits, the First Amendment does not forbid a school board from removing a book because it contains factual inaccuracies, whether they be of commission or omission. There is no constitutional right to have books containing misstatements of objective facts shelved in a school library.

The plaintiffs do not dispute that the School Board may remove a book because it is educationally unsuitable. Nor do they dispute that one of the Board's written criteria for determining the educational suitability of a nonfiction book is factual accuracy. [Board Br. App.C:6A-1.26(IV)(A)(1)–(15), (VIII); ACLU Br. 6] What they dispute is the Board's actual motive for ordering Vamos a Cuba removed from the library shelves. They contend that the Board acted to suppress the viewpoint expressed in Vamos a Cuba. The viewpoint the plaintiffs ascribe to the book, and describe as content neutral and apolitical, is one in which the people

51

of Cuba are portrayed as eating, working, and going to school like students in the Miami-Dade County School District do.  See ACLU, 439 F. Supp. 2d at 1283.  The Board's conclusion that Vamos a Cuba is inaccurate, according to plaintiffs, is nothing but a pretense for enforcing the politically orthodox view —especially prevalent in South Florida—that opposes the Castro regime.  The Board responds that it decided to remove the Vamos a Cuba books because they were "inaccurate and rife with omissions in their portrayal of life in Cuba," and that reason "does not constitute viewpoint discrimination."  [Board Br. 45]

The district court agreed with the plaintiffs.  It found, for the purposes of the preliminary injunction, that "the majority of the Miami-Dade County School Board members intended by their removal of the books to deny schoolchildren access to ideas or points-of-view with which the school officials disagreed, and that this intent was the decisive factor in their removal decision."  Id. at 1283.  The court also found "that the School Board's claim of 'inaccuracies' is a guise and pretext for 'political orthodoxy.'"  Id.

**B.**

Ordinarily, we review district court factfindings only for clear error, but First Amendment issues are not ordinary.  Where the First Amendment Free Speech Clause is involved our review of the district court's findings of

"constitutional facts," as distinguished from ordinary historical facts, is de novo. CAMP Legal Def. Fund, Inc. v. City of Atlanta, 451 F.3d 1257, 1268 (11th Cir. 2006) (CAMP II) ("We review the district court's determination of the 'constitutional facts' in a First Amendment case de novo." (citation and quotation marks omitted)); Coal. for the Abolition of Marijuana Prohibition v. City of Atlanta, 219 F.3d 1301, 1316 (11th Cir. 2000) (CAMP I) (same); Falanga v. State Bar of Ga., 150 F.3d 1333, 1335 (11th Cir. 1998); Don's Porta Signs, Inc. v. City of Clearwater, 829 F.2d 1051, 1053 n.9 (11th Cir. 1987) ("In cases involving [F]irst [A]mendment claims, an appellate court must make an independent examination of the whole record" and "is not bound by the 'clearly erroneous' standard of review.").

The plaintiffs contend that we should review only for clear error the district court's finding that the Board acted with a political motive when it decided to remove Vamos a Cuba from the school libraries. [ACLU Br. 21] To support their argument that clear error review generally applies to the question of whether a defendant's motivation is unconstitutional, the plaintiffs rely on Hatcher v. Board of Public Education, 809 F.2d 1546, 1559 (11th Cir. 1987), and Hoover v. Radabaugh, 307 F.3d 460, 467 (6th Cir. 2002). [ACLU Br. 20] Those cases involved claims that public employers retaliated against employees based on the

employees' exercise of their First Amendment rights. However, neither of those cases held that an appellate court should apply the clear error standard to a district court's findings of fact about the employer's motive; they simply determined that motive is a fact question in retaliation cases. See Hatcher, 809 F.2d at 1556 ("Only the question of whether the conduct is protected by the First Amendment is a question of law; the other elements are questions of fact."); Hoover, 307 F.3d at 467 (labeling the district court's determination that there was no genuine issue of material fact as to the motivation element a "factual determination" for purposes of deciding whether there was interlocutory appellate jurisdiction to review the denial of qualified immunity).

The standard of review for factual determinations concerning motive in First Amendment retaliation cases has spawned some confusion. See Bickel v. Burkhart, 632 F.2d 1251, 1256 n.7 (5th Cir. 1980)[3] ("There is some uncertainty as to the proper scope of appellate review of a trial court's resolution of this causation issue."). Compare Beckwith v. City of Daytona Beach Shores, 58 F.3d 1554, 1560 (11th Cir. 1995) ("[I]ssues of causation in a retaliatory discharge claim present questions of fact. In cases tried before a jury, the jury should decide questions of

---

[3] In our en banc decision Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981), we adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

54

motive and intent behind a government employment decision."), with Schneider v. City of Atlanta, 628 F.2d 915, 920 n.4 (5th Cir. 1980) (describing motivation in retaliation claims as a "factual issue[]" but noting that "any factual issues decided by a jury that might relate to ultimate questions of law are nonetheless subject to careful review by the district court and this court which are invested with the power to conduct an independent review of constitutional claims when necessary" (citation and quotation marks omitted)), overruled on other grounds by Bennett v. City of Slidell, 735 F.2d 861, 862 (5th Cir. 1984).

Even if we were to assume that clear error is the proper standard of review for factual determinations involving motive in First Amendment retaliation cases, that does not mean that the same is true in non-retaliation cases. The law that applies in the present First Amendment case is different from that which applies in a retaliation case, and the Supreme Court has instructed us that when it comes to distinguishing between factfinding and application of legal rules to facts, "[w]here the line is drawn varies according to the nature of the substantive law at issue." See Bose Corp. v. Consumers Union of U.S., Inc., 466 U.S. 485, 501 n.17, 104 S. Ct. 1949, 1960 n.17 (1984). The substantive law relating to the plaintiffs' First Amendment claim based on the School Board's decision to remove Vamos a Cuba differs from the substantive law of First Amendment retaliation claims in a way

55

that makes de novo review appropriate in this case, even if it would not be in a retaliation case.

Our predecessor court explained what it labeled as a "strong argument" for why motivation in retaliation cases should be treated as "simply a question of fact reviewable under the clearly erroneous standard:"

> The question of whether an employee's speech was a substantial or motivating factor in an employer's decision to discipline the employee cannot similarly be described as one of ultimate fact, for it is not "the ultimate issue for resolution in this case"; rather, it is a preliminary issue, the resolution of which cannot provide grounds for the employee to recover unless (1) the speech is also found to be constitutionally protected, and (2) the employer does not establish that the same decision would have been made in the absence of the constitutionally protected speech.

Bickel, 632 F.2d at 1256 n.7. In this case by contrast, under the Pico plurality standard we are assuming applies, the Board's motive is the ultimate fact upon which the resolution of the constitutional question depends.

Under the Pico standard, the Board members violated the First Amendment if they removed Vamos a Cuba "simply because they dislike[d] the ideas contained in [the] book[]" and sought by its removal "'to prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion.'" Pico, 457 U.S. at 872, 102 S. Ct. at 2810 (plurality opinion) (citation omitted). Unlike the question of motive in retaliation cases, motive in this case is not just a preliminary issue.

56

Instead, discerning the nature of the Board's motive will, under the standard we are assuming applies, determine the plaintiffs' First Amendment claim. "In cases in which there is a claim of denial of rights under the Federal Constitution, this Court is not bound by the conclusions of lower courts, but will re-examine the evidentiary basis on which those conclusions are founded." Niemotko v. Maryland, 340 U.S. 268, 271, 71 S. Ct. 325, 327 (1951) (conducting in a First Amendment case an independent review of the record about a city counsel's motive for denying a license, and finding that "[t]he conclusion is inescapable that [a license for] the use of the park was denied because of the City Council's dislike for or disagreement with the [Jehovah's] Witnesses or their views").

The Supreme Court has explained that "the reaches of the First Amendment are ultimately defined by the facts it is held to embrace, and we must thus decide for ourselves whether a given course of conduct falls on the near or far side of the line of constitutional protection." Hurley v. Irish-American Gay, Lesbian and Bisexual Group of Boston, 515 U.S. 557, 567, 115 S. Ct. 2338, 2344 (1995). As an appellate court we are "obliged to make a fresh examination of crucial facts" in order to resolve the First Amendment issue in this case. See id. at 567, 115 S. Ct. at 2344. Under the standard that we are assuming applies in this case, the School Board's motive in removing Vamos a Cuba is a constitutional fact, "a crucial fact"

57

that determines the core issue of whether that removal violates the First Amendment.

Our own decisions illustrate this standard of review. In CAMP I a marijuana advocacy group challenged the City of Atlanta's festival ordinance as a prior restraint on the group's right to free speech and assembly. CAMP I, 219 F.3d at 1316. The district court concluded as part of its First Amendment analysis that the City did not intend through its festival ordinance to discriminate against the group's marijuana advocacy agenda. See id. at 1317. We did not limit our review of that dispositive finding to whether it was clearly erroneous because, as we explained, "we review the district court's determination of the 'constitutional facts' in a First Amendment case de novo." Id. at 1316. After examining the whole record to make our own findings about the constitutional facts, we said: "Like the district court, we conclude that, upon examining the intent behind the 2000 Festival Ordinance, it is evident that the City adopted the ordinance in an effort to manage effectively and efficiently the use of the City's parks and other resources by the sponsors of large festivals, not because of a disagreement with the message conveyed by any particular festival." Id. at 1317. Although we ended up agreeing with the district court about why the City had taken the challenged action, we did so only after

examining the record and determining the City's motive for ourselves. We gave no deference to the district court's findings about that constitutional, or core, fact.

And in Don's Porta Signs, which involved a First Amendment challenge to a sign ordinance, we decided that "whether a commercial speech regulation directly advances the government's goals or is more extensive than necessary" is a constitutional fact that we were required to decide for ourselves. Don's Porta Signs, 829 F.2d at 1053 n.9. Our decisions show that we treat the few core facts that determine a First Amendment free speech issue as "constitutional facts" subject to de novo review.

Here the district court's conclusion about motive was predicated upon its finding that "'inaccuracies'" were not the real issue and that Vamos a Cuba is apolitical:

> While the debate was couched in terms of "inaccuracies" contained in the Cuba Books, the real issue was that the Cuba Books were content-neutral and scrupulously apolitical, and did not reflect, as viewed by the majority of the School Board members, the true evil of Castro's government and the oppression of the Cuban people. Thus, the majority was significantly motivated to remove the books because of their disagreement with the content-neutral views expressed in the Cuba Books, essentially the view that "People in Cuba eat, play and go to school like you."

ACLU, 439 F. Supp. 2d at 1283. If inaccuracy was in fact the motivating concern behind the Board's action, the Board properly exercised its "substantial legitimate

role . . . in the determination of school library content," Pico, 457 U.S. at 869, 102 S. Ct. at 2809 (plurality opinion).  Under Pico, however, if the Board removed the book simply because it disliked the ideas contained in it and by removal of the book sought to prescribe political orthodoxy or other matters of opinion, see id. at 872, 102 S. Ct. at 2810, then the Board violated the plaintiffs' First Amendment rights. See id. at 871, 102 S. Ct. at 2810 ("[W]hether petitioners' removal of books from their school libraries denied respondents their First Amendment rights depends upon the motivation behind petitioners' actions.").  Therefore, the "'conclusion of law as to a Federal right and [the] finding of fact are so intermingled as to make it necessary, in order to pass upon the Federal question, to analyze the facts.'"  Bose, 466 U.S. at 508 n.27, 104 S. Ct. at 1964 n.27 (quoting Fiske v. Kansas, 274 U.S. 380, 385–86, 47 S. Ct. 655, 656–67 (1927)).  In such cases, the Supreme Court has instructed us to "'make an independent examination of the whole record,'" id. at 508, 104 S. Ct. at 1964 (citation omitted), and has recognized our "ultimate power . . . to conduct an independent review of constitutional claims when necessary," id. at 506, 104 S. Ct. at 1963 (citation and quotation marks omitted).

This "rule of independent review assigns to [appellate] judges a constitutional responsibility that cannot be delegated to the trier of fact, whether the factfinding function be performed in the particular case by a jury or a trial judge."

60

Id. at 501, 104 S. Ct. at 1959.  In order to fulfill that responsibility, we must review de novo the district court's findings about the Board's motive, which depends on constitutional facts rather than historical ones.  See CAMP II, 451 F.3d at 1268; CAMP I, 219 F.3d at 1316; Falanga, 150 F.3d at 1335–36; Don's Porta Signs, Inc., 829 F.2d at 1053 n.9.

Applying that approach here, we will review for clear error only the district court's findings of ordinary historical facts.  Those are facts about the who, what, where, when, and how of the controversy—what the School Board did, when and how it acted, what various members of the Board said, and so forth.  Those facts, already set out earlier in this opinion, are largely undisputed.

By contrast, under the assumptions about the law that we have made for purposes of deciding this case, we must determine the "why" facts.  Those are the core constitutional facts that involve the reasons the School Board took the challenged action—its intent, or more accurately, its motive for removing copies of the Vamos a Cuba book from the school libraries.  The Board insists that it ordered Vamos a Cuba removed from the school libraries because the book contains factual errors and does not present an accurate picture of life in Cuba.  The plaintiffs counter that the Board's real motive for wanting to get rid of the book is to promote political orthodoxy because the Board disagreed with the book's viewpoint, which

61

the plaintiffs characterize as one of political neutrality toward Cuba. The argument about inaccuracies, the plaintiffs say, is just pretext, a cover for the anti-Castro goals of the Board. We must determine "the decisive factor" that motivated the Board. Pico, 457 U.S. at 871, 102 S. Ct. at 2810.

We must find the disputed "why" facts—the motive facts—ourselves, as though the district court had never made any findings about them. Here the record as a whole includes the proceedings of the School Committee and the District Committee, both of which made recommendations about Vamos a Cuba; the superintendent's correspondence with those committees and with the Board; the transcripts of the Board's proceedings; and the evidence presented by the Board and by the plaintiffs at the preliminary injunction hearing in the district court. Our primary disagreement with the dissent is about the "why" facts, the motive behind the School Board's removal of the books from its library shelves. See Dissenting Op. at 126 n.3 ("My dispute with the majority is not about 'what the Constitution obligates' but instead what the evidence shows motivated the School Board to make its removal decision.").

The dissent believes that "viewpoint discrimination was the decisive factor in [the Board's] motivation." Dissenting Op. at 128. Our review of the record leads us to the conclusion that under the Pico standard we are assuming applies, the

62

Board members did not "remove books from school library shelves simply because they dislike[d] the ideas contained in those books and [sought] by their removal to prescribe what shall be orthodox in politics . . . or other matters of opinion." Pico, 457 U.S. at 872, 102 S. Ct. at 2810 (quotation marks omitted). Under that standard, a school board's removal motive is unconstitutional if it is based on "simply" disliking ideas contained in the books *and* on seeking to prescribe what shall be orthodox in matters of opinion. See id., 102 S. Ct. at 2810. The record shows that the Board did not simply dislike the ideas in the Vamos a Cuba book. Instead, everyone, including both sides' experts, agreed that the book contained factual inaccuracies. See infra at 80–86. Factual accuracy in a non-fiction book is not a "matter[] of opinion." See Pico, 457 U.S. at 872, 102 S. Ct. at 2810. Under the Pico standard we are applying, the Board did not act based on an unconstitutional motive.

## C.

The initial complaint that started the process of removing Vamos a Cuba from the school district's libraries came from a parent of an elementary school student, not from any member of the School Board. [R:19:Ex.32] The parent, Juan Amador, stated in his complaint to the principal that he found the material in Vamos a Cuba "untruthful," "illus[ory]," and a "distort[ion] [of] reality." [Id.] According

63

to Amador, Vamos a Cuba "portrays a life in Cuba that does not exist." [Id.] Amador did not request that the library ban books on Cuba; instead, he asked that Vamos a Cuba be replaced with "[a]ny material that truly reflects the plight of the Cuban people of the past and present." [Id.]

Following established procedures [R:19:Ex.11:87–88], the School Committee members reviewed the challenged book by using unsigned evaluation forms. [See R:19:80–87] One of the eight members of the School Committee commented that Vamos a Cuba lacked literary merit and technical quality and that the "[a]uthor could have better researched her topic." [Id. at 83] Another committee member, who wrote an evaluation in Spanish, noted that Vamos a Cuba did "not meet" the School Board's "criteria" for "accuracy" and "literary merit," and specifically noted that pages four, five, nine, ten, seventeen, twenty-five, and twenty-eight of the thirty-two page book contained factual errors. [Id. at 87–88] Five of the evaluation forms stated that the book was "apolitical" or that it had no "political slant" or "political implications." [R:19:80–88] Another one emphasized that the book did not have "direct political implications." [R:19:86] One School Committee member commented that the book was "appropriate for the age group," but also stated that the "author could have better written and researched the topic." [R:19:82]

64

The District Committee conducted the next level of review for Vamos a Cuba, and some members had concerns about its accuracy. At that committee's first meeting, Mr. Rivera, a member, stated that: "[T]he book A Visit to Vietnam, when compared to A Visit to Cuba, contains more specific information and has more accuracy whereas, A Visit to Cuba detracts [sic] factual information and contains inaccuracies when comparing formulaic sentences." [R:19:59] Another member, Dr. Usatagui, likewise commented that "the information presented in the ["A Visit to" series] were not presented equally." [Id.] Dr. Usatagui, who is a child psychiatrist, was particularly concerned about the inaccuracies of Vamos a Cuba. [Id. at 59–60] She remarked that one inaccuracy was the title of the book because Cuba is not a country that a person is free to visit. [Id. at 59] None of the other members voiced objections to the book at that first meeting. [Id. at 56–60] In a memorandum to the superintendent of schools, Antoinette Dunbar, who was chairperson of the District Committee, stated that the minutes from the District Committee's second meeting were "not available." [R:19:18] However, Chairperson Dunbar summarized the District Committee's complete proceedings as follows:

> There was much discussion regarding the accuracy of the books, the sensitivity of the topic in regard to the community, and the differences between the English and Spanish text. Much of the dialogue focused on accuracy versus omissions, with the debate centering on the issue of

65

> missing facts versus how much and what type of information are meant
> to be contained in the book for very young children.

[Id.] The District Committee was presented with but did not have a chance to fully consider a report [R:19:47–48] about the book written by Dr. Juan Clark, professor emeritus at Miami-Dade College.[4] [Id. at 35]

During the District Committee's review of Vamos a Cuba, the superintendent wrote a letter to Chairperson Dunbar recommending that the school district "identif[y] immediately" "[o]ther materials that present a more accurate and complete description of life in Cuba" to "be made available immediately in library media centers with Vamos A Cuba/A Visit to Cuba in their collections." [R:19:49] The superintendent also recommended that a statement be placed in the inside cover of every Vamos a Cuba book in the district's libraries "explain[ing] to students and parents that statements in those books are incomplete or inaccurate in many cases and [directing] them by title to the alternate materials that have been identified as

_____

[4] Evidence was presented at the preliminary injunction hearing indicating that the District Committee did not fully consider Dr. Clark's report. Ronald Bilbao, a member of the District Committee, stated in his declaration that Dr. Usatagui distributed the report to the committee and asked everyone to read it while the committee was "trying to review the minutes." [R:19:232] But Dr. Usatagui herself testified that she introduced the report for the District Committee's consideration but believed that the committee "failed to adequately take the report into consideration when analyzing the suitability of the Cuba Books." [R:27:130] Antoinette Dunbar testified that as chairperson of the District Committee, she "did not allow" the committee to take Dr. Clark's analysis and report into account. [R:62:53] The upshot is that the District Committee did not fully consider evidence that the School Board had before it concerning the inaccuracies in Vamos a Cuba.

more factually correct and complete descriptions of life in Cuba and are available in their school's library media center." [Id.] The superintendent proposed the following language for the notice inside the Vamos a Cuba books:

ATTENTION STUDENTS AND PARENTS

This book was purchased by your school as part of a series of books on many foreign countries. Some of the information provided in this book about life in Cuba under that nation's communist dictatorship is incorrect or incomplete enough to be inaccurate. For an accurate depiction of life in Cuba, Miami-Dade County Public Schools recommends the following books that can be found in this school's library.

• Cuba for Kids by Ismael Roque-Velasco

[Id. at 51] Finally, the superintendent recommended that the school district permit Vamos a Cuba to be checked out only with parental consent. [Id. at 49]

This was the situation at the time the School Board made its decision about Vamos a Cuba. The Board knew that a parent of a student had found the book to be inaccurate [R:19:296] and that some members of both the School Committee and the District Committee had concerns about the book's inaccuracies, although a majority of each had recommended leaving the book on the shelves. Two members of the School Committee commented that the book could have been better researched [Id. at 82, 83], and one found that it was inaccurate. [Id. at 87] A child psychiatrist who was a member of the District Committee had voted for removal of

67

the book based on its inaccuracies, which she believed were harmful to children. [R:27:129–30] The superintendent had expressed concern about the book's distortions and inaccuracies. [R:19:222] He had recommended to the District Committee that access to Vamos a Cuba should be permitted only with parental consent, and even then, that the book should carry a disclaimer stating that it is inaccurate. [Id. at 222–24] Dr. Clark, an expert on modern Cuba, had appeared before the Board and informed it of his opinion that the book was rife with inaccuracies. He told Board members:

> Having examined this book aimed at young children, I have found various degrees of serious distortions in 13 of it[s] 29 pages. It ultimately attempts to equate Cuban social conditions to those of this country. Distortion of reality can take place by sheer lies or by omission. The book errs mostly by omission.

[Id. at 307]

There are nine members of the School Board. [Id. at 392] The vote to remove Vamos a Cuba was six to three. [Id. at 449] Five of the six members voting to remove it explained that they were doing so because of inaccuracies in the book.[5] Board Chairperson Barrera stated that:

> The issues before us, to me are quite clear, it's issues of inaccuracies, it's issues of omissions, because sometimes the words that are not said are more powerful than those words which are said,

_____

[5] When asked how he was voting, the sixth member said he was "voting for the cause. I['m] voting for The American Civil Liberties Union to file a lawsuit on us." [R:19:459–60]

68

and sometimes there's generalities, which [is] how this book is portrayed. . . .

I cannot support the recommendations that are made here today by the superintendent.  What I can support is the replacement of this book with a book that really talks about the richness and the culture that the Cuban people have lived and, if it was up to me, I would replace the whole series, because those books do not do justice to those 24 countries, and I think we owe it to the students in Miami-Dade County public schools to give them the best education possible.

[Id. at 399, 405]  Board member Logan explained that she "looked at the book" and found it "extremely offensive, inaccurate, full of omissions."  [Id. at 407]  The other books in the "A Visit to" series, she said, "also have omissions."  [Id.]  She proposed "to replace the series with a new and updated series."  [Id. at 408]

Board member Bolanos explained that:

We specifically mentioned School Board Rule 6G13, 6A126 that puts in place and sets forth clear educational standards that must be met by books that are placed in our public school library.  [Vamos a Cuba] does not meet those standards, that is crystal clear. . . .

And if we recognize as, even members of the committee that looked at this book, as the superintendent has recognized when he made an offer to place a label of distinction and separation o[n] the book, if we recognize that this book due to its acts of commission, and omission does not teach our children the truth about Cuba, then it should be removed from our public school libraries, we have that sacred responsibility.

69

[Id. at 409–10]  Board Vice-Chairperson Hantman explained that she could not

"support the presence of a book in our school that creates a misleading and

inaccurate portrait of Cuba."  [Id. at 414]  She continued:

> And I read [Vamos a Cuba], and in many pages, I would say at least
> 14 omissions or statements that are not true, so that's why I said that
> this is not about censorship or banning.  This is about a book that is
> not accurate, and there's nothing that—I cannot support this book in
> our libraries.

[Id. at 414–15]  Board member Perez adopted the comments she made at an earlier

Board meeting on the issue of removing Vamos a Cuba from the district libraries.

[Id. at 416]  At that earlier meeting, Perez had explained that:

> The school boards possess significant discretion to determine the
> content of their school library.  Which is why we don't have
> pornography and those other things.  It says, this discretion may not be
> exercised in a narrowly partisan or in a political manner. . . .
>
> That is not what this is about.  And so, in my opinion, I believe
> that if this publisher wants to publish [Vamos a Cuba] and if it is
> available for sale, that's all right.  I don't necessarily want it, or want
> my children perhaps to read it.  I can understand and defend their right
> to sell it.  But when we choose books in a content and say to children,
> these are the books that we as adults have chosen for you, I do not
> believe that this is an appropriate book.

[Id. at 358–59]

Even one of the three Board members who voted to retain Vamos a Cuba in

the district's libraries acknowledged that there were factual errors in the book.  He

stated that "the author's intent in Vamos a Cuba was not to say anything about the

70

politics of the country . . . but sometimes . . . when you do not say anything or avoid addressing real problems, you say a lot." [Id. at 426–27] He continued:

> I believe the proper way for an education system to handle this is to give our children a more accurate, age appropriate picture.
>
> Some of the ideas could include preparing a supplementary guide for parents to use with the book. The parent guide could address each and every inaccuracy, and be required with each checkout. Another idea is to have parent consent forms that would ensure that parents whose children check out this book will be able to review all of the material. Another way that may ensure a complete and accurate picture that is age appropriate is to consider providing the companion book with the check out.
>
> By adding additional resources, such as the supplementary parent guide, we can not only address what Vamos a Cuba did not say, but it will also allow our children to learn that not all sources are complete and accurate.

[Id. at 427] Of the other two members voting against removal, one said nothing. The other said that she was deferring to the opinion of the committees. [Id. at 34–35]

The Board's formal order stated Vamos a Cuba was being removed because the Board had found that "the book is inaccurate and contains several omissions." [Id. at 172] The order required that Vamos a Cuba "be replaced, throughout the school district, with a more accurate set of books that is more representative of actual life" in Cuba. [Id.]

71

The consistency throughout the process of the inaccuracy complaints and the consistency of the explanations of the Board members who voted to remove the book evidence that the Board's motive was what it stated—that the book was ordered removed from school libraries because it is full of factual errors.[6] And there is more evidence.

**D.**

A fact of great significance in deciding whether the School Board was motivated to remove Vamos a Cuba because of inaccuracies is that the book indisputably does contain inaccuracies. It is inaccurate because of what it says. It is inaccurate because of what it does not say. In recounting its factual errors, we will begin with the misstatements of the more mundane facts and move from there to misstatements of more import, which overlap to a large extent with the omission inaccuracies.[7]

---

[6] The dissenting opinion, like the district court's opinion, ignores many of these statements and much of the other evidence that we set out in this opinion.

[7] The assertion that Vamos a Cuba is nothing more than "a superficial geography book," Dissenting Op. at 160, is not accurate. Geography is primarily about the earth's surface—mountains, rivers, plains, and other physical features of a country. It is not about the daily lives of people in a country and whether they face hardships. While Vamos a Cuba contains some statements about the country's geography, the majority of the statements in the book are about the people there and how they live. Regardless of how the book is classified, its assertion that life in Cuba is "like" life in this country goes beyond a discussion of the geographic features of either country.

Page 29 of the English version of Vamos a Cuba states: "In one valley in Cuba, there are large, colorful paintings on some rocks. Inside the rocks are caves. The caves have paintings made by people who lived in Cuba about 1,000 years ago."[8] [R:28:A Visit to Cuba:29] The book includes a picture of a rock painting that depicts people and animals in red, blue, green, and purple. [Id.] It is undisputed, however, that the rock painting in the picture was not created "by people who lived in Cuba about 1,000 years ago" as the book indicates. Instead, the painting, "called Mural de la Prehistoria, which is located in the Valle de Vinales in Pinar del Rio," was done in the 1960s. [R:19:48] (Some Cuban caves have prehistoric paintings, but not the one pictured in the book. [Id. at 278])

On page 25 of Vamos a Cuba, the book states: "Cuba's beaches are good for swimming and boating. People like to dive and fish. There are also rowboat and sailboat races." [R:28:A Visit to Cuba:25] The truth, according to the uncontradicted evidence in the record, is that the traditional Cuban rowboat and sailboat races were abolished a half century ago. [R:19:48]

On page 15 of the book, it says: "For special festivals, men wear white pants and white shirts. Women wear colorful ruffled dresses." [R:28:A Visit to Cuba:15] The implication is that this type of clothing is worn on festival days by a

---

[8] The second sentence in this quote is not our typo. The book actually does state that "[i]nside the rocks are caves," instead of the other way around.

large segment of the population. The truth, according to the evidence in this record, is that the "vast[] majority of Cubans lack adequate clothing" and cannot afford this type of outfit.[9] [R:19:47]

The third sentence in the book tells the children of this country that: "People in Cuba eat, work, and go to school like you do." [R:28:A Visit to Cuba:5] It is simply not true that people in Cuba "eat, work, and go to school" the same way that American children do.

As for eating, unlike the situation in this country, in Cuba food is rationed by the government. It has been for forty-six years. [R:19:47] The book fails to mention that. In another place the book states that: "[m]any kinds of fruits grow in Cuba," and that "[b]ananas, pineapples, oranges, and mangoes are favorites." [R:28:A Visit to Cuba:13] While these fruits are indeed grown in Cuba and may be favorites, the implication that Cubans get to enjoy them is misleading. The population generally does not have free access to them because most of the fruit that

---

[9] The dissenting opinion asserts that Vamos a Cuba actually depicts Cuba as a poor country "with children missing articles of clothing (on page 10 a young boy is shirtless and on page 19 a boy is shirtless and shoeless)." Dissenting Op. at 160. The young boy on page 10 is walking on a sidewalk, wearing modern looking tennis shoes and overalls, albeit without a shirt. The boy on page 19, who is working on a farm, is not wearing a shirt or shoes. That boys in a semi-tropical country sometimes do not wear a shirt and occasionally go barefooted—what the dissenting opinion characterizes as "missing articles of clothing"— does not, of course, imply that it is a poor country. As page 14 of the book says: "Cubans dress to keep cool in the hot weather." In any event, the book simply does not depict substandard clothing on either children or adults. Nor does a single photograph of an early model car describe with anything approaching accuracy the country's problems.

is produced is exported, and the fruit that is not shipped out of the country is rationed by the government. [R:19:216] The evidence in the record indicates that malnutrition is not uncommon among the children of Cuba. [Id.] They do not eat like the children of this country do.

As for the Cuban people "working like you do," that is not true for children or adults. In Cuba there is "little private work," and "it [is] a crime to exercise private initiative or to have private practice of a profession." [Id.] "Practically everyone must work for the government." [Id.] From the sixth grade on, students must go to the countryside for a period of 45 days to do unpaid agricultural work. [Id. at 48] Moreover, "from the senior high level, all must go to the countryside to do unpaid agricultural work, on a permanent basis, alternating half day in the fields and half in the classroom." [Id.] Refusal to do agricultural work may result in expulsion from school. Bureau of Democracy, Human Rights, and Labor, U.S. Dep't of State, Cuba: Country Reports on Human Rights Practices 2006 (2007), available at http://www.state.gov/g/drl/rls/hrrpt/2006/78887.htm (last visited Dec. 8, 2008).[10] The book does not mention that.

---

[10] A 2008 Country Report on Cuba has now been issued; however, we refer to the 2007 Report because it details conditions in Cuba in 2006, which is the year the School Board made its decision to remove Vamos a Cuba from its libraries. The 2008 Report is not substantively different from the 2007 Report. [Hard copies of the internet materials cited in this opinion, including the 2006 and the 2007 Country Reports on Cuba, are on file at the Eleventh Circuit Court of Appeals Clerk's Office.]

Page 23 of the English version of <u>Vamos a Cuba</u> does acknowledge that:

"All schoolchildren do some kind of work during their school day.  Some children work in gardens.  Older children may work in factories."   [R:28:A Visit to Cuba:23]  But even that nod toward reality is not accurate.  Cuban children do not work in gardens, as the book says, but instead perform manual labor in the countryside doing unpaid agricultural work.  [R:19:48]  As the State Department's report on Cuba reveals:

> Secondary school students were expected to devote up to 15 days of their summer vacation completing a variety of tasks ranging from farm labor to urban cleanup projects and were paid a small wage for this labor.  Students in postsecondary institutions (technical schools, university preparatory schools, and agricultural institutes) were expected to devote 30 to 45 hours per year to primarily agricultural work.  Refusal to do agricultural work could result in expulsion from school.

Cuba Human Rights Report, <u>supra</u>.

The book's assertion that people in Cuba go to school "like you do" is false, too.  In addition to agricultural field work being a mandatory part of school for Cuban children, the Human Rights Report found that elementary and secondary students receive "obligatory ideological indoctrination."  <u>Id.</u>  Throughout the educational system, academic freedom is restricted and revolutionary ideology and discipline are reinforced.  <u>Id.</u>  Advancement in the school system "depend[s] on participation in political activities."  <u>Id.</u>  As the report detailed, in Cuba:

76

> The government maintained a dossier on every child from kindergarten through high school, which included a record of the child's participation in political activities, such as mandatory marches. Full participation in political activities, such as membership in the Union of Pioneers of Cuba, a regimented youth organization used by the government for political indoctrination, was essential to advance in the school system.

Id.

According to page 22 of Vamos a Cuba, "Cuban children go to school between the ages of five and fourteen." [R:28:A Visit to Cuba:22] That is not completely true. The record in this case establishes that some children go to school beyond the age of fourteen, but only if the student does not have "a 'political stain,'" the absence of which "is crucial to have access to the university level, since 'the universities are for the revolutionaries.'" [R:48] See Cuban Human Rights Report, supra ("Full participation in political activities . . . was essential to advance in the school system.").

What Vamos a Cuba fails to mention, and takes great pains to cover up with its "like you do" misrepresentations, is that the people of Cuba live in a state of subjugation to a totalitarian communist regime with all that involves. See generally, e.g., Gonzalez v. Reno, 212 F.3d 1338, 1350 & n.14 (11th Cir. 2000) (noting that the INS had determined that Cuba is "a communist-totalitarian state," and quoting the U.S. Dept. of State, 1999 Country Reports on Human Rights

77

Practices: Cuba (2000) for the proposition that "Cuba is a totalitarian state," where the Communist Party "exercises control over all aspects of Cuban life"); Licea v. Curacao Drydock Co., 537 F. Supp. 2d 1270, 1272 (S.D. Fla. 2008) (referring to "totalitarian Cuba's forced labor system"); Rodriguez v. Ridge, 310 F. Supp. 2d 1242, 1246 (S.D. Fla. 2004) (referring to "the dictatorial regime that . . . is Cuba"); Zappa v. Cruz, 30 F. Supp. 2d 123, 139 (D.P.R. 1998) ("Since 1898, Cuba, without benefit of the United States Constitution, has wallowed in poverty and corruption, mostly under dictatorial rule."); see also Cuba Human Rights Report, supra ("Cuba, with a population of more than 11 million, is a totalitarian state led by an acting president, General Raul Castro.").

The following summary of Cuban life is from the State Department's Human Rights Report on Cuba that describes the situation in 2006, the year that the School Board determined Vamos a Cuba does not accurately portray life in Cuba:

> The government's human rights record remained poor, and the government continued to commit numerous, serious abuses. The government denied citizens the right to change their government. There were at least 283 political prisoners and detainees at year's end. Thousands of citizens served sentences for "dangerousness," in the absence of any criminal activity.
>
> The following human rights problems were reported: beatings and abuse of detainees and prisoners, including human rights activists, carried out with impunity; harsh and life-threatening prison conditions, including denial of medical care; frequent harassment, beatings, and threats against political opponents by government-recruited mobs,

police, and state security officials; frequent arbitrary arrest and detention of human rights advocates and members of independent professional organizations; denial of fair trial, particularly to political prisoners; and interference with privacy, including pervasive monitoring of private communications.

There were also severe limitations on freedom of speech and press; denial of peaceful assembly and association; restrictions on freedom of movement, including selective denial of exit permits to thousands of citizens; and refusal to recognize domestic human rights groups or permit them to function legally. Domestic violence, underage prostitution, sex tourism, discrimination against persons of African descent, and severe restrictions on worker rights, including the right to form independent unions, were also problems.

Cuba Human Rights Report, supra (paragraph breaks inserted). Life in Cuba is not like life in the United States.

As to underage prostitution and sex tourism, the report explains:

Child prostitution was a problem, with young girls engaging in prostitution to help support themselves and their families . . . . While underage prostitution was widely apparent, there were no reliable statistics available regarding its extent. . . . Minors played a key role in the country's thriving sex trade, which was fueled by visits by thousands of foreign tourists. There was anecdotal evidence that state run hotel workers, travel companies, taxi drivers, bar and restaurant workers, and law enforcement personnel were complicit in the commercial sexual exploitation of children. . . . Sex tourism revenues provided an important, indirect source of hard currency to the government.

Id. It simply is not true, as Vamos a Cuba asserts, that the lives of children in Cuba are like those of children in this country.

79

**E.**

There was no evidence at the preliminary injunction hearing that the picture

of life in Cuba that Vamos a Cuba presents is an accurate one. No one who testified

there stated, or even suggested, that it is. To the contrary, the evidence at the

hearing proved beyond dispute that the book contains substantial factual errors. At

the hearing six expert witnesses—three for each side—testified through

declarations, affidavits, live testimony, or a combination of those methods. [See

generally R:62(Hearing Tr.)] None of them testified that Vamos a Cuba is

accurate.[11]

Dr. Juan Clark, a Miami-Dade College professor emeritus, testified that

"[t]he fundamental flaw in the Cuba Books is that they fail to fairly and accurately

portray life in Cuba and contain blunt inaccuracies regarding that country.

Therefore, the Cuba Books utterly fail to help their readers understand what it's like

---

[11] While never contesting any of the statements or testimony about how bad life in Cuba is, the dissenting opinion appears to suggest that the reality is relative. It puts the word in quotation marks when recounting the statements of School Board member Frank J. Bolanos about the factual distortions in the book. Dissenting Op. at 137 ("Each 'reality'"); id. at 137 ("His corresponding 'reality'"); id. at 138 (same twice). The reality Bolanos described is that the people of Cuba are deprived of civil liberties and due process of law; they can lose their jobs or be sentenced to prison for voicing an opinion contrary to the party line; they are told where to work; the children of that country are indoctrinated and forced to chant Castro's greatness in class; and food is rationed. Id. at 137–38. We disagree with the suggestion that this is just the "reality" of Mr. Bolanos. It is the reality of everyone who spoke on the subject during the Board meeting or testified at the preliminary injunction hearing, and it is also the reality of the State Department, as illustrated in its official country report on Cuba. See supra at 75–79. So far as we know, no one questions this reality. See Dissenting Op. at 139 ("Indeed, life in Cuba is as bad as Mr. Bolanos makes it out to be.").

to be an average person or a child living in Cuba." [R:27:App.B:3] On cross-examination, Dr. Clark testified that Vamos a Cuba "omits or hides a crucial dimension of Cuban reality which makes it unique among all the nations in this hemisphere, and I would say around the world with the exception of North Korea." [R:62:132] Dr. Clark also prepared a written report that detailed inaccuracies on thirteen of the thirty-two pages of Vamos a Cuba. [R:19:47–48] He concluded that his "overall assessment indicates the presence of a considerable amount of inaccuracies" in the book. [Id. at 47]

Dr. Usatagui, a child psychiatrist and the only member of the District Committee to vote for removal of Vamos a Cuba, [R:27:129:¶ 14] testified at the preliminary injunction hearing that in her professional opinion presenting inaccurate information to children under the guise of "nonfiction" is damaging:

> [I]t is entirely inappropriate to teach or use an inaccurate book to instruct children on geography or any other subject. This is especially true with respect to nonfiction and factual educational materials, regardless of whether they are intended to be introductions to the subject matter.
>
> The need for accuracy in factual information is especially true and of utmost importance for five to seven year-olds, because they are very impressionable. Children in this age group accept what they are exposed to at face value and are unable to question or challenge it. Five to seven year-olds do not have the cognitive ability to analyze and discern falsehoods from truth. For this reason, children five to seven years-old cannot ascertain the accuracy of the content in the Cuba books.

81

Moreover, it is damaging to children to present them with inaccurate information. This results in confusion for the children, especially when subsequently exposed to accurate information.

[Id. at 128 (para. numbering omitted)]

Dr. Lisandro Perez, an expert who testified for the plaintiffs, agreed that Vamos a Cuba contains inaccurate information: "To be sure, there are some inaccuracies in the book." [R:19:277:¶7] However, he believed that such inaccuracies are of "little consequence." [R:19:275:¶5(a)]

The real debate among the experts in the case, who all agreed that Vamos a Cuba was inaccurate, had to do with educational suitability. The experts disagreed about whether a truthful account of life in Cuba could be presented in an age-appropriate way.

Dr. Usatagui testified that in her opinion accurate information about Cuba could be presented in a book written for elementary school children in a manner that would be age appropriate:

I do not suggest necessarily that children ages five to seven have to be presented with facts on malnutrition, forced labor, and deprivation of civil liberties—since these are difficult concepts for this age group. These facts might be presented in a manner that is age-appropriate, such as when children learn about the hardships of other children by participating in activities that help underprivileged children, such as toy drives. This way, children begin learning how to help and care for others in an age appropriate manner. In contrast, I find that in the Cuba books, children are improperly taught facts about Cuba that are false and misleading.

82

[R:27:129:¶ 12]

One of the plaintiffs' experts, former school librarian Pat Scales, [R:19:250] agreed that certain realities about life in Cuba could be presented in an age appropriate way. She testified:

Q: And my question for you is: Would it be inappropriate? Would it be providing too much information to say that some children in Cuba are poor?

A. That's not too much information, but I think that's in that book, in the photographs.

Q. Okay. And would it be too much information to say some children in Cuba don't have enough to eat?

A. I'm not sure that's what this book is about.

Q. I'm asking you if it would be too much information?

A. Not to state it in that way.

\* \* \* \*

Q. And the determination about how much information is appropriate to present to children necessarily involves some line drawing, correct?

A. Yes.

Q. And reasonable people could disagree about where exactly you draw that line, correct?

A. Yes. . . .

[R:62:113–14]

Dr. Perez opined that the reality of life in Cuba is not appropriate subject matter for the readership of <u>Vamos a Cuba</u>:

> Rationing of consumer goods, indoctrination in schools, limitations and prohibitions on entrepreneurship, urban decay, government-controlled markets, austerity in dress, overcrowded mass transit, tourist-only beaches, exclamations of religious fervor before firing squads, the politicization of university admissions, and more, have been part of the reality of Cuba. But are those topics appropriate for a book for this readership and purpose? Can those topics be appropriately handled in a book that, because of its intended readership, only has sixty-five sentences? Is it appropriate for a book series that teaches young children elementary notions of national culture and society to present Cuba as a hellhole (which is apparently what the detractors would like)?

[R:19:278:¶ 8]

Similarly, plaintiffs' expert Lucia Gonzalez testified that because of its target audience, the book necessarily had to present an incomplete picture of life in Cuba:

> Q. Okay. Just to be clear: Your understanding is that the book is meant to offer information about the way of life in Cuba; is that correct?
>
> A. My understanding is the book offers basic facts about the way of life in Cuba. It is very limited because of the size of the book and the grade level that it's aimed at. The target age, of course, is very limited.

[R:62:84]

Contrary to Dr. Perez's and Ms. Gonzalez's apparent assumption, some of the other books in the "A Visit to" series, which are aimed at the identical age

84

group, do contain information similar to that which they asserted would not be age-appropriate in Vamos a Cuba. The book A Visit to Cambodia tells its audience: "Not all young people can go to school. There has been war in Cambodia for more than 20 years. Many schools have been destroyed." [R:28:A Visit to Cambodia at 23] Despite providing this information, the Cambodia book also tells children that "Cambodians travel and go to school like you." [Id. at 5] Similarly, A Visit to India informs children: "Many children are too poor to go to school. Their families need them to stay at home. The children help farm or they beg in the streets." [R:28:A Visit to India at 23] Nonetheless, the book also proclaims that "Indians eat, sleep, play, and go to school like you." [Id. at 5] Inexplicably, only the "A Visit to" books on England, Scotland, Wales, and Canada do not contain the "like you" formula language. [See R:28]

The district court concluded that the "like you" statement in Vamos a Cuba was "apolitical and content-neutral." ACLU, 439 F. Supp. 2d at 1283. The reality, however, is that regardless of politics the "like you" representation is inaccurate. All of the experts in this case agreed that people in Cuba do not live like people in the United States. As the plaintiffs' own expert explained, they don't because "[r]ationing of consumer goods, indoctrination in schools, limitations and prohibitions on entrepreneurship, urban decay, government-controlled markets,

85

austerity in dress, overcrowded mass transit, tourist-only beaches, exclamations of religious fervor before firing squads, the politicization of university admissions, and more, have been part of the reality of Cuba." [R:19:278:¶ 8]

Although everyone agreed that Vamos a Cuba contains inaccuracies, the district court still concluded that "ban[ning] books because of perceived inaccuracies sweeps too broadly." ACLU, 439 F. Supp. 2d at 1284. There are two fundamental flaws in that characterization. For one, the inaccuracies were not merely "perceived." They were undisputed. For another thing, the book was not being banned. It was being removed from a school's library shelves. The book could still be found in public libraries in the area, and it was available for purchase from any of several online book sellers.[12]

Nonetheless, the district court characterized the Board's removal of Vamos a Cuba as book "banning." [See, e.g., ACLU Br. 18, 21, 32] See ACLU, 439 F. Supp. 2d at 1279 ("Here, by totally banning the Cuba Books and the rest of the Series, the School Board is in fact prohibiting even the voluntary consideration of the themes contained in the books by students at their leisure."); id. at 1284 ("To ban books

---

[12] Vamos a Cuba remains available for purchase from various online book vendors, see, e.g., Amazon.com: Vamos a Cuba, http://www.amazon.com/Vamos-Cuba-Visit-Spanish/ dp/1575723840 (last visited Dec. 10, 2008); see also Abebooks.com, http://www.abebooks.com/ servlet/SearchResults?sts=t&tn=vamos+a+cuba (last visited Dec. 10, 2008). According to plaintiffs' own expert, Lucia Gonzales, the book is available in public libraries; she found it in the Broward County library system. [Doc. 19:267, ¶ 15]

because of perceived inaccuracies sweeps too broadly."). The dissenting opinion not only adopts that pejorative label from its very first sentence, but also builds its entire attack on the Board's action on the premise that this case involves book banning. See Dissenting Op. at 118, 137, 147, 167–74. That is a faulty foundation. The Board did not ban any book. The Board removed from its own school libraries a book that the Board had purchased for those libraries with Board funds. It did not prohibit anyone else from owning, possessing, or reading the book.

The overwrought rhetoric about book banning has no place here. Book banning takes place where a government or its officials forbid or prohibit others from having a book. That is what "ban" means. See Webster's New Twentieth Century Dictionary 144–45 (1976) (defining "ban" as "to prohibit" or "to forbid"); see also Black's Law Dictionary 154 (8th ed. 2004) (defining "ban" as "[t]o prohibit, esp[ecially] by legal means"). The term does not apply where a school district, through its authorized school board, decides not to continue possessing the book on its own library shelves. The School Board is the entity that has the ultimate authority to decide what books will be purchased and kept on the shelves of the schools in the district. See, e.g., Fla. Stat. § 1001.32(2) (providing that "district school boards shall operate, control, and supervise all free public schools in their respective districts and may exercise any power except as expressly prohibited

87

by the State Constitution or general law"); see also id. § 1006.28(1)(d) (assigning to district school boards the duty to "[e]stablish and maintain a program of school library media services for all public schools in the district"). The School Board could have decided not to purchase and shelve Vamos a Cuba in the first place. See Pico, 457 U.S. at 871, 102 S.Ct. at 2810 ("As noted earlier, nothing in our decision today affects in any way the discretion of a local school board to choose books to add to the libraries of their schools."). Unless deciding not to purchase a book is an act of banning it, and no rational person would suggest it is, removing a book from one's own shelves is not book banning either.[13]

In an attempt to defend the district court's and its own use of the "banning" rhetoric, while at the same time dismissing our disagreement with it as "largely semantical," the dissenting opinion quotes the same dictionary definition of "ban" that we have but attempts to contort that definition to fit the facts of this case. See Dissenting Op. at 168. The dissent asserts that by removing the book from its own school library shelves the Board did "prohibit, by legal means, public school libraries from carrying Vamos a Cuba." Id. at 168. That assertion ignores the fact that the Board, and the Board alone, has the responsibility and authority under

---

[13] We are reminded of Justice O'Connor's wise observation that: "If the school board can set the curriculum, select teachers, and determine initially what books to purchase for the school library, it surely can decide which books to discontinue or remove from the school library so long as it does not also interfere with the right of students to read the material and to discuss it." Pico, 457 U.S. at 921, 102 S. Ct. at 2835 (O'Connor, J., dissenting).

88

Florida law to decide what books are to be on the shelves of the school libraries in its district.  See supra at 87–88.  The school libraries are under the control of the Board and their employees are employees or agents of the Board.  See id.  When viewed in that light, as it must be, the dissent's insistence that the Board has banned the book amounts to arguing that when an entity decides to remove a book from its own library shelves it has banned itself from having that book there.  The dissent openly asserts as much.  See Dissenting Op. at 168 n.8  ("When a school board decides to remove a book from the school libraries within its district, it indeed has banned itself from having that book on its library shelves.").  The dissent does not explain how removing a book from one's own library shelves is any more banning it than deciding not to shelve the book to begin with would be.  Taken to its logical end, the dissent's view is that everyone who does not purchase a book to begin with has banned himself or herself from having the book. As the dissent sees things, there is a whole lot of banning going on.

There is, after all, a difference between banning and "removing."  The word "remove" means "to move from a place or position; take away or off."  Random House Unabridged Dictionary 1630 (2d ed. 1993); see also Black's Law Dictionary 1322 (8th ed. 2004) (defining removal as "[t]he transfer or moving of a . . . thing from one location, position, or residence to another").  That is what the Board did

89

with the book; it did not forbid or prohibit anyone from publishing, selling, distributing, or possessing the book.  Nor is it accurate to say, as the dissent does, that the Board "prohibited even the voluntary consideration of the book in schools." Dissenting Op. at 168.  There is not one whit of evidence in the record to suggest that the Board prohibited anyone from considering the book anytime or anywhere. Any student or teacher was free to consider the book.  The Board simply decided to remove the book from the library shelves of the schools in its district.

The dissenting opinion argues that "our own Circuit's usage of the word" ban can be found in Virgil v. School Board of Columbia County, 862 F.2d 1517, 1525 (11th Cir. 1989), and Searcey v. Harris, 888 F.2d 1314, 1318, 1322 (11th Cir. 1989).  See Dissenting Op. at 169.  The part of the Virgil opinion the dissent relies on is not the basis of the decision, and it cites—"cf."— only to the opinion of a district court in Maine.  See Virgil, 862 F.2d at 1525.  The Virgil decision, which upheld a school board's removal of some literary texts from the school curriculum, did not establish anything about the definition of banning.   Nothing in Virgil suggests that a school board's decision to remove books from its library shelves necessarily constitutes "banning."[14]  See id.  As for the Searcey case, neither its

_____

[14] In assessing whether the school board's decision to remove certain books from the school curriculum was reasonably related to its legitimate motive for doing so, we reasoned in Virgil that the books were still accessible:  "No student or teacher is prohibited from assigning or reading these works or discussing the themes contained therein in class or on school property. Cf. Sheck v. Baileyville School Committee, 530 F. Supp. 679 (D. Maine 1982) (granting

90

facts nor its use of the word "ban" had anything to do with a book's removal from a school's library shelves or removal of a book from anywhere.  Nor are we persuaded by the fact that other courts in other jurisdictions may have from time to time used the word loosely or incorrectly.  See Dissenting Op. at 170–71.

If the matter is to be resolved by looking at how the actions that the Board took in this case have been described by other courts in other opinions, we would think that the best place to look is in the Supreme Court decision from which we are drawing our legal standard.  We are assuming that the Pico plurality's legal standard applies.  See supra at 56.  In that case, as in this one, a school board ordered that some books be taken off the library shelves of the schools in its district. If that action amounted to banning those books, one would think that at least one of the seven separate opinions that the Supreme Court issued in the Pico case would have said so.  None did.

Instead, the one thing that every one of the justices agreed on in Pico is that a school board's action in removing a book from school library shelves is more

_____

preliminary injunction against school banning of book from library for its 'objectionable' language, where ban extended to mere possession of work anywhere on school property, including school buses)."  Virgil, 862 F.2d at 1525.  In Virgil we did not engage in a "consistent use of the word" ban, Dissenting Op. at 169 n.10, to define a school board's decision to remove books from its school libraries.  In the present case, as in Virgil, the Board did not prohibit students or teachers from assigning or reading Vamos a Cuba or discussing the themes contained therein in class or on school property.  See Virgil, 862 F.2d at 1525.  It did not forbid the possession of Vamos a Cuba anywhere on school property.  See id.  It did not, under Virgil, ban the book.

91

accurately described as removing the book instead of as banning it. In describing what the board did the <u>Pico</u> plurality opinion used "removal" or a derivative of that word forty-eight times. 457 U.S. at 856–75, 102 S. Ct. at 2802–12. It did not use the word "ban" or any derivative of it once. See <u>id.</u>, 102 S. Ct. at 2802–12. Justice Blackmun's partial concurrence in the plurality opinion and concurrence in the judgment used some form of the word "removal" six times to describe the board's action. <u>Id.</u> at 877–82, 102 S. Ct. at 2813–16. It did not use any form of the word "ban," not even once. See <u>id.</u>, 102 S. Ct. at 2813–16. Justice White's opinion, which concurred in the judgment, four times described what the board did as removing the book. <u>Id.</u> at 883, 102 S. Ct. at 2816. It did not once describe the action as banning the book. See <u>id.</u>, 102 S. Ct. at 2816. Chief Justice Burger's dissenting opinion, joined by Justices Powell, Rehnquist, and O'Connor, seventeen times described the board's action as removing books. <u>Id.</u> at 889–93, 102 S. Ct. at 2820–21. It never described what the board did as banning books. See <u>id.</u>, 102 S. Ct. at 2820–21. Justice Powell's dissenting opinion referred to removing books three times. <u>Id.</u> at 894–97, 102 S. Ct. at 2822–23. It never referred to banning books. See <u>id.</u>, 102 S. Ct. at 2822–23. Justice Rehnquist's dissenting opinion, joined by Chief Justice Burger and Justice Powell, on twenty-eight occasions described what the board did as removing books. <u>Id.</u> at 906–19, 102 S. Ct. at

92

2828–34.  It never described what had happened as banning books.  See id., 102 S. Ct. at 2828–34.  Justice O'Connor's five-sentence dissenting opinion used the word "remove" once.  Id. at 921, 102 S. Ct. at 2835.  It did not use the word "ban."  See id. at 921, 102 S. Ct. at 2835.  One hundred and seven times the Pico Court's various opinions described the action of the school board in taking books off library shelves.  See generally id. at 855–921, 102 S. Ct. at 2802–35. Every one of those hundred and seven times the Supreme Court called the board's action what it was—removing the books.  See generally id., 102 S. Ct. at 2802–35.  Never once did any member of the Pico Court take the position, which our dissenting colleague does, that a school board's action in taking a book off library shelves amounts to banning the book.  See generally id., 102 S. Ct. at 2802–35.

The dissenting opinion argues that if a school board's action in removing a book from its own library shelves does not amount to banning a book, then a school board can never ban a book.  See Dissenting Op. at 172.  So what?  Nowhere is it written that a school board must be empowered to ban books.  Because a school board has no power to prohibit people from publishing, selling, distributing, or possessing a book, it has no power to ban books.  That definition of banning does not "limit[] the word's application to almost nothing," as the dissent insists. Dissenting Op. at 172.  The Board removed books based on its "significant

93

discretion to determine the content of [its] school libraries." See Pico, 457 U.S. at 870, 102 S. Ct. at 2810 (plurality opinion). Describing the Board's actions as "banning" runs counter to the Supreme Court's terminology in Pico and muddies the water in the motive analysis.

## F.

The School Board's educational suitability criteria for books in the school library include the requirement that "[n]onfiction information is correct, recent, and objective." [R:19:125:No.3] As we have just explained, it is undisputed that some of the information contained in Vamos a Cuba is not correct, recent, and objective. The School Board majority has consistently stated that the reason it was removing the book from school library shelves was its inaccuracies. Despite all of this, the district court still concluded that the School Board's stated reason was a guise for its members' actual motive to suppress Vamos a Cuba's viewpoint and "impose upon their students a political orthodoxy to which they and their constituents adhered." ACLU, 439 F. Supp. 2d at 1272. It was, the district court believed, an act of viewpoint discrimination intended "to deny schoolchildren access to ideas or points-of-view with which the school officials disagreed." Id. at 1283.

The district court's reasoning is flawed. It never comes to grips with the substance of the School Board's position, which is that representations made in

94

Vamos a Cuba falsely portray a life in Cuba that does not exist and that in reality life under the Castro regime is bad—really bad. At some points the court's opinion seems to acknowledge the truth about life in Cuba. See id. at 1284 ("Tragically, [the Board's] point-of-view is based on real life experiences that members of the Cuban Community and their families have painfully endured in Cuba before coming to this country, and which many who have remained continue to endure under an oppressive totalitarian regime."); see also id. at 1265–66 ("The heart of the argument is that the Cuba Books omit the harsh truth about totalitarian life in Communist Cuba."). Yet, at other points the district court's opinion seems to deny the undeniable. Id. at 1283 (referring to the claim of "'inaccuracies'"and "'omission'" with quotation marks around those words); id. (referring to the Board members' "point-of-view of what is 'true' for a child's life" with quotation marks around the word "true"); id. (stating that "the real issue was that the Cuba Books . . . did not reflect, as viewed by the majority of the School Board members, the true evil of Castro's government and the oppression of the Cuban people" (emphasis added)); id. at 1284 (referring to the "perceived inaccuracies").

In places the district court opinion parodies the School Board's position, insisting that "[t]he gist of the argument, however, is that the books were too objective and, therefore, should be banned." Id. at 1283. The gist of the Board's

95

argument is actually just the opposite. The Board's consistent position has been and remains that Vamos a Cuba is not objectively accurate but instead is factually inaccurate and that because of glaring omissions and incorrect information, the book misrepresents life in Cuba. The Board is right about that.

The district court's reasoning also misapprehends the importance of factual accuracy in this type of First Amendment analysis. After quoting one Board member's statements about how Vamos a Cuba distorts the truth because people in Cuba are deprived of freedom and life is not the same in Cuba as in this country, the court stated that "[t]he merit or truth of these statements is not the issue." Id. at 1284. To the contrary, they are very much the issue. Whatever else it does in the context of school library books, the First Amendment does not require a school board to leave on its library shelves a purportedly nonfiction book that contains false statements of fact.[15] That is no less true if, as here, the falsehoods in the book make a totalitarian regime that is out of favor in this country look better than the true facts

_____

[15] The dissenting opinion seems almost, but not quite, willing to acknowledge as much. In one place it concedes, "A school board may remove a book from a school library for legitimate pedagogical reasons, such as obscenity or factual inaccuracy." Dissenting Op. at 133; see also id. at 126 n.3 ("Plainly, school boards may remove books from library shelves which contain falsehoods."). At other places, however, the dissenting opinion seems to indicate that the Board may act only if the inaccuracies are "gross" ones. See id. at 125–26 ("I also agree that the First Amendment does not forbid a school board from removing from its shelves books that contain gross factual inaccuracies."). We do not think that the Constitution obligates a government entity to place falsehoods, whether gross or ungross, on the shelves of school libraries.

would. A preference in favor of factual accuracy is not unconstitutional viewpoint discrimination.

Nor is the omission of factual information about the hardships of life in another country a political viewpoint entitled to protection. One of our differences with the dissenting opinion can be seen in its discussion of Board member Bolanos' explanation about why he was voting to remove Vamos a Cuba from the school library shelves. See Dissenting Op. at 137–40. Mr. Bolanos talked about the factual distortions in the book and its failure to mention food rationing, religious persecution, prosecution of those who speak out against the government, deprivation of due process, and so forth. Id. at 137–39. The dissent characterizes his statements about the book's factual inaccuracy and omissions as amounting to opposition based on the book's omission of "negative political information" and says that they show Bolanos wanted to require the "book to carry a political viewpoint." Id. at 139. We disagree. Facts about the conditions inside a country are not a viewpoint. They are facts. A book that recounts those facts accurately would not, for that reason, be political in nature. And a book that presents a distorted picture of life inside a country—whether through errors of commission or omission—does not, for that reason, become "apolitical."

Those who express minority viewpoints are no more entitled to fill a school library shelf with factually inaccurate statements than anyone else. A few examples illustrate the point. The series of books that gave rise to this case does not include one about North Korea, but suppose it did. Suppose that book stated: "People in North Korea eat, work, and go to school like you do." We probably could all agree that statement is factually inaccurate. Would a school board be prohibited from removing the book on the ground that doing so would constitute viewpoint discrimination? Or because it promotes political orthodoxy to remove a book that makes a despised regime look better than the truth would? Would a school board's decision to remove that book from the shelves of its libraries amount to book banning? Would removing it be unconstitutional?

As the School Board pointed out in its hypothetical examples, what about a book that talked about the life of German children during the Third Reich? [Board Br. 11] Suppose the book, in addition to describing some of the geography of Germany, said: "People in the Third Reich ate, worked, and went to school like you do," being careful not to mention any of the millions of people who were sent off to concentration camps. And that this book, like the Vamos a Cuba book, had a cover showing youths in uniform.[16] Hitler is out of favor now. Political orthodoxy views

_____

[16] The dissenting opinion points out that the cover of Vamos a Cuba contains a picture of Cuban school children in uniforms and states that one of the Board members found that "was

98

his regime as evil. Would that book's distortion through omission be protected on the ground that it was "apolitical"? Would the Constitution forbid a school board from removing that book from its library shelves because it was "a book that failed to reflect politically orthodox views toward [the Third Reich]"? See Dissenting Op. at 147. Would the fact that a board removed the book because it did not contain enough information about life in the Third Reich—omitting what the dissent might call "negative political information"—be considered forbidden viewpoint discrimination? Would the opposition to the book's inaccuracy be disregarded if one segment of the population was particularly upset about the book's distortions because of "their intolerance to messages that fail to conform to their personal experiences"? See id. at 143. Would the school board's actions be forbidden because "a sensitivity to the horrors of the [Hitler] regime does not permit state-sponsored censorship of other viewpoints"? See id. at 145. Would it be enough to say, as the dissent does, that: "The answer to books that do not provide all the information a reader wants is to find another book. If a reader is curious about the [Hitler] regime, he can find another book that enlightens him further"? Id. at 162. Would removing the book be prohibited because including "the negative information about [the Third

---

offensive because of the Cuban school uniform's symbolic connection with that which he abhors." Dissenting Op. at 142–43. The Hitler Youth wore uniforms, too, and that uniform was symbolically connected to that which many people abhor about the Third Reich.

Reich that] the School Board claimed was omitted could render the book developmentally inappropriate for children"? See id. at 159. Would the First Amendment require that the book be left on the shelves of the school district library?[17]

And what about a book about life in the antebellum South that asserted: "People in the old South ate, worked, and went to school like you do," neglecting to mention anything about slavery and the millions of human beings who lived and died in bondage? [Board Br. 11] Would we describe that book as "apolitical"? Would a school board be forbidden from removing the book from its library shelves because the book's distortions were through omissions, or because it went against "politically orthodox views"? Would removal of the book be prohibited on the ground that it was motivated by the book's failure to contain enough "negative political information" about the pre-Civil War South? If the book depicted some children not wearing shirts or shoes in the summertime, would that insulate it from

_____

[17] The dissenting opinion at least implies that the Constitution would forbid a school board from removing from its library shelves a book that misrepresented life in the Third Reich. See Dissenting Op. at 143 n.4. The hypothetical is not about a book that merely shows a picture of Hitler Youth in uniform but instead describes a book that falsely represents to school children that people in the Third Reich "ate, worked, and went to school like you do," without mentioning the bad aspects of life under that regime. To the extent the dissent views a board's removal of such book from its own library shelves as "censor[ing] a book" and as unconstitutionally "prescribing political orthodoxy," that position illustrates our disagreement with the dissent. See id.

removal on the ground that anything else would be "[m]ore extreme negative information"? See Dissenting Op. at 160. Would the glaring falsehoods through omissions in the book be protected by the First Amendment on the ground that they further the revisionist views of some who pine for old Dixie? Would a federal court order require that a school board keep that book on its library shelves?

The district court's opinion insists that Vamos a Cuba, including its statement that "People in Cuba eat, work, and go to school like you do," is "content-neutral and scrupulously apolitical." ACLU, 439 F. Supp. 2d at 1283. We disagree. By misrepresenting life in Cuba, the "like you do" statement makes the totalitarian regime that runs the country and controls the lives of everyone in it appear much better than telling the truth would. Statements in what purports to be a nonfiction book that whitewash the problems of a country and make the life of its people appear to be better than it is are not content neutral any more than overt propaganda would be. Misstatements of fact that benefit, directly or indirectly, the ruling government in a country are inescapably political in nature and effect. The "like you do" statement in a book about Cuba is no more content neutral or apolitical than the same statement would be in a book about North Korea, or in one about the Third Reich, or in one about the antebellum South.

101

There is something of this flavor in the plaintiffs' argument and the district court's opinion: the majority of the School Board members were Cuban Americans; Cuban Americans despise Castro and his regime; therefore, the Board's removal of the book must have been motivated by their disagreement with the book's political viewpoint instead of by its factual inaccuracies. See id. (considering whether "School Board members who happen to emigrate from any of these [other] countries [in the "A Visit to" series] to the United States [should] be permitted to ban books in the Series because of their individual political orthodoxy and point-of-view of what is 'true' for a child's life in one or more of these countries"); id. at 1284 (referring to the "real life experiences that members of the Cuban Community and their families have painfully endured in Cuba"). To the extent that is an argument, it confuses interest with motive. Cuban Americans are more interested than others in removing a book that falsely portrays, to the upside, life in Castro's Cuba, but that does not mean their motive for wanting the book removed is anything other than the fact that the book contains falsehoods. If the book accurately discussed life in Cuba, they would have no reason to have it removed.

Besides, the argument in question sweeps too widely. It would, for example, render constitutionally suspect the votes of Jewish school board members to remove our hypothetical book about life in the Third Reich. It would do the same to the

102

votes of any African American board members who wanted to remove our hypothetical book about life in the antebellum South. Interest does not necessarily equate with improper motive. If some members of the Board found Vamos a Cuba to be offensive, the record establishes that what offended them was its inaccurate portrayal of life in Cuba.

Unlike the dissenting opinion, we do not agree with the district court that the factual inaccuracies in the book were "altogether separate from any determination about quality of life in Cuba." Dissenting Op. at 134. The factual inaccuracies about the quality of life in Cuba go to the heart of the dispute. If Vamos a Cuba had not distorted the facts about life in Cuba—by insisting, for example, that "People in Cuba eat, work, and go to school like you do"—there would not have been any opposition to the book. There would have been no difference in view. If the book had told the truth about life in Cuba or had simply refrained from presenting a distorted picture of it, there would have been no opposition. The book did not tell the truth. It made life in Cuba under Castro appear more favorable than every expert who testified for either side at the hearing knows it to be, more favorable than the State Department knows it to be, more favorable than the district court knows it to be, see ACLU, 439 F. Supp. 2d at 1265–66, 1284, and more favorable than we know it to be. Once you find, as we have, that the book presents a false picture of life in

103

Cuba, one that misleadingly fails to mention the deprivations and hardships the people there endure, the argument that the Board acted for ideological reasons collapses on itself. The asserted motive of the Board, which is to paint Castro's regime in its naturally bad light, does not exist apart from the factual inaccuracy of the book.

## G.

The plaintiffs and their experts convinced the district court that the factual errors in <u>Vamos a Cuba</u> could not be corrected without producing a book that was educationally unsuitable for four to eight year old children.[18] This position overlooks the fact that simply omitting the most obvious falsehood—the statement that "People in Cuba eat, work, and go to school like you do"—could not possibly render the book unsuitable for the target age group or any other. As a matter of fact, that very statement was omitted from the books about the countries where life is most similar to life here—England, Scotland, Wales, and Canada. No one could reasonably suggest that the omission of the "like you" statement from those books rendered them educationally unsuitable.[19]

---

[18] The record reveals some discrepancies regarding the age range of the target audience for <u>Vamos a Cuba</u>. <u>See</u> note 2, <u>supra</u>. The district court concluded that four to eight was the target age group, and we accept that. <u>ACLU</u>, 439 F. Supp. 2d at 1248.

[19] The reason the series omits the "like you" statement from the very books where it would be accurate is a mystery. The theory behind this paradox may be that the educational suitability of asserting that life in another country is like life in this country varies inversely with

The district court's decision about educational suitability is also wrong for the more fundamental reason that it was not a matter for the district court to decide. Federal courts should not arrogate to themselves power over educational suitability questions. Such questions are the perfect example of a core educational policy matter within the exclusive province of local school boards. Yet the district court proceeded to hear evidence on the suitability issue, and after considering conflicting expert opinions, pronounced: "I conclude that the greater weight of the more credible evidence, for preliminary injunction purposes, supports the educational suitability of the books" as they are. Id. at 1286. The court even decided that correcting the inaccuracies in Vamos a Cuba would do more harm than good, because "too much information of the kind at issue is cognitively more damaging to young children than too little." Id. at 1287 (footnote omitted).

In examining and deciding whether Vamos a Cuba was educationally suitable, or would be made more or less suitable for school children if it more accurately described the conditions in Cuba, the district court stepped well beyond the proper bounds of the judiciary. The Supreme Court has repeatedly instructed us:

> By and large, public education in our Nation is committed to the control of state and local authorities. Courts do not and cannot intervene in the resolution of conflicts which arise in the daily operation of school

the truth of the statement. We hope not.

105

systems and which do not directly and sharply implicate basic constitutional values.

Epperson v. Arkansas, 393 U.S. 97, 104, 89 S. Ct. 266, 270 (1968); see also Tinker, 393 U.S. at 507, 89 S. Ct. at 737 ("[T]he Court has repeatedly emphasized the need for affirming the comprehensive authority of the States and of school officials, consistent with fundamental constitutional safeguards, to prescribe and control conduct in the schools.").

A Seventh Circuit decision in this area is instructive. See Zykan v. Warsaw Cmty. Sch. Corp., 631 F.2d 1300 (7th Cir. 1980). In Zykan the school board made some decisions about the English curriculum at a high school, the use of books in that curriculum, and the rehiring of English teachers. Id. at 1302. The plaintiffs alleged, among other things, that the removal of certain books from some courses and from the school library violated their rights under the First and the Fourteenth Amendments. Id.

The Seventh Circuit observed that state legislatures have "lodge[d] primary responsibility for secondary school education in local school boards." Id. at 1305. The court also recognized that "[v]irtually every judicial body that has commented on the matter [of school board authority] has acknowledged the need for broad discretionary powers in local school boards." Id. (citing cases). Although Zykan was decided before Pico, its conclusions regarding the authority of school boards to

106

make choices about educational suitability remain undisturbed by the Pico plurality rule, which we are assuming applies for purposes of deciding this case. As the court explained in Zykan, "nothing in the Constitution permits the courts to interfere with local educational discretion until local authorities begin to substitute rigid and exclusive indoctrination for the mere exercise of their prerogative to make pedagogic choices regarding matters of legitimate dispute." See Zykan, 631 F.2d at 1306.

The extent to which the dissenting opinion second guesses the Board on its educational suitability decision is evident from the acknowledgment that "[i]t could well be that Vamos a Cuba's simple depiction of life in Cuba does not contain information that would lead to a child's better understanding of it." Dissenting Op. at 158. Yet instead of leaving that decision to the Board, the dissenting opinion decides it, choosing the view of the plaintiffs' experts over that of the Board and its experts on the suitability question. See id.

The dissenting opinion also concludes that including all of the negative information about Cuba "could render the book developmentally inappropriate for children." Dissenting Op. at 159. Neither the dissent nor any of plaintiffs' experts have explained why, if that is true, inclusion of negative information about other countries is developmentally appropriate for children. For example, as we have pointed out, the "A Visit to" book about India informs the same audience of young

107

readers that: "Many children are too poor to go to school. Their families need them to stay at home. The children help farm or they beg in the streets." [R:28: A Visit to India at 23] And the book about Cambodia tells this same audience that some children in that country cannot go to school because after 20 years of war many schools have been destroyed. [Id. A Visit to Cambodia at 23] If it is developmentally appropriate to tell children in this country about some of the hardships that children face in India and in Cambodia, it is no less developmentally appropriate to mention some of those that children face in Cuba. Or at least the Board reasonably could decide that, and it is the Board that should be allowed to make that decision.

The dissent's argument that young children should not be told about "domestic violence, underage prostitution, sex tourism,[and] discrimination against persons of African descent," Dissenting Op. at 159 (quotation marks omitted), is a red herring. No one has suggested that all of the problems the people of Cuba face should be specifically discussed. But if an audience of this age can be told about children in India begging in the streets and children in Cambodia not being able to go to school because of the effects of decades of war, there is no reason that they cannot be told about food shortages, rationing, discrimination, or similar problems in Cuba. There is a difference between not including graphic detail about adult subjects on the one hand and falsely representing that everything is hunky dory on the other.

108

The dissenting opinion insists that federal courts may substitute their own findings and opinions about educational suitability for those of a school board whenever the board's motive for an action is questioned.  See Dissenting Op. at 154. That approach would eviscerate the precedent that cautions against second-guessing educational suitability decisions of local school boards, because it would allow federal courts to make those decisions whenever a litigant questions the motive behind a board decision.  And motive can always be questioned in these kind of cases.  The result of the dissent's position would be that federal courts instead of school boards would always end up making the final educational suitability decision. We are neither qualified nor constitutionally authorized to do that.

In this case the real issue for the federal courts, under the assumption of law that we have made, is not the educational suitability of Vamos a Cuba.  It is whether the Board's decision to remove the book from school library shelves was motivated by its inaccuracies concerning life in Cuba or by a desire to promote political orthodoxy and by opposition to the viewpoint of the book.  We find from the evidence in this record, including the School Board majority's consistent statements that it was removing Vamos a Cuba from the school library shelves because of factual inaccuracies and the undisputed fact that the book does contain inaccuracies, that those inaccuracies were what motivated the Board.  If there had been no factual

inaccuracies, the book would not have been removed. While the fact that the Board members who voted to take the action are Cuban American may explain their interest in it, that does not impugn their motive. The stated motive was not a pretext or a guise for viewpoint discrimination. The plaintiffs' First Amendment claim does not have a substantial likelihood of success on the merits. The district court should not have granted a preliminary injunction based on that claim.[20]

## V.

The district court also concluded that the plaintiffs had a substantial likelihood of success on their due process claim and rested the preliminary injunction on that ground. ACLU, 439 F. Supp. 2d at 1288–89. The due process claim is dependent on both of two propositions. One is that the Board violated its own regulations by removing copies of Vamos a Cuba from libraries other than the one from which the original complaint came, and the other is that every violation of a regulation amounts to a violation of due process. Id. Neither proposition survives scrutiny.

---

[20] In its conclusion the dissenting opinion endorses the view of one person who attended the Board meeting to oppose removing Vamos a Cuba. See Dissenting Op. at 174. The opinion quotes with approval his statement that if a school board can remove from its own library shelves a book (containing falsehoods), then "'we may have become what we protest against—a totalitarian government.'" Id. We do not agree with the dissent about that. Allowing a school board to remove from its library shelves a book that contains falsehoods does not mean that we have a totalitarian government like Cuba does. The statement that we do ranks right alongside the statement in Vamos a Cuba that "[p]eople in Cuba eat, work, and go to school" like people in this country do.

## A.

The School Board's regulations do not prevent the Board, once it decides that a book is unsuitable, from removing that book from every library in the school district. The regulations specify the procedure a parent must use if he wants to have a book removed from the shelves where his child attends school. See supra at 5–7. The regulations provide that if the parent is not successful through the District Committee he "may appeal the decision of the Superintendent to the School Board in writing and may request an appearance before the Board in accordance with School Board Rule 6Gx13-8C-1.17." [R:19:41:6A-1.26(VIII)(C)(3)(h)] The regulations are, however, silent about the actions the Board may take if it agrees with a parent that a book in the school district's libraries is educationally unsuitable. The Board has interpreted that silence to mean that it can take any reasonable action, including removing the book from every school district library where a copy of it can be found. ACLU, 439 F. Supp. 2d at 1290.

We have said that deference is owed to a municipal body's statutory interpretation of its own rules and regulations "'so long as its interpretation is based on a permissible construction.'" Beaulieu v. City of Alabaster, 454 F.3d 1219, 1232 (11th Cir. 2006) (quoting Southlake Property Assocs. v. City of Morrow, 112 F.3d 1114, 1119 (11th Cir. 1997)). The Board's interpretation of its own regulation is not

only based on a permissible construction, it may well be the only reasonable interpretation of that regulation.

The alternative reading of the regulation, which the plaintiffs proposed and the district court accepted, would lead to an absurd result. After a long and deliberative process had led the Board to conclude that a book was educationally unsuitable, it would be forced to leave the book in every library in the district except the one where the complaint originated. Then, supposedly, the entire process would have to start over when another parent whose child attended a different school complained about the same book. The process could be repeated for every one of the district libraries where the book could be found—thirty-three in the case of Vamos a Cuba. On and on it would have to go until the process, as well as the committees and the Board, were exhausted. To dismiss that prospect as "somewhat burdensome," as the district court did, ACLU, 439 F. Supp. 2d at 1291, is like dismissing the Ironman triathlon as somewhat tiring.

The plaintiffs argue, and the district court pointed out, that the School Board's own attorney concluded in her advice to the Board that "there is no provision in the school Board Rule for a district-wide removal of a school library book stemming from a [District Committee] review." Id. at 1290. [ACLU Br. 52–53] That is true. There is no provision one way or the other. The regulation neither explicitly permits

112

nor explicitly forbids the Board from entering a district-wide removal order. Its silence is symmetrical.

The School Board's attorney also advised it that "the Rule does not prohibit the Board from making a decision affecting the District as a whole," but that a district-wide decision "would be more susceptible to legal challenge." [R:19:113 n.6] That may be true, but susceptibility to legal challenge does not equate with legal invalidity. In any event, the Board's attorney also expressed the opinion that the regulation offers the School Board "wide latitude in reaching a decision as to the merits of the appeal and in crafting a resolution." [Id. at 113] This is exactly the interpretation of the regulation that the School Board advocated before the district court and here, an interpretation to which we owe deference.

Even if there were a difference of opinion between the Board and its attorney as to the proper interpretation of the regulation, the Board is the arbiter of the meaning of its regulations. The Board, and not its attorneys, decides for the Board and for the schools within the district. See Fla. Stat. § 1001.33 ("[A]ll public schools conducted within the district shall be under the direction and control of the district school board with the district superintendent as executive officer."). The Board is not bound to follow its attorney's advice.

We defer to the School Board's reasonable interpretation of its own regulation. See Beaulieu, 454 F.3d at 1232; Southlake Property Assocs., 112 F.3d at 1119. Under that interpretation the Board was authorized to order, as it did, the removal of all copies of Vamos a Cuba from school library shelves throughout the district. There was no violation of the regulation. That conclusion is fatal to the plaintiffs' procedural due process claim.

**B.**

Even if the Board had violated its own regulation, it would not follow that it had violated due process. The district court's belief that "an agency must follow its own rules in order to avoid infringing due process rights," ACLU, 439 F. Supp. 2d at 1292 n.45, cannot be grounded in the law of this circuit. Under that belief, every procedural regulation an agency adopts effectively amends the Constitution so that violating the regulation violates the Constitution. That is not the law.

In Smith v. Georgia, 684 F.2d 729 (11th Cir. 1982), the plaintiff made essentially the same argument that the plaintiffs make in this case. Id. at 732 n.6. He argued that "the state agency's failure to follow its own regulations, without more, offends due process." Id. We rejected the argument, explaining that "[w]hile it is possible that disregard for state procedures may support a constitutional claim, the two analyses are separate, and even if [the state agency] departed from its own

114

guidelines, not every violation by a state agency of its own rules rises to the level of a due process infringement." Id. (citations omitted). Instead, "the root requirement of the Due Process Clause" is that one be given notice and an opportunity to be heard. See Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532, 542, 105 S. Ct. 1487, 1493 (1985) (quotation marks omitted). There was plenty of notice and opportunity to be heard in this case.

Juan Amador filed his complaint about Vamos a Cuba on April 6, 2006. The School Board announced on or before April 18, 2006 that it would take up the matter at its meeting on that date. [R:19:Ex.19] At that April 18 meeting, two representatives of the ACLU, of which plaintiff Mark Balzli is a member, appeared and spoke in favor of retaining the Vamos a Cuba books in the school district's libraries. [R:19:328–32] Twenty-two other members of the community also spoke on one side of the issue or the other. [Id. at 304–51] The student government president, whose organization is a would-be plaintiff in this case, did not attend the April 18 meeting, but one of the Board members read a statement from him opposing removal of the book. [Id. at 373–74] After hearing from all those who wanted to speak the Board rejected the proposal to remove Vamos a Cuba at that time, and instead opted to wait for the committees that were considering the book to complete their review of it.

115

On June 7, 2006 the School Board again announced that it would discuss the removal of Vamos a Cuba from the district's libraries, this time at its June 14, 2006 meeting. [R:19:Ex.22] The ACLU sent a letter to the Board, which again registered its objections to removing Vamos a Cuba, "request[ed] that the Board follow the First Amendment," and "suggested that the Board purchase more books on Cuba, with different perspectives, rather than give license to censorship." [R:39:11] A student government representative attended the June 14 meeting and spoke against removing Vamos a Cuba from the school district's libraries (although she did acknowledge that "this book has inaccuracies, and it has omissions"). [R:19:392, 416–19]

The root requirements of due process were amply met. The plaintiffs had notice and an opportunity to be heard. They were heard. To the extent that the School Board did not adhere to its regulations—and we think that it did—the plaintiffs still were not deprived of their due process rights.

## VI.

In conclusion, the plaintiffs do not have standing to pursue injunctive relief as to removal of any of the "A Visit to" series of books other than the Vamos a Cuba book (in both languages). The part of the complaint concerning removal of the other books is due to be dismissed for lack of standing. As to the removal of the Vamos a Cuba book the plaintiffs do have standing. Even assuming that the First Amendment

116

applies to school board decisions to remove books from school libraries, the Board's action in removing this book did not violate the First Amendment. Nor did the Board's actions with respect to the book violate the procedural due process rights of the plaintiffs.

The preliminary injunction is VACATED and the case is REMANDED to the district court for further proceedings consistent with this opinion.

WILSON, Circuit Judge, dissenting:

The First Amendment prevents the government from banning books from school libraries, except in limited circumstances not present here. I find no abuse of discretion by the district court, which determined that there is a substantial likelihood that *Vamos a Cuba* was banned from the Miami-Dade County school library shelves because of its viewpoint, rather than for legitimate pedagogical reasons. Therefore, I must respectfully dissent.

## I. STANDING

I agree with the majority's reasoning and conclusion that while the plaintiffs do not have standing to challenge the School Board's order to remove the entire *A Visit to* series, they do have standing to challenge the order to remove copies of *Vamos a Cuba*.[1] I thus turn to the issues regarding that part of the preliminary injunction.

## II. PRELIMINARY INJUNCTION

"A district court may grant preliminary injunctive relief if the moving party shows that: (1) it has a substantial likelihood of success on the merits; (2) irreparable injury will be suffered unless the injunction issues; (3) the threatened injury to the movant outweighs whatever damage the proposed

---

[1] I refer to all copies of the English *A Visit to Cuba* and its Spanish-language counterpart, *¡Vamos a Cuba!*, by the title *Vamos a Cuba*, as the majority does.

injury may cause the opposing party; and (4) if issued, the injunction would not be adverse to the public interest." *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000) (en banc). The School Board argues that we should reverse the district court's grant of a preliminary injunction because the plaintiffs failed to establish a substantial likelihood of success on the merits.

The majority demands more than the law requires in its review of the district court's grant of a preliminary injunction. First, "[w]e review the ultimate decision of whether to grant a preliminary injunction [only] for abuse of discretion. . . ." *Owner-Operator Ind. Driver's Ass'n, Inc. v. Landstar Sys., Inc.*, 541 F.3d 1278, 1293 (11th Cir. 2008) (quoting *Teper v. Miller*, 82 F.3d 989, 993 (11th Cir. 1996)). "The trial court has considerable discretion in determining whether the situation requires the issuance of . . . a [preliminary] injunction and the fact that the appellate court reaches a contrary conclusion does not warrant a reversal." 11A CHARLES ALAN WRIGHT, ARTHUR R. MILLER, & MARY KAY KANE, FEDERAL PRACTICE AND PROCEDURE: Civil 2d § 2962 (West 2008). Our review is highly deferential to the district court. *Siegel*, 234 F.3d at 1178; *BellSouth Telecomms., Inc. v. MCImetro Access Transmission Servs., LLC*, 425 F.3d 964, 968 (11th Cir. 2005) ("We begin our review by noting how deferential it is."). "The review of a district court's

decision to grant or deny a preliminary injunction is extremely narrow in scope." *Carillon Imps. v. Frank Pesce Int'l Group*, 112 F.3d 1125, 1126 (11th Cir. 1997). *See also Revette v. Int'l Ass'n of Bridge*, 740 F.2d 892, 893 (11th Cir. 1984) ("Appellate review of such a decision is very narrow."). "This Court will not review the intrinsic merits of the case." *Id.* (quoting *United States v. Lambert*, 695 F.2d 536, 539 (11th Cir. 1983) (internal quotation marks omitted)).

> This limited review is necessitated because the grant or denial of a preliminary injunction is almost always based on an abbreviated set of facts, requiring a delicate balancing of the probabilities of ultimate success at final hearing with the consequences of immediate irreparable injury which could possibly flow from the denial of preliminary relief. Weighing these considerations is the responsibility of the district court.

*Siegel*, 234 F.3d at 1178 (quoting *Gray Line Motor Tours, Inc. v. City of New Orleans*, 498 F.2d 293, 296 (5th Cir. 1974)).

> The expedited nature of preliminary injunction proceedings often creates not only limits on the evidence available but also pressure to make difficult judgments without the luxury of abundant time for reflection. Those judgments, about the viability of a plaintiff's claims and the balancing of equities and the public interest, are the district court's to make and we will not set them aside unless the district court has abused its discretion in making them.

*BellSouth*, 425 F.3d at 968 (quoting *Cumulus Media Inc. v. Clear Channel Commc'ns, Inc.*, 304 F.3d 1167, 1171 (11th Cir. 2002)). "[T]he trial judge's ability to formulate a decree tailored to deal with the violations existent in each

case is normally superior to that of any reviewing court, due to his familiarity with the testimony and exhibits." *AmBrit, Inc. v. Kraft, Inc.*, 812 F.2d 1531, 1547 (11th Cir. 1986). "The abuse-of-discretion standard, therefore, serves an important and vital purpose." *Siegel*, 234 F.3d at 1178.

An abuse of discretion occurs if a district court fails to apply the proper legal standard or to follow proper procedures in making the determination, or makes findings of fact that are clearly erroneous. We review "findings of fact . . . for clear error," *SEC v. Unique Fin. Concepts, Inc.*, 196 F.3d 1195, 1198 (11th Cir. 1999). We review "constitutional facts" *de novo*. Here, the School Board's motive in removing *Vamos a Cuba* is a constitutional fact. *See United States v. Hanna*, 293 F.3d 1080, 1088 (9th Cir. 2002); [Majority Opinion at 52-62]. Thus, I review the district court's finding of the School Board's motive in making the removal decision *de novo*, but we must show higher deference to the district court's other findings of fact. The majority claims it reviews only the School Board's motive *de novo*, but it in fact includes many other fact findings that require greater deference in its *de novo* review.

While the majority is entitled to review the district court's finding of the School Board's motive as if the district court had made no such finding, that cannot be said for other facts the district court found with which the majority

121

disagrees. For example, the district court found that many of the proffered inaccuracies were of little consequence and that many of the omissions were appropriate to omit given the age level and purpose of the book. *ACLU of Fla., Inc. v. Miami-Dade County Sch. Bd.*, 439 F. Supp. 2d 1242, 1288 n.42 (S.D. Fla. 2006) [hereinafter *ACLU*]. The majority disagrees, finding that the book "contains substantial factual errors" and that the presentation of that information is "damaging" to its readers. [Majority Opinion at 80-81.] While the majority may disagree with the district court about what testimony and evidence was more credible and persuasive, this is not the majority's place. "[D]ue to his familiarity with the testimony and exhibits," the trial judge was in a superior position to make determinations about the seriousness of the inaccuracies and omissions. *See AmBrit*, 812 F.2d at 1547. While the majority may find "the 'like you' representation [to be] inaccurate," [Majority Opinion at 85], the district court found that it was not an inaccurate factual statement, but was merely a device to emphasize the things that we have in common with Cuban people. *ACLU*, 439 F. Supp. 2d at 1288. The district court was well within its discretion to rely on what it deemed to be the greater weight of the more persuasive and credible evidence presented at the preliminary injunction hearing. The majority disagrees with the district court's finding that the book

122

is "content-neutral and scrupulously apolitical." *Id.* at 1283. It instead opines that "the 'like you do' statement makes the totalitarian regime that runs the country and controls the lives of everyone in it appear much better than telling the truth would." [Majority Opinion at 101.] It was not clearly erroneous for the district court to rely on the scores of professional educators that agreed that the book was "content-neutral and scrupulously apolitical." The majority oversteps the applicable standard of review and engages in *de novo* review with regard to many factual findings.

Second, the majority treats this case as if it were a decision on the merits. It is not. This is an appeal from a preliminary injunction, for which there need only be a substantial *likelihood* of success on the merits, not a substantial *certainty* of success, as the majority seems to require. "The court is not required to find that ultimate success by the movant is a mathematical probability, and indeed, . . . may grant a stay even though its own approach may be contrary to movant's view of the merits." *Ruiz v. Estelle*, 650 F.2d 555, 565 (5th Cir. 1981)[2] (quoting *Wash. Metro. Area Transit Comm'n v. Holiday Tours, Inc.*, 559 F.2d 841, 843 (D.C. Cir. 1977)). In other words, "[a]

---

[2] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), this court adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

district court's determination that such a showing has been made is best understood as a prediction of a probable, but necessarily uncertain, outcome." *Smyth v. Rivero*, 282 F.3d 268, 276 (4th Cir. 2002). *See also Am. Fed'n of Gov't Employees, Local 1858 v. Callaway*, 398 F. Supp. 176, 196 (N.D. Ala. 1975) ("Th[e] [likelihood of success on the merits] requirement does not mean that a plaintiff must establish during a preliminary hearing held only a few days after the institution of suit, without the benefit of discovery, that no doubt exists as to the ultimate resolution of the merits."). "All courts agree that [a] plaintiff must present a prima facie case but need not show that he is certain to win." 11A CHARLES ALAN WRIGHT, ARTHUR R. MILLER, & MARY KAY KANE, FEDERAL PRACTICE AND PROCEDURE: Civil 2d § 2948.3 (West 2008).

"The fact that a preliminary injunction is granted in a given circumstance, then, by no means represents a determination that the claim in question will or ought to succeed ultimately; that determination is to be made upon the 'deliberate investigation' that follows the granting of the preliminary injunction." *Smyth*, 282 F.3d at 276. *See also Unicorn Mgmt. Corp. v. Koppers Co.*, 366 F.2d 199, 205 (2d Cir. 1966) (noting that a trial court need not find that the party seeking a preliminary judgment ultimately would prevail on the merits in order to issue a preliminary injunction). Here, the majority

124

ignores certain evidence in order to reach its decision. Instead of considering all the evidence in the record, as the district court did, the majority ignores various statements made by School Board members which suggest and sometimes even admit impermissible motives in the removal decision. Since this was not a trial on the merits but was instead a preliminary injunction hearing, the credible and persuasive evidence was sufficient for the district court to have found a substantial likelihood of success on the merits.

Although I agree with the majority that the plaintiffs have failed to establish a substantial likelihood of success on their due process claims, I disagree with its conclusion on the First Amendment claim. I find no abuse of discretion by the district court, which conducted a searching and thorough analysis of the evidence, deciding the case solely on law and precedent.

## A.    The First Amendment Claim

We are without much precedent to help us decide the extent to which the First Amendment applies to school library book removal decisions. But the precedent we do have does not, in my view, support the majority's conclusion.

I agree with the majority that Justice Brennan's plurality decision in *Pico* is of limited precedential value, in the absence of a majority opinion joined by four other justices. I also agree that the First Amendment does not

125

forbid a school board from removing from its shelves books that contain gross factual inaccuracies.  Nor do I disagree with the proposition that a school board may remove a book because it is educationally unsuitable.  I part company with the majority on its conclusion that the Miami-Dade County School Board's actual motive for ordering *Vamos A Cuba* from the shelves of its library was because of "gross factual inaccuracies" or "inaccuracies by omission."[3]

Although school boards are vested with wide discretion to decide what books occupy its library shelves, I do not believe that the First Amendment permits a school board to ban a book for the purpose of suppressing the viewpoints expressed in the book, when the educational content of the book is otherwise innocuous.  *Vamos a Cuba*, which is simply a part of an apolitical, superficial geography series, is only 26-sentences in length.  I attach, in its entirety, the text as an Appendix.  Having read the book and independently

---

[3] The majority twists my meaning in its opinion, implying that I somehow believe "that the Constitution obligates a government entity to place falsehoods, whether gross or ungross, on the shelves of school libraries." [Majority Opinion at 96 n.15.]  I do not.  Plainly, school boards may remove books from library shelves which contain falsehoods.  However, they may not when their primary motivation for removing the books is viewpoint discrimination, and the books' falsehoods are a pretext for that genuine motivation.  My dispute with the majority is not about "what the Constitution obligates" but instead what the evidence shows motivated the School Board to make its removal decision.  Moreover, the majority makes much of my use of the word "gross" in front of "inaccuracies."  I do this only because this is why the School Board claimed it was motivated—that it removed *Vamos a Cuba* because it was filled with "gross inaccuracies."

126

examined the entire record, I agree with the district court that the School Board's claim that *Vamos a Cuba* is grossly inaccurate is simply a pretense for viewpoint suppression, rather than the genuine reason for its removal. The record supports the district court's determination that the book was not removed for a legitimate pedagogical reason.

The majority declines to determine whether the standard set forth in *Hazelwood School District v. Kuhlmeier*, 484 U.S. 260, 108 S. Ct. 562 (1988), or the standard set forth in *Board of Education v. Pico*, 457 U.S. 853, 102 S. Ct. 2799 (1982), applies to school library book removal decisions, finding that "even if the plaintiffs . . . got the [standard] of their dreams," the test articulated by a plurality of the Supreme Court *Pico*, the plaintiffs would still lose because the School Board removed *Vamos a Cuba* for "legitimate pedagogical reasons." [Majority Opinion at 50-51.] I also do not determine which standard applies, as I find that even under the more lenient standard the Court set forth in *Hazelwood*, the plaintiffs demonstrated a substantial likelihood of success on the merits.

Under the more lenient standard in *Hazelwood*, a school board may regulate expression related to curricular materials so long as the school board's motivation is "reasonably related to legitimate pedagogical concerns."

127

*Hazelwood*, 484 U.S. 260, 273, 108 S. Ct. 562, 571 (1988). This standard does not, however, permit a school board to engage in viewpoint discrimination. *Searcey v. Harris*, 888 F.2d 1314, 1319 n.7 (11th Cir. 1989). "The prohibition against viewpoint discrimination is firmly embedded in [First Amendment] analysis." *Id.* at 1325 (citation omitted). Therefore, we have held that "we will continue to require school officials to make decisions relating to speech which are viewpoint neutral." *Id.* (citing *Virgil v. Sch. Bd. of Columbia County*, 862 F.2d 1517, 1522-23 & n.6 (11th Cir. 1989)). We must decide whether a political motive was the motivating or decisive factor in a school board's decision to remove a book. *Pico*, 457 U.S. at 872, 102 S. Ct. at 2810. This record demonstrates that, even under the *Hazelwood* standard, the School Board engaged in viewpoint discrimination, and that this viewpoint discrimination was the decisive factor in its motivation when it removed *Vamos a Cuba* from its libraries. The greater weight of the credible evidence supports the district court's finding "that the majority of the Miami-Dade County School Board members intended by their removal of the books to deny schoolchildren access to ideas or points-of-view with which the school officials disagreed, and that this intent was the decisive factor in their removal decision." *ACLU,* 439 F. Supp. 2d at 1283.

State-supported censorship of speech based on political viewpoint offends the First Amendment. "If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion. . . ." *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642, 63 S. Ct. 1178, 1187 (1943). This bedrock of the First Amendment applies with special force to the protection of children, a principle recognized by the district court when it concluded in its order:

> [I]t is the primary function of our schools to prepare their students for citizenship. Students will practice this "citizenship" in a country which prizes diversity and dissent. Hence, our schools must embody intellectual openness, lest they teach youth to discount important principles of our government as mere platitudes. The First Amendment ensures wide exposure to that robust exchange of ideas upon which the Nation's future depends. The School Board may not use its inherent power to expunge the expression of disfavored ideas.

*ACLU*, 439 F. Supp. 2d at 1288. The district court's analysis here is faithful to Supreme Court guidance: "[t]he Nation's future depends upon leaders trained through wide exposure to that robust exchange of ideas which discovers truth out of a multitude of tongues, rather than through any kind of authoritative selection." *Keyishian v. Bd. of Regents*, 385 U.S. 589, 603, 87 S. Ct. 675, 683 (1967) (alterations and quotations omitted). In Justice Brennan's words:

129

> [T]he right to receive ideas is a necessary predicate to the recipient's meaningful exercise of his own rights of speech, press, and political freedom. . . . [J]ust as access to ideas makes it possible for citizens generally to exercise their rights of free speech and press in a meaningful manner, such access prepares students for active and effective participation in the pluralistic, often contentious society in which they will soon be adult members.

*Pico*, 457 U.S. at 867-68, 102 S. Ct. at 2808-09 (emphasis omitted). Here, the School Board's own Collection Development policy recognizes these principles, encouraging the acquisition of "[m]aterials on controversial issues representing various views in order that young citizens may develop, under guidance, the practice of critical analysis and intellectual integrity in forming judgments." [PI Exhibit 43.]

There is perhaps no more important place for guarding free speech principles than in our Nation's schools. *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 512, 89 S. Ct. 733, 739 (1969) ("The vigilant protection of constitutional freedoms is nowhere more vital than in the community of American schools.") (quoting *Keyishian*, 385 U.S. at 603, 87 S. Ct. at 684). It is axiomatic that public school students do not "shed their constitutional rights to freedom of speech or expression at the schoolhouse gate." *Id*. at 506, 89 S. Ct. at 736. "That they are educating the young for citizenship is reason for scrupulous protection of Constitutional freedoms of

130

the individual, if we are not to strangle the free mind at its source and teach youth to discount important principles of government as mere platitudes." *Barnette*, 319 U.S. at 637, 63 S. Ct. at 1185. "In our system, students may not be regarded as closed-circuit recipients of only that which the State chooses to communicate." *Id.* at 511, 89 S. Ct. at 739. "[T]he First Amendment . . . does not tolerate laws that cast a pall of orthodoxy over the classroom." *Keyishian*, 385 U.S. at 603, 87 S. Ct. at 683. "Hence, our schools must embody intellectual openness, lest they teach youth to discount important principles of our government" as trivial. *ACLU*, 439 F. Supp. 2d at 1288.

If the school is one of the most important laboratories for application of free speech principles, then its library is perhaps the most important. *See Pico*, 457 U.S. at 868, 102 S. Ct. at 2809 ("[T]he special characteristics of the school library make that environment especially appropriate for the recognition of the First Amendment rights of students.") (emphasis omitted). Nowhere can a student better expose herself to the multitude of ideas so vital to nurturing the participation of young people in a pluralistic society. Thus, "students must always remain free to inquire, to study and to evaluate, [and] to gain new maturity and understanding" in the school library. *Keyishian*, 385 U.S. at 603, 87 S. Ct. at 684 (quoting *Sweezy v. New Hampshire*, 354 U.S. 234, 250, 77 S.

131

Ct. 1203, 1212 (1957)).  It is "a mighty resource in the free marketplace of ideas."  *Minarcini v. Strongsville City Sch. Dist.*, 541 F.2d 577, 582 (6th Cir. 1976).  The school library, "no less than any other public library, is 'a place dedicated to quiet, to knowledge, and to beauty.'"  *Pico*, 457 U.S. at 868, 102 S. Ct. at 2809 (quoting *Brown v. Louisiana*, 383 U.S. 131, 142 (1966)).  "In [a] school library a student can literally explore the unknown, and discover areas of interest and thought not covered by the prescribed curriculum.  The student learns that a library is a place to test or expand upon ideas presented to him, in or out of the classroom."  *Id.* at 869, 102 S. Ct. at 2809 (alterations, citations, and quotations omitted).

Because the school library occupies a unique place in the educational system as a place for voluntary study, school boards "must discharge their important, delicate, and highly discretionary functions within the limits and constraints of the First Amendment."  *Id.* at 865, 102 S. Ct. at 2807 (quotations omitted).  Students' First Amendment rights may be "directly and sharply implicated by the removal of books from the shelves of a school library."  *Id.* at 866, 102 S. Ct. at 2808.

While school boards are accorded wide discretion in the management of school affairs, that discretion is not unlimited.  They have "important, delicate,

132

and highly discretionary functions, but none that they may not perform within the limits of the Bill of Rights." *Barnette*, 319 U.S. at 637, 63 S. Ct. at 1185. A school board may remove a book from a school library for legitimate pedagogical reasons, such as obscenity or factual inaccuracy. But if a school board's motive for removal is suppression of a viewpoint expressed in the book, its removal decision is unconstitutional. *Searcey*, 888 F.2d at 1319 n.7; *Virgil*, 862 F.2d at 1522-23 & n.6. Here, the School Board claims that it removed *Vamos a Cuba* because of factual inaccuracies and omissions, rendering the book educationally unsuitable. The plaintiffs dispute the School Board's actual motive for removing the book, claiming the School Board was motivated to suppress the content-neutral and apolitical viewpoint about Cuba expressed in the book.

The majority reverses the district court and concludes that the School Board removed *Vamos a Cuba* because of factual inaccuracies that paint Cuba under the Castro regime in a falsely positive light. It finds that the district court's reasoning is flawed because "[the district court] never comes to grips with the substance of the School Board's position, which is that representations made in *Vamos a Cuba* falsely portray a life in Cuba that does not exist and

133

that in reality life under the Castro regime is bad—really bad." [Majority Opinion at 95.]

I read the district court's order differently. The district court concluded that the School Board's stated reasons for removing the book were merely a pretext for the political views prevalent in Miami that oppose the Castro regime. This conclusion is altogether separate from any determination about quality of life in Cuba. In fact, the district court acknowledged the dire situation in Cuba. *E.g. ACLU*, 439 F. Supp. 2d at 1265 (noting that "the Cuba Books omit the harsh truth about totalitarian life in Communist Cuba"). It empathized with the Cuban American community. *Id.* at 1284 (noting the painful experiences Cuban Americans endured "under an oppressive totalitarian regime"). But recognizing that life in Cuba is oppressive does not justify constitutionally impermissible viewpoint discrimination. The greater weight of the record evidence supports the district court's finding that the School Board acted in a narrowly partisan, political manner in furtherance of ideological viewpoints, in a way that the First Amendment forbids, when it voted to remove *Vamos a Cuba* from its library shelves.

The School Board claimed it removed *Vamos a Cuba* because of factual inaccuracies and omissions, which render the book educationally unsuitable.

For example, it claimed that the book's statement that "people in Cuba eat, play and go to school *like you*," [*Vamos a Cuba*: 5 (emphasis added)], is an inaccurate portrayal of life in contemporary Cuba. The district court, however, found that the evidence of viewpoint discrimination was "overwhelming." *ACLU*, 439 F. Supp. 2d at 1282. It found that the "greater weight of the more persuasive and credible evidence at the preliminary injunction hearing [demonstrated] that the majority of the Miami-Dade County School Board members intended by their removal of the books to deny school children access to ideas or points-of-view with which the school officials disagreed and that this intent was the decisive factor in their removal decision. In so acting, the School Board abused its discretion in a manner that violated the transcendent imperatives of the First Amendment." *Id.* at 1283.

The district court further concluded that although "the debate [at the School Board meetings] was couched in terms of 'inaccuracies' contained in the Cuba books, the real issue was that the Cuba books were content neutral and scrupulously apolitical, and did not reflect, as viewed by the majority of the School Board numbers, the true evil of Castro's government and the oppression of the Cuba people." *Id.* According to the district court, "the gist of

135

the argument, however, is that the books were too objective and, therefore, should be banned." *Id.*

### 1. Statements in Connection with the Removal Decision

The Eleventh Circuit "ha[s] not hesitated to look beyond the stated reasons for school board action." *Virgil*, 862 F.2d at 1522 n.6. While the majority finds that "the School Board majority[] [made] consistent statements that it was removing *Vamos a Cuba* from the school library shelves because of factual inaccuracies," [Majority Opinion at 109], I find little factual support for this conclusion in the record. Instead, I find numerous statements that demonstrate that other motivations were at work.

The record is rather clear that from the beginning of the removal process, the primary motivation for removing *Vamos a Cuba* was the favoring of one particular political viewpoint over another. A parent's complaint launched the review process. The parent, Juan Amador, complained that "[a]s a former political prisoner from Cuba, *I find* the material to be untruthful" because "[i]t portrays a life in Cuba that does not exist." [R:19:296] (emphasis added). Amador's objection was that the book was not based on *his* perspective, that of the Cuban exile. "The merit or truth of [his perspective] is not the issue. . . . Tragically, that point-of-view is based on real life

136

experiences that members of the Cuban Community and their families have painfully endured in Cuba before coming to this country, and which many who have remained continue to endure under an oppressive totalitarian regime." *ACLU*, 439 F. Supp. 2d at 1284. The issue instead is the state's imposition of what shall be the orthodox view of Cuba—the First Amendment does not permit that one perspective officially dominate the discourse.

The record provides palpable support for the district court's conclusion that School Board members banned the book not because of inaccuracies per se but because the book failed to make a negative political statement about contemporary Cuba. For example, School Board member Frank J. Bolanos described certain passages of the book as "distortions" and, after each "distortion," he added his own comments on the subject matter, which he labeled as "reality." Each "reality" demonstrates ideological opposition to the Castro regime. For example, Mr. Bolanos called the passage, "The people of Cuba eat, work and study like you," [*Vamos a Cuba*: 5], a "distortion." His corresponding "reality" was:

> Nothing could be further from the truth. The people of Cuba survive without civil liberties and due process under the law and receive 10 to 20 year prison sentences for simply writing a document or voicing an opinion contrary to the party line. People are told where to work. They lose their job if they do not follow the dictates of the communist party.

137

Children are indoctrinated and forced to chant Castro's greatness in class.

*ACLU*, 439 F. Supp. 2d at 1251.  He also labeled the passage, "White rice is the most common food in Cuba.  Black beans are eaten.  Arroz con Pollo is another favorite dish," [*Vamos a Cuba*: 12], a "distortion."  His corresponding "reality" was: "Food is rationed; people stand in line for hours to ask for their measly ration only to be told they ran out. Children stop receiving their milk ration at age six." *ACLU*, 439 F. Supp. 2d at 1251.  He called the passage, "The major celebration in Cuba is 'Carnival.'  It is celebrated on July 26th," [*Vamos a Cuba*: 26], a "distortion."  His corresponding "reality" was:

> The annual commemoration of July 26th is the symbolic observation of the rise to power of Castro's communist, totalitarian regime.  It is a day of mourning for most Cubans.  Cubans celebrate the 20th of May and the 28th of January, to celebrate their independence from Spain and the birth of Jose Marti, Cuba's greatest national hero.

*ACLU*, 439 F. Supp. 2d at 1251.  Lastly, he labeled the passage, "The celebrations in Cuba are a mix of African and Catholic roots," [*Vamos a Cuba*: 27], a "distortion."  Mr. Bolanos' stated that in reality:

> Historically, Castro's regime has prohibited or chastised those that engage in religious practices, including the Catholic Church and other organized forms of religion.  Religious leaders, including Jehovah's Witnesses have been imprisoned.  A famous cry while facing Castro's firing squad was "Viva Cristo el Rey" (long live Christ the King).

*ACLU*, 439 F. Supp. 2d at 1251-52. Mr. Bolanos argued that the book was rife with distortion because it omitted negative political information about the Castro regime, including omissions regarding political subjects such as civil liberties, due process, freedom of speech, government indoctrination, food rationing, and religious freedom. While Mr. Bolanos' viewpoints may be correct, I find no support in the law for the state requiring a book to carry a political viewpoint.

The majority questions my discussion of Mr. Bolanos' remarks. [Majority Opinion at 80 n. 11.] My analysis should not be understood as questioning the truth or accuracy of his remarks. Indeed, life in Cuba is as bad as Mr. Bolanos makes it out to be. I analyze Mr. Bolanos' "distortions" and "realities" to point out that his statements are concerned with the exclusion and inclusion of political statements from a particular viewpoint. The majority also faults me for putting the words "distortion" and "reality" in quotation marks, finding that this punctuation somehow means that I do not believe the truth of the statements. The majority mistakes my meaning. I use the quotation marks to designate that these were Mr. Bolanos' statements, statements which, contrary to the majority's contention, evidence that the School Board did not consistently state that it was removing the book because of inaccuracies. I am

139

attempting to determine whether the School Board's proffered reason for removing the book was pretextual, and nothing more.

Mr. Bolanos described the book as "hurtful and insulting to both our Cuban-American community and those Cubans still living on the island under oppressive conditions." *ACLU*, 439 F. Supp. 2d at 1251. He criticized the School Board's book review process as one that would not "satisfy the segment of our community that is outraged, that feels discriminated against by this book." [April Transcript, 73:3-73:11.] Some exiles want the discourse to reflect their plight, and they are "outraged" because the book does not conform to this message.

Several School Board members referred to their Cuban birth and their experience as exiles as explanations for why they found the book offensive. For example, School Board member Logan asserted that she wanted the book removed "as somebody who suffered [in Cuba] firsthand." [April Transcript, 69:20-69:22.] School Board member Hantman prefaced her opinion by saying: "I am a Cuban American. I was born in Cuba. And as the other board members said, my family, and my father and mother lost everything they had worked for." [April Transcript, 80:13-80:22.] She later stated, "I suffered and my family suffered with the rise of Fidel Castro." [June Transcript, 22:17-18.]

140

School Board member Perez also demonstrated her motivation for objecting to the book when she remarked that the book "is especially damaging to the sensibilities of this community." [April Transcript, 62:7-62:9.] The sensibilities to which she referred are those sensibilities that are hostile to the Cuban government and are intolerant of contrary, less hostile, views. She compared *Vamos a Cuba* to books about "pornography. . . , devil worship and other offensive things like that." [April Transcript, 60:9-60:12.]

School Board member Barrera acknowledged the accuracy of the picture on the cover of *Vamos a Cuba* showing children in their school uniforms—"to the average person it is just kids in school uniforms." [June Transcript, 11:10-11:11.] But, he continued, "as a Cuban, and to the Cuban American community, . . . that [picture] represents what is there today, which is the dictatorship of Fidel Castro. So, yes, we are offended. Even though it doesn't say anything, but the cover of that book is offensive to us as a community." [June Transcript, 11:11-18.] Mr. Barrera objected because the book merely displayed the picture and neglected to comment negatively on the school uniforms and their symbolic connection with Castro.

Mr. Barrera was also bothered by the portrayal of Cuba as normal—"just kids in school uniforms." [June Transcript, 11:10-11:11.] "To present Cuba as

141

a normal place is unacceptable to exiles because it negates the very reason for their exile and struggle. The adamant rejection of normalcy accounts for the strong desire to remove from the library shelves a book that treats Cuba as the same as any other country." *ACLU*, 439 F. Supp. 2d at 1284 n.37 (quoting [R:19:281.]). Similarly, District Materials Review Committee (DMRC) members Balcells and Dr. Usategui explained that the books "present a portrayal of life in Cuba for young children as being normal, benign, and politics-free-with a focus of trying to draw human parallels showing that life is relatively the same as in other countries." [R:19:457.] Their criticism is grounded in a portrayal of Cuba as normal and apolitical.

The majority responds that to say the evidence reflects improper motive "confuses interest with motive." [Majority Opinion at 102.] It argues that Cuban Americans are more interested than others in removing false books about Cuba, and that they are "offended" only by the "inaccurate portrayal of life in Cuba." [Majority Opinion at 103.] The distinction between motive and interest has little merit in this context. The various comments made by School Board members, as I discussed above, reflect that it was not only inaccuracies that offended them. To the contrary, the cover of the book, which Mr. Barrera admitted was accurate, was offensive because of the Cuban school uniform's

142

symbolic connection with that which he abhors.[4]  The record supports the conclusion that the School Board was not merely interested in removing a book full of inaccuracies; it was motivated to remove a book that symbolically represented something with which it disagreed.

Some members of the Cuban American community attended the School Board meetings and demonstrated their intolerance to messages that fail to conform to their personal experiences.  One member of the DMRC, Ronald Bilbao, described the environment at one of the meetings, as "very scary." [Supplemental Bilbao Declaration at p. 3.]  He noted that "it was packed with people from the community who kept interrupting.  Security guards were standing by.  I felt intimidated and I was afraid to speak freely at the meeting." [*Id.*]  When a DMRC member said something about the book being accurate, some would whisper "communist" and hiss.  [*Id.*]  For example, when the DMRC discussed the passage regarding the Carnival celebration at page 26 of the book, which says, "Cuba's biggest celebration is called Carnival.  It is held on July 26.  People dance and sing at this festival," a member, Mr. Rivera, said

---

[4] The majority opinion points out that just as the Cuban schoolchildren in uniforms offended a School Board member, "[t]he Hitler Youth wore uniforms, too, and that uniform was symbolically connected to that which many people abhor about the Third Reich." [Majority Opinion at 98-99 n. 16.]  I do not doubt this.  However, I would not censor a book which depicted a picture of Hitler Youth, either.  The First Amendment forbids the state from prescribing political orthodoxy, no matter how abhorrent the alternative message.  The majority opinion seems to add inflammatory rhetoric about Hitler where it has little relevance.

that this was inaccurate because "[the book] doesn't also say that people who live there are required to go to the festival." [*Id.*] Mr. Bilbao replied "that as far as [he] could tell the book is accurate, it just doesn't add that people have to attend." [*Id.*] In response to this comment, Mr. Rivera got angry with Mr. Bilbao and members of the community hissed at Mr. Bilbao and called him a communist. [*Id.*] He spoke only that one time at the meeting because he felt intimidated. [*Id.*] Members of the audience at the meeting "kept pressuring [Mr. Bilbao]" and telling him "that the book was offensive and hurtful to the Cuban community." [*Id.*]

The Superintendent of the Miami-Dade County School System also noted the intense political pressure from the community:

> I have listened carefully to the citizens who have come to address the School Board . . . and have been struck by some disturbing signals of intolerance, which left unaddressed could threaten the progress and the harmony that has marked our community over the last decade. Divisive rhetoric only damages the fabric of our society. However, respectful, open and frank discussions about our differences and cultures lead to understanding and build bridges of acceptance. There can be no doubt that the issues raised at recent Board meetings must be dealt with in ways that reflect respect for different opinions and sensitivity to views held by both the majority and the minority. . . . There is no "easy fix" to the complex issues we are contemplating; we can teach children that even the most twisted knots can be untied by citizens willing to work together for solutions that recognize many legitimate interests and concerns.

144

Memorandum from Superintendent of Schools Crew to Deputy Superintendent Dunbar, May 22, 2006, [R:19:35-26.]

The intensity of the feelings in the Cuban American community in Miami was not lost upon the district court:

> Nothing written here is intended to cast doubt upon the heartfelt point-of-view expressed by Mr. Bolanos and his supporters. Tragically, that point-of-view is based on real life experiences that members of the Cuban Community and their families have painfully endured in Cuba before coming to this country, and which many who have remained have continued to endure under an oppressive totalitarian regime.

*ACLU*, 439 F. Supp. 2d at 1284. But a sensitivity to the horrors of the Castro regime does not permit state-sponsored censorship of other viewpoints, as the district court noted:

> [M]any have come to this nation, and continue to do so today, for the opportunity to live in freedom under the protection of our Constitution and Bill of Rights. The quintessential freedom of speech may not be sacrificed on the altar of beliefs no matter how firmly those beliefs are held. In this nation, we do not prohibit the expression of an idea simply because some in the community find it offensive or disagreeable.

*Id.*

There was prior precedent supporting the district court's decision to grant the motion for preliminary injunction. A Miami museum had held an auction of art created by artists who had not renounced the Castro regime or

145

continued to live in communist Cuba. *Cuban Museum of Arts and Culture,*

*Inc. v. City of Miami*, 766 F. Supp. 1121, 1122 (S.D. Fla. 1991). Outraged by

the museum's tolerant attitude toward contemporary Cuba, the auction was

held amidst hostility and threats in the Miami community. *Id.* One of the

paintings was purchased and burned in the streets as a crowd chanted its

opposition to the artists. *Id.* A bomb exploded under the automobile of a

director of the museum. *Id.* Members of the museum's executive committee

were pressured to resign, and those that did not "endured McCarthy-like

allegations of communist inclinations and sympathies." *Id.* Eventually,

following years of controversy, a Miami city commission decided not to renew

the museum's lease. *Id.* at 1124. The museum brought an action to enjoin the

city, claiming the controversial art was subject to First Amendment protection.

*Id.* A district court enjoined the city from evicting the museum, holding that

the controversial art was subject to First Amendment protection and the city's

asserted grounds for evicting the museum were either minor concerns or a

pretextual basis upon which to remove the museum. *Id.* at 1129. The court

found that the city commission "appear[ed] to have fallen victim to the

localcommunity's intolerance for those who chose to" exhibit artwork by

artists who expressed a contrary political viewpoint to the Castro regime. *Id.* at 1126.

Similarly, here the School Board, a politically elected body, was faced with intense community pressure. A member of the Miami community confirmed at a School Board meeting: "There is a narrow group of Cuban Americans, a small group, a small sector, very powerful, politically strong that imposes their will on the Cuban community and everybody else in Dade County to fear, to threat, to intimidation." [R:19:310:14-310:19.] School Board member Robert Ingram illustrated the inordinate pressure the School Board was under to remove the book when he said that if the members of the School Board did not vote to remove the book, "they can't walk out of here. If they don't vote for it, they can't go home, they might find a bomb under their automobiles. . . ." [R:19:430:16-18.] As in *Cuban Museum of Arts and Culture*, "[e]ven if [the School Board members'] personal feelings were properly set aside, [the School Board] was obviously influenced by the local community's outrage and public outcry over" a book that failed to reflect politically orthodox views toward Cuba. 766 F. Supp. at 1126. The evidence also shows that personal feelings were not always put aside; indeed, School Board member Hantman explained that her decision to ban the book was

147

grounded "firmly in [her] commitment to stand with the Cuban American community, [of] which [she is] a very proud member." [June Transcript, 21:17-19.] She further stated that she "would not be doing her job as a Cuban American" if she did not vote to remove the book. [June Transcript, 24:21-23.]

The record contains observations by educators, most of whom were themselves employed by the School Board, who consistently assured the Board that whatever omissions and inaccuracies there were in the book were not significant enough to remove the book for a legitimate pedagogical reason. One School Board member explicitly admitted this: "The 22 professional educators who reviewed this book have affirmatively determined that [the book does not have serious, material, irrevocable and clear inaccuracies and biases], therefore, we are here today in essentially a political process." [June Transcript, 34:23-35:2.] Furthermore, "[t]he record should reflect that this issue has been driven by Phone-A-Thons, phone banking, radio, newspaper articles, e-mail campaigns, letter writing campaigns. . . . We are rejecting the professional recommendation of our staff based on political imperatives that have been pressed upon members of this board." [June Transcript at 35:5-35:15.] Certainly a School Board is a political body that must serve its constituents. However, the School Board also took an oath to uphold the

148

Constitution. No amount of political pressure can trump the First Amendment of the Constitution.

## 2. Circumstances Surrounding the School Board Debate

We are required to give some weight to "the circumstances surrounding the School Board's vote to remove the [b]ook [which] cannot help but raise questions regarding the constitutional validity of its decision." *Campbell v. St. Tammany Parish Sch. Bd.*, 64 F.3d 184, 191 (5th Cir. 1995). First, the School Board failed to consider, much less follow, the recommendations of two previous committees of professional educators and lay people retained to help guide the review process, whom the School Board's attorney admitted conducted "extensive analysis and deliberations." [R:19:116.] The committees consistently found that *Vamos a Cuba* was educationally suitable, noting that it was "scrupulously apolitical," "factually accurate, and developmentally appropriate." [*E.g.* Ad Hoc School Materials Review Committee Evaluation of Instructional Materials.] The School Board's failure to consider the advice of professional educators or librarians, or even the Superintendent, reinforces the suspicion that the School Board's motivation was constitutionally impermissible. *See Campbell*, 64 F.3d at 190-91 (noting that "fail[ing] to consider, much less adopt, the recommendation of two

149

previous committees to restrict the Book's accessibility . . . in apparent disregard of its own outlined procedures—has the appearance of [improper] motivations"); *Pico*, 457 U.S. at 874-75, 102 S. Ct. at 2811-12 (finding that ignoring the advice of literary experts, librarians, teachers, and the Superintendent, may support suspicions that a school board's motivations were unconstitutional).

Second, one School Board member attempted to have the Board violate the Board's own rules and circumvent the appeals process set out by School Board rule, proposing that the School Board immediately remove *Vamos a Cuba* without waiting for the administrative process to proceed. The Board eventually voted 6 to 3 to allow the administrative process to run its course, but only after the School Board's attorney advised the School Board to remain "mindful of its own board rule and follow all levels of due process procedures in our book removal process." [April Transcript, 56:19-56:24.] Further, counsel reminded the School Board that the School Board rules did not allow the School Board to "act independently and remove a book that it finds objectionable. Rather, it must follow the process that is in that rule in order to achieve that purpose." [April Transcript, 58:16-58:22.]

Third, the School Board eventually did violate its own procedures when it voted to remove the entire *A Visit to* series of which the book is a part. None of the other 19 books in the geography series were ever reviewed for accuracy by a review committee or the Superintendent per the School Board's rules, nor were they previously questioned on appeal. Most of the School Board members had not even read the rest of the series before they voted. The School Board's reluctance to follow its own procedures in connection with the series as a whole raises more questions about its School Board's motivations. *Id.* at 190-91 (noting that "apparent disregard of [a school board's] outlined procedures . . . has the appearance of 'the antithesis of those procedures that might tend to allay suspicions regarding the [s]chool [b]oard's motivations'") (quoting *Pico*, 457 U.S. at 875, 102 S. Ct. at 2812 (alterations omitted)); *Case v. Unified Sch. Dist. No. 233*, 908 F. Supp. 864, 875 (D. Kan. 1995), *aff'd in part and rev'd in part on other grounds*, 157 F.3d 1243 (10th Cir. 1998) (finding that the "irregular and erratic manner in which [the school board] removed [a book] from the District's libraries and their disregard of established policy and procedure are important evidence of their improper motivation"). The fact that the School Board removed books that many of its members had never even read further suggests that the School Board majority may have had

151

impermissible motives for removing the book from the library shelf. *Campbell*, 64 F.3d at 191 (finding "question[able] . . . the constitutional validity of [the school board's] decision" when many school board members had not read the book in question or had not read its entirety).

The content and circumstances of the debate cast doubt on the School Board's proffered motivation that it removed the book because of factual inaccuracies.

### 3. The School Board's Proffered Inaccuracies and Omissions

The majority finds that "[a] fact of great significance in deciding whether the School Board was motivated to remove *Vamos a Cuba* because of inaccuracies is that the book indisputably does contain inaccuracies." [Majority Opinion at 72.] The majority says that it is undisputed "that the book . . . contain[s] inaccuracies" and that "[i]f there had been no factual inaccuracies, the book would not have been removed." [Majority Opinion at 109-10.] My independent view of the record, however, fully supports the district court's determination that these inaccuracies were merely post hoc rationalizations for the book's removal—"plausible but disingenuous justifications." *ACLU*, 439 F. Supp. 2d at 1282.

The majority faults the district court for going through this very exercise, stating that "[t]he district court's decision about educational suitability is . . . wrong for the . . . fundamental reason that it was not a matter for the district court to decide, [as] [s]uch questions are the perfect example of a core educational policy matter within the exclusive province of local school boards." [Majority Opinion at 105.] But the district court's purpose in examining the educational suitability of the books was to get to the heart of the actual motivation on the part of the School Board, which the Supreme Court requires. *See Pico*, 457 U.S. at 870, 102 S. Ct. at 2810 (holding that while school boards "rightly possess significant discretion to determine the content of their school libraries . . . that discretion may not be exercised in a narrowly partisan or political manner"); *see id.* at 907, 102 S. Ct. at 2828-29 (Rehnquist, J., joined by Burger, C.J. and Powell, J., dissenting) ("cheerfully conced[ing] [that school boards] may not exercise[] [their discretion] in a narrowly partisan or political manner"); *Zykan*, 631 F.2d at 1306 ("[N]othing in the Constitution permits the courts to interfere with local educational discretion *until* local authorities begin to substitute rigid and exclusive indoctrination for the mere exercise of their prerogative to make pedagogic choices regarding matters of legitimate dispute.") (emphasis added). Federal courts must engage in some

153

analysis of the educational suitability of a book if this is the suggested basis of a school board's decision. Here, the Miami-Dade School Board found "that the book was inaccurate and contains several omissions." [R:19:172.]

In order for a court to determine if the proffered reason for removal was pretextual, it must evaluate those findings. A court must evaluate whether the proffered motivations have such weaknesses, implausibilities, or incoherencies such that they are unworthy of credence. Contrary to the majority's suggestion, we do not overstep our bounds by evaluating educational suitability for this limited purpose. *See Virgil*, 862 F.2d at 1517 n.6 ("Courts have not hesitated to look beyond the stated reasons for school board action."). Only the School Board has the authority to determine whether a book's content makes it suitable for the school library shelves. But after carefully reviewing the evidence, the district court concluded that the School Board removed the book not because of its factual inaccuracies, but because a majority of the School Board agreed with the members of the community who considered an apolitical picture of Cuba to be offensive. *Cf. Pratt v. Ind. Sch. Dist. No. 831*, 670 F.2d 771, 778 (8th Cir. 1982) (holding that a school board could not constitutionally ban films from the school curriculum because a majority of the school board objected to the ideological and religious content of the films). I

154

do not "decide" the educational suitability question, as the majority contends that I do.  [*See* Majority Opinion at 107.]  Instead, I scrutinize the School Board's proffered omissions and inaccuracies to see whether there are such weaknesses, implausibilities, and incoherencies in the record to support the district court's determination regarding the genuine motivations for the removal decision.

### a.     The School Board's Proffered Omissions

The vast majority of educators that reviewed the book found that the omissions on which the School Board eventually relied to remove it did not affect its educational suitability.  In fact, the omissions about which the plaintiff complained, if included, were found to be developmentally inappropriate and would render the book educationally unsuitable. [R:19:267:¶17.] (finding that the type of information the objectors found was omitted from the book "would be detrimental to a child's understanding of the world at a very young age").  As the district court found, the School Board's concerns with *Vamos a Cuba* seem to be "based on an adult attempting to import an adult value system into a children's book." *ACLU*, 439 F. Supp. at 1287.  The book was written for children ages four to eight.

155

The School Board complained that various facts relating to the Cuban government were omitted from the book. One of the School Board's experts, Dr. Juan Clark, listed the book's omissions of facts, which included the regime's rationing of consumer goods, limitations on private enterprise, the agricultural system, government-control and indoctrination of the education system, and child labor. [R:19:47-48.] The plaintiffs' experts Lucia Gonzalez and Patricia Scales considered the inclusion of such information in children's books. Ms. Gonzalez found that children in this age group cannot grasp "the level of political thought implicit in" these omitted facts. [R:19:267:¶17.] Ms. Scales noted that they do not understand the concept of "government" in any sophisticated way. [R:19:255:¶16.] Rather, educators introduce young children to concepts including "community or culture, . . . self, and how they fit in, and their understanding of these concepts is only the most basic at this age level." [R:19:255:¶16.] The record supports the conclusion that these omissions would have been inappropriate to include in light of the conceptual understanding of children in this age group.[5]

---

[5] The majority suggests that these subjects may be able to be presented in an age-appropriate manner, though it recognizes that the experts disagree on this point. [Majority Opinion at 82.] But even the School Board's expert, Dr. Usategui, admitted that such subjects "are difficult concepts for this age group." [*Id.* (quoting [R:27:129:¶12.])] Dr. Usategui admitted that such difficult subjects, like "hardships of other children," could be taught through only limited means, such as "participating in activities that help underprivileged children, such as toy drives." [*Id.* (quoting [R:27:129:¶12.] Dr. Usategui never suggested that such difficult

The book attempts to illustrate complicated subjects in simple ways. For example, an in-depth discussion of Cuba's complicated transportation systems is omitted from the book. However, the book does explain the transportation situation. As the School Board's expert Dr. Clark asserted, Cubans cannot buy new cars, public transportation is overcrowded, and foreigners do not take buses. But nothing the book says paints a different picture—the book reads: "[T]here are not many cars . . . [and] most Cubans travel by bus." [*Vamos a Cuba*: 18.] As such, Dr. Clark's omission is not so much an omission as a developmentally appropriate way of presenting information to children in the early grades of elementary school.

Similarly, the technical information about houses and buildings that Dr. Clark noted was omitted "would be giving [children] more information than they would need, want or could comprehend," according to Ms. Scales. [R:19:255:¶18.] Dr. Clark objected that the book only notes that there are new and old buildings without noting that some buildings are deteriorated. [R:19:47.] But such factual detail would be lost on a reader in this age group. [R:19:256:¶18.] "Children are far less patient than adults and will not wade through factual and technical details." [R:19:256:¶18.] Children need to know

_____

information could be properly presented in a book, but only through other means.

157

only the concise fact that there are new and old buildings, as *Vamos a Cuba* points out at page 10. [R:19:256:¶18.]

It could well be that *Vamos a Cuba*'s simple depiction of life in Cuba does not contain information that would lead to a child's better understanding of it. According to the testimony of several of the plaintiff's experts, however, it is better to err on the side of caution in a young children's book. Giving too much inappropriate information, like the information regarding government discussed above, "is cognitively more damaging to young children than [giving] too little." *ACLU*, 439 F. Supp. 2d at 1287. The School Board's expert, Dr. Usategui, disagreed, stating that the book teaches "something different from what the children learn in their homes or from peers in their neighborhoods," which "can lead to cognitive dissonance." [R:27:128:¶11.] Dr. Usategui argued in essence that the public school library shelves should not contain books which cast a pall on what is politically orthodox in the community. But the Supreme Court stated in *W. Va. Bd. of Educ. v. Barnette*, 319 U.S. 624, 642, 63 S. Ct. 1178, 1187 (1943): "If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion. . . ."

158

Furthermore, if included, the negative information about Cuba the School Board claimed was omitted could render the book developmentally inappropriate for children. The majority, in order to demonstrate the differences between Cuba and the United States, highlights negative information including "domestic violence, underage prostitution, sex tourism, [and] discrimination against persons of African descent." [Majority Opinion at 79 (quoting the Cuba Human Rights Report)]. According to Ms. Scales, however, an "important aspect of books written for young children is that they emphasize the positive." [R:19:256:¶20.] Negative subjects are inappropriate. Assuming it could even be understood by young children, negative information "has the danger of frightening children or inducing a sense of hopelessness that is both unnecessary and developmentally inappropriate." [R:19:256:¶20.]

The majority points out that two other books in the series include negative information, while *Vamos a Cuba* makes Cuba out to be "hunky dory." [Majority Opinion at 108.] First, the negative information to which the majority refers is minor. The Cambodia and India books briefly touch on the war in Cambodia and poverty in India in one sentence each, while leaving out volumes of negative information that their respective Human Rights Reports include. That left out information would likewise render the Cambodia and

159

India books developmentally inappropriate. Moreover, *Vamos a Cuba* does not depict Cuba as "hunky dory" by any means. The pictures depict Cuba as a poor country, with children missing articles of clothing (on page 10 a young boy is shirtless and on page 19 a boy is shirtless and shoeless), people engaged in manual labor, children also engaged in such labor, and outdated housing and cars. Some of the text verifies this—for example, at page 23, it reads: "Some children work in gardens. Older children may work in factories." Negative information is in fact included in *Vamos a Cuba*. More extreme negative information is left out, along with any negative political information.

The omitted information also falls outside the scope of a superficial geography book.[6] *Vamos a Cuba* is simply part of an apolitical geography

---

[6] The majority makes much of my calling *Vamos a Cuba* a "geography" book. [Majority Opinion at 72 n. 7.] The district court also found that *Vamos a Cuba* was a "geography" book. *ACLU*, 439 F. Supp. 2d at 1287 (calling *Vamos a Cuba* "part of a series of geography books written for 4-6 year old children"). This factual finding by the district court is reviewed under a clearly erroneous standard. This would seem to be another instance wherein the majority engages in *de novo* review of an historical fact when it should have given greater deference to the district court. Additionally, the School Board admits that *Vamos a Cuba* is "geography" book. *Id.* at 1294 (quoting Defendants' Response to Plaintiffs' Supplemental Memorandum on Certain Preliminary Injunction Elements at 9) (referring to the series as "geography books"). Last, according to Webster's New Twentieth Century Dictionary, "geography" includes the study of the "inhabitants . . . and industries of the" region. WEBSTER'S NEW TWENTIETH CENTURY DICTIONARY 765 (1976). The majority seems to have a narrower conception of the study of geography than the dictionary has. In order to show that *Vamos a Cuba* is not in fact a geography book, it states that geography books are not about "whether [people in a country] face hardships." [Majority Opinion at 72 n. 7.] I agree. This is precisely my point—the School Board removed the book from the shelves because it did not contain information that it was never meant to contain, as it was well beyond the scope of a simple geography book.

160

series. Its overall purpose is "to offer very basic information to young children about the way of life in another country." [R:19:267:¶15.] The very title of the book tells the reader that he "will be taken on a brief visit through the pages of the book." [R:19:256:¶21.] If a young child were traveling, he would likely be taken to only certain places and would see only limited things. He would be shown a windmill in Holland, not the "Red Light" district in Amsterdam. [R:19:256:¶21.] He would be shown the Eiffel Tower, not the seedy sections of Paris. [R:19:256-57:¶21.] *Vamos a Cuba* introduces information children would want as young readers, and not beyond. "[*Vamos a Cuba*], like all the other books in the series, is simply meant to give small children a sense of what it's like to be a child in another country. One page in [*Vamos a Cuba*] shows a shirtless and shoeless little boy leading a team of oxen to a farm field. Should the text say it's a state-owned collective? I don't think so, although a knowledgeable parent could tell his child that. Assuming a 6-year-old would care." Michael Putney, *Let's Close the Book on Attempts to Censor*, MIAMI HERALD, April 19, 2006, [Plaintiff's Exhibit 20.]

A mother and teacher noted at a School Board meeting: "introduc[ing] the truth to children [is best done] in increments." [April Transcript, 20:10-12.] A simple glimpse into life in Cuba stimulates the young child's interest so

161

he will seek more complex information when he is older.  [R:19:253-4:¶13.]

Moreover, a parent may provide more information to satisfy his child's

curiosities, just as the parent may show his child more than a windmill or the

Eiffel Tower.  *Vamos a Cuba* provides only a basic picture of Cuba and

contains a section at the end of the book called "More Books to Read."

[*Vamos a Cuba*: 32.]  That section refers a curious reader to additional sources,

including a more in-depth book with a recommendation that "an older reader

can help you with this book."  [*Vamos a Cuba*: 32.]  Consequently, the young

reader can build on the basic information he has just learned by seeking out

more information about Cuba.  "Not every book can be everything to every

child," [Scales Cross, 115:8-9], which *Vamos a Cuba* implicitly recognizes by

referring readers to further material.

The answer to books that do not provide all the information a reader

wants is to find another book.  If a reader is curious about the Castro regime,

he can find another book that enlightens him further.  Nothing in this book

hinders that process.  To the contrary, it provides a simple glimpse into Cuba

which will form the basis of a future, deeper understanding about the country.

[April Transcript, 25:10-13] ("a child may not be ready to understand all of the

horrors of the Castro regime, but this book can be used to start the discussion

162

about true life in Cuba"). Even Mr. Amador, the father who made the underlying challenge to the book conceded: "The best thing that's happened here is that this has given me further opportunity to talk with my child, my daughter, about the reasons why we are here, and even though they may not understand still what I've been through and what so many of Cubans have been through, I hope some day they will understand. . . ." [June Transcript, 7:7-13.] Despite his purpose, Mr. Amador illustrated the marketplace of ideas.

### b. The School Board's Proffered Inaccuracies

Many of the inaccuracies complained of are inconsequential, which casts doubt on whether those proffered motivations for the book's removal are worthy of credence. For example, one of the "inaccuracies" is that the book explained that Cuban music is played with maracas made of pumpkins. [*Vamos a Cuba*: 28.] Dr. Clark objected: "To say that maracas are made of pumpkins shows the utter ignorance of the writer on this matter. The maracas are made from the *guiro* fruit, dried and properly processed."[7] [R:19:217.] Yet, according to the Dictionary of the Royal Spanish Academy, the *guiro* fruit in fact *is* a pumpkin. It is a type of gourd, which are in the same family as pumpkins. While it may have been more precise for the book to say that

---

[7] Only the Spanish version of the book says that maracas are made of pumpkins. The English version correctly says that the maracas are made of gourds.

163

maracas are made from a *guiro* fruit or a gourd, it borders on frivolity to argue about whether a maraca is made from a pumpkin. [R:19:277:¶7.] Moreover, it is evident that explaining that a maraca is made from a *guiro* fruit will mean far less to an American four-year-old than explaining that it is made from a pumpkin, with which Halloween has rendered the four-year-old familiar. [R:19:277:¶7.]

The inaccuracy that Dr. Clark considers to be "probably the worst factual error in the book," [R:19:48], is at page 29: "In a Cuban valley, there are big colored paintings, on the rocks and caves. These were painted by Cuba's inhabitants about a thousand years ago." [*Vamos a Cuba*: 29.] The book includes a picture of a rock painting was done in the 1960s, not 1,000 years ago. [R:19:48] While some Cuban caves do indeed have prehistoric paintings, the one pictured in the book is not one of them. [R:19:278.] While this is misleading, it does not justify removing the book.

Another error listed by Dr. Clark is that Cuban houses are not made from palm trunks, as the book noted on page 11, but instead from the upper growth of the palm. [R:19:47.] This seems inconsequential, as a young reader will understand that the houses are made from the palm in any case.

164

In response to the School Board's complaints about generalizations in the book about traditional customs and dress, Ms. Scales stated, "all similar non-fiction books about other countries for young children contain generalizations about traditional dress and customs. For example, a book about Scotland for children of this age would almost invariably highlight men wearing kilts when the reality is that these garments are rarely worn and are very tourist-oriented." [R:19:256:¶19.] Such generalizations do not render a book inaccurate so much as they simplistically illustrate Cuba's culture.

The book's sentence which has perhaps generated the most controversy is it's first sentence: "People in Cuba eat, work, and go to school like you do." [*Vamos a Cuba*: 5.] It appears fairly evident that this short sentence is meant to show simply that other children in other cultures also do those things. [R:19:255:¶17.]

The record supports the book's evident purpose, which "is to paint a very elementary picture of Cuban life and culture in a way that fosters cross-cultural understanding among young children." [R:19:278:¶8.] Explaining cross-cultural commonalities is "appropriate for the level of understanding for children in this age group." [R:19:255:¶17.] The book conveys the message that although Cuba may seem very different, when it comes to the essentials,

165

all children are the same in that they also "eat, work, and go to school." It is important to note that *Vamos a Cuba* subsequently states, after the "like you do" comment, that "[l]ife in Cuba is also unique." [*Vamos a Cuba*: 5.] First the book stresses the common ground, then it goes onto explain the differences.

Without some common ground it is difficult for a child to learn about what would otherwise seem too foreign. It would be inappropriate for a book that teaches children elementary notions of Cuban culture and society to present it the way the objectors would like: a place where, as the majority says, life is "bad—really bad," [Majority Opinion at 95]. Instead, "[t]he emphasis [is] on things people share in common, not what divides and drives them apart." *ACLU*, 439 F. Supp. 2d at 1288.

## B.    A Dangerous Precedent

The majority concludes that the book is "inaccurate because of what it does not say," in that it leaves out the horrors of the Castro regime. [Majority Opinion at 72.] Opening the door to the majority's interpretation of "inaccuracy" would lead to a host of challenges. [June Transcript, 34:4-34:11 (School Board member Greer pointing out that if the School Board adopts this standard then "next week we will have another complaint about another book

166

from another group, and if this standard is applied, we will go through almost every book in our system with legitimate objections that people can raise about the omissions from their point of view of the content of those materials").]  For example, a reference book for children about cars and trucks would be "inaccurate" without information about how their emissions contribute to global warming.  Brief for American Booksellers Foundation for Free Expression et al. as Amici Curiae Supporting Appellees at 18, ACLU v. Miami-Dade County School Board, No. 06-14633 (11th Cir. Nov. 22, 2006). The sanctioned banning of a simple book like this would be logically supported by a finding that age-appropriate, politically neutral texts are rendered "inaccurate" by their omission of information that would express a particular political viewpoint.

I am also troubled by the majority's discussion about how the "book was not being *banned* . . . [but rather] *removed* from a school's library shelves." [Majority Opinion at 86.]  The majority argues that because the book was removed from a school's library shelves, but could still be found in other public libraries in the area and was available for purchase, the booked was not banned.  I disagree.

167

At the outset, I note that our argument here is largely semantical—what the majority calls "removal" I call banning. No matter what we call it, I would still find that the record supports that the School Board's removal/banning violated the First Amendment.

Nevertheless, the majority's definition of banning does not comport with the dictionary definition. According to Webster's New Twentieth Century Dictionary, "ban" means simply "to prohibit" or "to forbid." WEBSTER'S NEW TWENTIETH CENTURY DICTIONARY 144-45 (1976). According to Black's Law Dictionary, it means "to prohibit, especially by legal means." BLACK'S LAW DICTIONARY 139 (7th ed. 1999). This is precisely what the Miami-Dade School Board did when it passed a resolution to prohibit, by legal means, public school libraries from carrying *Vamos a Cuba*.[8] The School Board prohibited even the voluntary consideration of the book in schools. This book was not a part of the curriculum or required reading—it was a library book.

---

[8] The majority states that I "ignore[] the fact that the Board, and the Board alone, has the responsibility and authority under Florida law to decide what books are to be on the shelves of school libraries in its district," such that, under my understanding of the word, "when an entity decides to remove a book from its own library shelves it has banned itself from having that book." [Majority Opinion at 88-89]. The majority suggests that such an outcome is somehow absurd. I disagree. When a school board decides to remove a book from the school libraries within its district, it indeed has banned itself from having that book on its library shelves. If a school principal were to place *Vamos a Cuba* on the shelves of a Miami-Dade County school library, the School Board would order it removed. This amounts to what the majority deems so absurd: "bann[ing] itself from having that book."

168

The dictionary does not require, as the majority does, that one must be prohibited from having a book altogether for that book to be banned.[9]

Moreover, the majority's definition of the word does not comport with the common usage of the word. Indeed, it does not comport with our own Circuit's usage of the word. *See Virgil v. Sch. Bd. of Columbia County*, 862 F.2d 1517, 1525 (11th Cir. 1989) (suggesting that a book is "banned" if it is not available in a school library).[10] *See also Scott v. Sch. Bd. of Alachua County*, 324 F.3d 1246, 1247-49 (11th Cir. 2003) (per curiam) (calling school administrators' prohibition of the display of Confederate flags on school grounds "banning," even though the prohibition does not apply elsewhere); *Denno ex rel. Denno v. Sch. Bd of Volusia County*, 218 F.3d 1267, 1277-78 (11th Cir. 2000) (calling a prohibition of Confederate flags on school grounds,

---

[9] I am unconvinced by the majority's assertion that if removing a book from the library shelves in an act of banning, "deciding not to purchase a book [must also be] an act of banning it, [which] no rational person would suggest. . . ." [Majority Opinion at 88.] As previously discussed, the dictionary defines banning as prohibiting, especially by legal means. By not stocking a book on a library shelf in the first place, a school board has prohibited no one from subsequently placing that book on a shelf. On the other hand, the School Board's action here prohibits all the district's schools from placing *Vamos a Cuba* on their library shelves.

[10] The majority states that *Virgil* uses the word "ban" "only [when relying on] the opinion of a district court in Maine." [Majority Opinion at 90.] This is untrue. *Virgil* uses the word "ban" several times throughout the opinion, in various contexts, including to explain that the books at issue in the case were not "banned" from a school because they were available in the school library. *See Virgil*, 862 F.2d at 1525 (noting "that the disputed materials have not been banned from the school. The [disputed materials] are available in the school library."). While this may not be "the basis of the [*Virgil*] decision," it illustrates the court's consistent use of the word and its meaning.

169

and not elsewhere, a "ban").  Similarly, other courts define the word "ban" the way that I have.  *See, e.g., B.W.A. v. Farmington R-7 Sch. Dist.*, No. 07-3099, at *4, *8 (8th Cir. filed Jan. 30, 2009) (calling a school board's prohibition against depicting the Confederate flag on clothing in schools "banning"); *Barr v. Lafon*, 538 F.3d 554, 557-77 (6th Cir. 2008) (calling the prohibition against wearing clothing displaying the Confederate flag "banning," even though the students were not prohibited from wearing that clothing outside of school); *Sypniewski v. Warren Hills Reg'l Bd. of Educ.*, 307 F.3d 243, 248-63 (3d Cir. 2002) (calling the prohibition against wearing or possessing items depicting racial hatred a "ban," even though those items were not prohibited outside of the schools); *Monteiro v. Tempe Union High Sch. Dist.*, 158 F.3d 1022,1028 (9th Cir. 1998) (referring to the removal of books in schools as "banning"); *Pratt v. Ind. Sch. Dist. No. 831*, 670 F.2d 771, 773-80 (8th Cir. 1982) (referring to the "banning" of a film in schools based on their ideological content); *Cary v. Bd. of Educ.*, 598 F.2d 535, 536 (10th Cir. 1979) (calling books "banned" when they were removed from use in classes); *Sund v. City of Wichita Falls*, 121 F. Supp. 2d 530, 533 (N.D. Tex. 2000) (referring to the removal of books in libraries as "banning"); *Borger v. Bisciglia*, 888 F. Supp. 97, 98, 100 (E.D. Wis. 1995) (referring to a film removed from the curriculum as "banned");

170

*Sheck v. Baileyville Sch. Committee*, 530 F. Supp. 679, 681-83 (D. Maine 1982) (referring to a book as "banned" when it was removed from a school library). Morever, in other contexts, we use the word "ban" as I use it here. *See, e.g., Searcey v. Harris*, 888 F.2d 1314, 1318, 1322 (11th Cir. 1989) (calling a school board's regulation prohibiting certain groups from presenting at career day "banning," even though they were not prohibited from presenting elsewhere). For example, we say that smoking has been "banned" on airplanes and in restaurants, even though people are free to have cigarettes and smoke in other venues. *See, e.g.,* FLA. STAT. ANN. § 386.206 (2008) (referring to "the smoking ban" in workplaces when people are allowed to have cigarettes and smoke in other venues); *Roark & Hardee LP v. City of Austin*, 522 F.3d 533, 550 (5th Cir. 2008) (referring to "smoking bans" even though smoking is permitted in some areas). In sum, our usage of the word "ban" does not require that people be forbidden from having the object entirely, as the majority contends.[11]

---

[11] The majority rightly points out that the Supreme Court did not use the word "ban" to describe book removal in the *Pico* decision. [Majority Opinion at 91-93.] However, because I speak to the common usage of the word, both by the courts and in everyday use, the majority's point does not detract from the importance of the many other courts' use of the word and the way we all commonly use it. If we must look to the Supreme Court for guidance, we need not look any further than the *Tinker* decision. There, a school prohibited its students from wearing black armbands as a political protest. *Tinker*, 393 U.S. at 504, 89 S. Ct. at 735. The Court called the prohibition a "ban." *Id.* at 508, 509, 89 S. Ct at 737, 738. Even though the school did not prohibit the wearing of such armbands outside of the school, and indeed could not have done so,

171

Furthermore, under the majority's definition—"where a government or its officials forbid or prohibit others from *having* a book," [Majority Opinion at 87], a school board could never ban a book. It has the authority to remove books only within its school system. If it does this, according to the majority, it has not banned the book, as it could only be "banned" if people cannot have the book altogether. Can it be that a school board can never take any action that would constitute banning? Can it be that "[i]f a Democratic school board, motivated by party affiliation, ordered the removal of all books written by or in favor of Republicans, [or] if an all-white school board, motivated by racial animus, decided to remove all books authored by blacks or advocating racial equality and integration," *Pico*, 457 U.S. at 870-71, 102 S. Ct. at 2810, this would not constitute banning because the schoolchildren are not also forbidden from owning these books at all? Such a definition limits the word's application to almost nothing.

Furthermore, it does not somehow lessen the School Board's "important, delicate, and highly discretionary functions" if the book remains available in

the Court nonetheless referred to the action as a "ban." Thus, the Supreme Court's use of the word does not comport with the majority's conception of a "ban" as when a "government or its officials forbid[s] or prohibit[s] others from having an [object]" altogether. [Majority Opinion at 87.]

172

other venues. The majority suggests that a school board's removal action is less repugnant to the First Amendment when it discusses all the ways one can still get his hands on a copy of the book, including online vendors, like Amazon.com. However, the requirements of the First Amendment are "[not] minimized by the availability of the disputed book in sources outside the school." *Minarcini v. Strongsville City Sch. Dist.*, 541 F.2d 577, 582 (6th Cir. 1976). *See also Denver Area Educ. Telecoms. Consortium v. FCC*, 518 U.S. 727, 809, 116 S. Ct. 2374, 2418 (1996) (Kennedy, J., concurring in part and dissenting in part) ("[T]he possibility the Government could have imposed more draconian limitations on speech never has justified a lesser abridgment. . . . [F]ew of our First Amendment cases involve outright bans on speech."). "Restraint on protected speech generally cannot be justified by the fact that there may be other times, places or circumstances for such expression. The symbolic effect of removing the [book] . . . is more significant than the resulting limitation of access to the story." *Pratt v. Ind. Sch. Dist. No. 831*, 670 F.2d 771, 779 (8th Cir. 1982) (citations omitted). As in *Pratt*, the Miami-Dade County School Board "has used its official power to perform an act clearly indicating that the ideas contained in the [book] are unacceptable and should not be discussed or considered. This message is not lost on students and

173

teachers, and its chilling effect is obvious." *Id.* The majority's discussion of what constitutes "banning" chips away at the important limitations the First Amendment imposes on state-supported censorship of speech.

## CONCLUSION

For decades, residents of Communist Cuba have emigrated to the United States to escape the repressive totalitarian regime of its dictator, to seek freedom, and to enjoy the privileges of United States citizenship. Prominent among those privileges is the freedom of speech, protected by the First Amendment to the United States Constitution. The banning of children's books from a public school library under circumstances such as these offends the First Amendment. As one Cuban American lamented, "I fear we may have become what we protest against—a totalitarian government." Matthew I. Pinzur, *Book on Cuba To Stay, For Now*, MIAMI HERALD, April 19, 2006, [Plaintiff's Exhibit 20].

"Don't like the book? Don't check it out. That's a choice unavailable to people in Cuba." Michael Putney, *Let's Close the Book on Attempts to Censor*, MIAMI HERALD, April 19, 2006, [Plaintiff's Exhibit 20.]

I respectfully dissent.

174

(1) Cuba – "Cuba is a country in the Caribbean Sea, south of Florida. It is one big island with some smaller ones nearby. People in Cuba eat, work, and go to school like you do. Life in Cuba is also unique." (2) Land – "Cuba has flat plains that are used for farmland. There are also sandy beaches and coral reefs. The weather in Cuba is very warm. There are mountains in Cuba, too. The mountains are covered with forests." (3) Landmarks – "The capital of Cuba is Havana. The Capitol building in Havana looks like the United States Capitol building in Washington, D.C. Morro Castle is an old fort. It was built by people from Spain. It was used 400 years ago to protect Havana from pirates." (4) Homes – "Most Cubans live in cities. The cities are crowded, so many live in apartment buildings. There are some beautiful old buildings. There are new buildings, too. Most homes in the country are simple. Some are made of wood from palm trees. They have roofs of palm leaves or grasses." (5) Food – "White rice is the most common food in Cuba. Sometimes it is mixed with black beans. Chicken with rice is popular, too. Many kinds of fruits grow in Cuba. Bananas, pineapples, oranges, and mangoes are favorites. Yucca is a plant that people eat as a vegetable." (6) Clothes – "Cubans dress to keep cool in the hot weather. Many children wear

shorts and T-shirts.  For special festivals, men wear white pants and white shirts.  Women wear colorful ruffled dresses." (7) Work – "Some Cubans work in factories that make cigars or sugar.  There are also factories where people make cloth, shoes, paper, and farm tools.  In the country, there are large farms.  The workers there grow sugarcane and tobacco.  There are also farms for vegetables, such as lettuce, onions, and carrots." (8) Transportation – "There are not many cars in Cuba.  In the cities, some people drive old cars from the United States.  Most Cubans travel by bus.  On country roads, people use animals to pull wagons.  Animals are also used to help farmers in their fields." (9) Language – "Most people in Cuba speak Spanish.  This is because Cuba was settled by people from Spain.  Spanish uses some of the same letters as English.  There are also some extra letters in the Spanish alphabet." (10) School – "Cuban children go to school between the ages of five and fourteen.  They wear uniforms to school.  There are different colored uniforms for different ages.  In school, children learn math, reading, and history.  All school children do some kind of work during their school day.  Some children work in gardens.  Older children may work in factories." (11) Free Time – "Baseball is Cuba's national sport.  Cuba won the gold medal in baseball in the 1996 Olympic Games.  Cuba's beaches are good for swimming and boating.  People

176

like to dive and fish.  There are also rowboats and sailboat races.  (12)

Celebrations – "Cuba's biggest celebration is called Carnival.  It is held on July 26.  People dance and sing at this festival.  Some people who settled in Cuba were Roman Catholics.  Other people who lived in Cuba were from Africa.  So some Cuban celebrations mix African and Catholic beliefs."  (13)  The Arts – "Cuban music mixes sounds from Africa and Spain.  Musicians use guitars, drums, and gourds to make music and a beat.  Dances from Cuba are popular around the world.  In one valley in Cuba, there are large colorful paintings on some rocks.  Inside the rocks are caves.  The caves have paintings made by people who lived in Cuba about 1,000 years ago."